# EXHIBIT 1

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


JACQUELINE MEADOWS,

          Plaintiff,

       vs.                 Case No. 2:22-cv-11276

                             Hon. Terence G. Berg

                             Mag. Kimberly G. Altman

DELTA AIR LINES, INC., PETER

SABALLA, BASE DIRECTOR, and

CHRISTIAN GUNN, FIELD SERVICE

MANAGER, Jointly and Severally,

          Defendants.

_____


The Deposition of JACQUELINE MEADOWS,

Commencing at 10:07 a.m.,

Monday, May 22, 2023,

Before Jenifer Weisman, CSR-6006,

Taken remotely from Oakland County, Michigan.

Jacqueline Meadows
May 22, 2023

Page 2

```
 1   APPEARANCES
 2
 3   HERBERT A. SANDERS
 4   The Sanders Law Firm
 5   4031 Santa Clara Street
 6   Detroit, Michigan 48221
 7   313.962.0099
 8   herbert@sandersforjustice.com
 9       Appearing on behalf of the Plaintiff.
10
11   MAMI KATO
12   Ogletree, Deakins, Nash, Smoak & Stewart, PC
13   34977 Woodward Avenue
14   Suite 300
15   Birmingham, Michigan 48009
16   248.593.6400
17   mami.kato@ogletree.com
18       Appearing on behalf of the Defendants.
19
20   ALSO PRESENT:
21   Erin H. Harris - Delta Air Lines In-House Counsel
22   Peter Saballa-Davis
23   Christian Gunn
24
25
```

Page 4

```
 1   DEPOSITION EXHIBIT 13                      182
 2   DEPOSITION EXHIBIT 14                      191
 3   DEPOSITION EXHIBIT 15                      194
 4   DEPOSITION EXHIBIT 16                      197
 5   DEPOSITION EXHIBIT 17                      199
 6   DEPOSITION EXHIBIT 18                      220
 7   DEPOSITION EXHIBIT 19                      228
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                 TABLE OF CONTENTS
 2
 3   WITNESS:                               PAGE:
 4   JACQUELINE MEADOWS
 5
 6   EXAMINATION BY MS. KATO:                  5
 7   EXAMINATION BY MR. SANDERS:             275
 8   RE-EXAMINATION BY MS. KATO:             277
 9
10                   EXHIBITS
11
12   (Attached to the transcript.)
13
14   DEPOSITION EXHIBIT 1                      18
15   DEPOSITION EXHIBIT 2                      38
16   DEPOSITION EXHIBIT 3                      40
17   DEPOSITION EXHIBIT 4                      54
18   DEPOSITION EXHIBIT 5                      77
19   DEPOSITION EXHIBIT 6                      80
20   DEPOSITION EXHIBIT 7                      88
21   DEPOSITION EXHIBIT 8                      94
22   DEPOSITION EXHIBIT 9                     114
23   DEPOSITION EXHIBIT 10                    144
24   DEPOSITION EXHIBIT 11                    154
25   DEPOSITION EXHIBIT 12                    178
```

Page 5

```
 1   Monday, May 22, 2023
 2   10:07 a.m.
 3
 4                 JACQUELINE MEADOWS,
 5   was thereupon called as a witness herein, and after
 6   having first been duly sworn to testify to the truth,
 7   the whole truth and nothing but the truth, was
 8   examined and testified as follows:
 9                   EXAMINATION
10   BY MS. KATO:
11   Q.   Good morning, Ms. Meadows.
12   A.   Good morning.
13   Q.   My name is Mami Kato and I represent Delta Air Lines
14        in this lawsuit that you brought against Delta Air
15        Lines, as well as Peter Saballa-Davis and Christian
16        Gunn.
17             Have you ever had your deposition taken
18        before today?
19   A.   Yes.
20   Q.   When was that?
21   A.   Sometime around the '90s.
22   Q.   And what was the nature of that deposition?
23   A.   It was a civil lawsuit.
24   Q.   Do you recall what the nature of the claim was?
25   A.   It was for -- they said that I hit their car, damaged
```

Jacqueline Meadows
May 22, 2023

Page 6

1    their car.
2  Q.  So you were a defendant in that case?
3  A.  Uh-huh.
4  Q.  All right.  So it sounds like it's been a while --
5  A.  Yeah.
6  Q.  -- since your last deposition, so let me go through a
7       couple of the ground rules to make it easier for us
8       today.
9  A.  Okay.
10  Q.  So first thing is I'm going to ask you for a verbal
11       response.  The court reporter, Jenifer, is here taking
12       all my questions and your answers, and she can only
13       take one person at a time, and she cannot take down
14       physical response like uh-huh, uh-uh, so I'm going to
15       ask you for a yes or no.  If I ask you is that a yes,
16       I don't mean to be rude, I just want to make sure we
17       have a clean record.
18  A.  Okay, yes.
19  Q.  And again, the court reporter can only take one person
20       at a time, so I'm going to ask you to let me finish my
21       question before you give me an answer and I'll do the
22       same.
23  A.  Okay.
24  Q.  If you need a break at any time today, please tell me.
25       This is not supposed to be a marathon session or

Page 7

1    trying to see how long you last.  So at any time if
2    you need a break, you can let me know and we'll just
3    take one at a convenient time.  The only thing that I
4    do ask is that if I had asked you a question and
5    unless your attorney has instructed you not to answer,
6    you give me the answer to that question before we take
7    the break.
8  A.  Okay.
9  Q.  Your counsel may object to my questions from time to
10       time; he certainly has a right to do that.  If your
11       counsel speaks up, please give him the opportunity to
12       place an objection on the record.  But unless he tells
13       you not to answer the question, I'm still going to
14       need an answer to my question.
15  A.  Okay.
16  Q.  If at any time you don't understand my question,
17       please tell me.  I'm happy to rephrase it, repeat it,
18       whatever it is to make sure you understand them.  If
19       you give me an answer to my question, I am going to
20       assume that you understood my question and gave me
21       your best answer, is that fair?
22  A.  Yes.
23  Q.  All right.  Would you please state your legal name for
24       the record, please.
25  A.  Jacqueline Ann Meadows.

Page 8

1  Q.  Is that Ann with an E?
2  A.  A-N-N.
3  Q.  Ms. Meadows, what did you do to prepare for today's
4       deposition?
5            MR. SANDERS:  Objection, form.
6            You can answer.
7  A.  I got up this morning and came here ready.
8  BY MS. KATO:
9  Q.  Okay.  I don't want you to tell me what you spoke with
10       your attorney, but did you have a discussion with your
11       attorney at any point?  Again, I don't want you to
12       tell me what you discussed --
13  A.  Yes.
14  Q.  And when was that?
15  A.  This morning.
16  Q.  And how long did you meet with him?
17            MR. SANDERS:  Objection.  She's not going
18       to answer that question.  I didn't object before but
19       now I think you're delving into attorney/client
20       communication.
21  BY MS. KATO:
22  Q.  All right.  Did you review any documents in
23       preparation for today's deposition?
24  A.  Yes.
25  Q.  And what were the documents you reviewed?

Page 9

1            MR. SANDERS:  Unless I object, please
2       answer.
3  A.  The Complaint, the case that was filed.
4  BY MS. KATO:
5  Q.  Anything else?
6  A.  No.
7  Q.  All right.  Other than your attorney and without your
8       attorney present, did you discuss today's deposition
9       with anyone?
10  A.  Yes.
11  Q.  And who did you discuss it with?
12  A.  My father.
13  Q.  And when did you discuss this deposition with your
14       father?
15  A.  Yesterday.
16  Q.  And what did the two of you talk about?
17  A.  Just that I was having a deposition today.
18  Q.  Did you have any substantive discussion about what you
19       might testify to, anything along that line?
20  A.  No.
21  Q.  Just the fact that you were actually coming here
22       today?
23  A.  Yes.
24  Q.  Since you filed this lawsuit, have you spoken with
25       anyone about your claims against Delta Air Lines, Mr.

Jacqueline Meadows
May 22, 2023

Page 10

1    Saballa-Davis or Mr. Christian Gunn, outside the
2    presence of your attorney?
3  A.  Yes.
4  Q.  Who did you speak with?
5  A.  Close friends.
6  Q.  Who were they?
7  A.  Kimberly Morgan.
8  Q.  And is Ms. Morgan associated with Delta Air Lines?
9  A.  No.
10 Q.  And what is your relationship with Ms. Morgan?
11 A.  Friend.
12 Q.  And when did you speak with Ms. Morgan?
13 A.  The whole time.
14 Q.  Multiple times?
15 A.  Yes.
16 Q.  Can you give me the timeline, a timeframe, when you
17     were speaking with Ms. Morgan about this lawsuit?
18 A.  When I started, when I started the lawsuit.
19 Q.  How often do you speak with Ms. Morgan about this
20     lawsuit?
21 A.  Rephrase.
22 Q.  How often do you speak with -- when you speak with Ms.
23     Morgan, I assume this is not strictly about this
24     lawsuit, right, you speak to Ms. Morgan about other
25     things?

Page 11

1  A.  Yes.
2  Q.  Okay.  So how often does the subject of this lawsuit
3      come up?
4  A.  Frequent.
5  Q.  Can you give me a little bit more than just a
6      frequent; every week, every two weeks?
7  A.  Every week, yes.
8  Q.  When you speak with Ms. Morgan about this lawsuit,
9      what do you two talk about?  Do you talk about merits
10     of the case, what's going on, what's the substance of
11     this conversation?
12 A.  My disappointment, the way I was treated.
13 Q.  Okay.  Anything else?
14 A.  Mainly how I was treated, not fairly, the events that
15     occurred.
16 Q.  Other than Ms. Morgan, did you speak with anybody else
17     about this lawsuit outside the presence of your
18     attorney?
19 A.  No.
20 Q.  So is Ms. Morgan like your confidant?
21 A.  Yes.
22 Q.  When you speak with Ms. Morgan, what's the mode of
23     your communication; is it phone, e-mail, text message?
24 A.  Phone.
25 Q.  By phone, I assume you mean telephonic verbal

Page 12

1      discussion, right, not text messages through the phone
2      or instant messages?
3  A.  I would say both.  We communicate by text message and
4      talking on the phone.
5          MR. SANDERS:  I guess I'd ask for
6      clarification.  When you're asking her when she speaks
7      with Ms. Morgan, in general or about the matters
8      associated with Delta?
9          MS. KATO:  Fair enough.
10 BY MS. KATO:
11 Q.  I'm only interested in matters related to this
12     lawsuit.  Same answer still?
13 A.  Repeat the question.
14 Q.  Sure.  So when you speak -- when you communicate with
15     Ms. Morgan, what's the mode of communication?
16 A.  Telephone.
17 Q.  By telephone?
18 A.  Verbal, voice, yes.
19 Q.  Do you ever exchange text messages on the subject of
20     this lawsuit with Ms. Morgan?
21 A.  I may have.  I'm not for sure.
22 Q.  How about social media, any communication?
23 A.  No, ma'am.
24 Q.  How about instant messenger?
25 A.  No.

Page 13

1  Q.  Any e-mails?
2  A.  No.
3  Q.  So have we covered the universe of folks that you have
4      spoken to about this lawsuit outside of your attorney?
5      So we talked about your dad who knows about you coming
6      here today and Ms. Morgan with whom you frequently
7      communicate about the substance of this lawsuit;
8      anybody else you can think of?
9  A.  Uh-uh.
10 Q.  No?
11 A.  No.
12 Q.  Ms. Meadows, are you on any medication this morning?
13 A.  No.
14 Q.  Is there anything that would interfere with your
15     ability to give me your best answer today?
16 A.  No.
17 Q.  Ms. Meadows, based on Delta's records, I have your
18     date of birth as June 4, 1966, is that accurate?
19 A.  Yes.
20 Q.  What's your current address, ma'am?
21 A.  25751 Stonycroft Drive, Southfield, Michigan 48033.
22 Q.  How long have you been at this address?
23 A.  20 years, I'll say.
24 Q.  You own the place, I take it?
25 A.  No.

Jacqueline Meadows
May 22, 2023

Page 14

1  Q.  Is that a rental place?
2  A.  My parents.
3  Q.  Do you live with your parents?
4  A.  Yes.
5  Q.  And ma'am, what's your marital status?
6  A.  Single.
7  Q.  Do you have any children?
8  A.  No.
9  Q.  A few questions about your educational background.
10     Did you complete high school?
11 A.  Yes.
12 Q.  Where did you go and when did you graduate?
13 A.  Cooley High School, 1984.
14 Q.  And did you seek postsecondary education, as in did
15     you go to college?
16 A.  Yes.
17 Q.  Where did you go?
18 A.  Oakland Community College.
19 Q.  What was the area of study?
20 A.  Criminal justice.
21 Q.  Did you graduate?
22 A.  No.
23 Q.  How long were you at OCC?
24 A.  I was on and off for about six years.
25 Q.  Was it a part-time program or --

Page 15

1  A.  No.
2  Q.  -- were you attending classes --
3  A.  Yes, part-time.
4  Q.  What were you doing at the same time you were going to
5      OCC, were you employed elsewhere or doing something
6      else?
7  A.  Yes, a master barber.
8  Q.  Where were you a master barber?
9  A.  I started out at Big D's Barbershop on Livernois; I
10     worked at Madison Bleu Salon in Birmingham; and also
11     opened up my own barbershop, barber suite, in Lathrup
12     Village and Redford, Michigan.
13 Q.  Two different locations?
14 A.  Yes, ma'am.
15 Q.  Did you have any training to become a master barber?
16 A.  Yes, ma'am.
17 Q.  Where did you go for that training?
18 A.  Michigan Barber College.
19 Q.  And what was the timeframe when you received that
20     training?
21 A.  I would say around 2002.
22 Q.  So when you were going to OCC on and off for six
23     years, were you also a master barber at the same time
24     or was that a different timeframe?
25 A.  Oh, same time.

Page 16

1  Q.  Okay.  So when did you start at OCC?
2  A.  Like 1998, '97, yeah.
3  Q.  So you graduated in 1984, so tell me, what did you do
4      after graduation from high school?
5  A.  I was a dental assistant.  I did a lot.
6  Q.  How long did you work as a dental assistant?
7  A.  Until 1989.
8  Q.  And that's when you began with Northwest Airlines?
9  A.  Yes.
10 Q.  So from 1984 to 1989, for a five year period, you were
11     a dental assistant, is that right?
12 A.  Yes.
13 Q.  Did you have any other jobs that you were doing at the
14     same time?
15 A.  No, I can't recall.
16 Q.  So that was a full-time position?
17 A.  Yes.
18 Q.  Any other postsecondary education, training or
19     certifications, other than what we just talked about?
20 A.  Training, I did some mobile detailing training, which
21     was in 2021.  I also have my police training with the
22     Detroit Police Department, that was six years ago.
23 Q.  That was about 2017, thereabouts?
24 A.  Yes.
25 Q.  Did you, at any point, have a photography business as

Page 17

1      well?
2  A.  Yes, yes.
3  Q.  Tell me about that.
4  A.  It was really just, you know, people would hire me for
5      their events or family.  I took one class in Ann
6      Arbor.  I can't remember the school.  It was a
7      community college where I took one class there.
8  Q.  Washtenaw Community College?
9  A.  That's it.
10 Q.  When did you attend the class at Washtenaw Community
11     College for photography?
12 A.  I can't recall.  I would say within the last -- I
13     would say in the last six years, yeah.  I can't recall
14     the date though.
15 Q.  All right.  So I think we just talked about this, so
16     1989, you moved on from the dental assistant,
17     full-time position to Northwest Airlines, correct?
18 A.  Yes.
19 Q.  And I believe I have date of your hire as March 3rd,
20     1989, is that right?
21 A.  Yes.
22 Q.  So what was the position that you started out with --
23     let me back up.
24     What made want to you apply for a position
25     with Northwest Airlines?

Jacqueline Meadows
May 22, 2023

Page 18

1  A.  It was a major hub here in Detroit, I was looking for
2      a change in careers, flexibility was good, and I
3      wanted to be a part of the Northwest team.
4  Q.  Okay.  And did you apply for a position as a flight
5      attendant?
6  A.  Yes.
7  Q.  And did you receive training to be a flight attendant
8      when you first became employed by Northwest Airlines?
9  A.  Yes.
10  Q.  How long was the training?
11  A.  Six weeks.
12  Q.  I presume you became a Delta employee when Northwest
13      merged with Delta in 2008 or thereabouts?
14  A.  Yes.
15  Q.  I'm going to hand you what I'm going to mark as
16      Exhibit 1 to your deposition.
17               MARKED FOR IDENTIFICATION:
18               DEPOSITION EXHIBIT 1
19               10:26 a.m.
20  BY MS. KATO:
21  Q.  So Ms. Meadows, go ahead and take a look at what the
22      court reporter has handed to you as Exhibit Number 1
23      to your deposition and let me know if you recognize
24      that.
25  A.  Yes.

Page 19

1  Q.  So these are your answers to our interrogatories,
2      which is a whole bunch of written questions.
3  A.  Uh-huh.
4  Q.  Did you prepare these answers yourself?
5  A.  Yes.
6  Q.  Were they accurate to the best of your knowledge and
7      ability at the time they were prepared?
8  A.  Yes.
9  Q.  As you sit here today, are these answers still
10      accurate to the best of your ability and knowledge?
11          MR. SANDERS:  Take your time and read it
12      over before you answer.
13  A.  Yes.
14  BY MS. KATO:
15  Q.  Thank you.  Ms. Meadows, if you could turn to pages 5
16      and 6 of Exhibit 1, which is your answer to
17      interrogatory number 13.
18  A.  Page 5?
19  Q.  Yes.
20  A.  Yes.
21  Q.  So in interrogatory number 13, we asked you about
22      other jobs, positions you have held, other than Delta
23      Air Lines, and we just talked about a few of those
24      things.  And your answer was that you had a barber --
25      master barber at Barber Parlor from March 1st, 2014

Page 20

1      through March of 2021 in Lathrup Village and Redford,
2      which is what we just talked about, right?
3  A.  Yes.
4  Q.  Has that business ceased?
5  A.  Yes.
6  Q.  Was it because of the pandemic?
7  A.  Yes.
8  Q.  And the other answer you gave us was that you had been
9      a Detroit Police reserve officer since July 17, 2017
10      to the present.  And so July 17, 2017, is that the
11      date you applied or is that the day you were sort of,
12      for lack of better terms, like admitted into the
13      police department?
14  A.  That was the graduation date, yes.  We were sworn in
15      on that day.
16  Q.  So in 2017, you were a purser-qualified flight
17      attendant with Delta Air Lines, correct?
18  A.  Yes.
19  Q.  So what prompted you to join the reserve force with
20      the Detroit Police Department?
21  A.  I've always liked police work, helping people, working
22      with children; so the opportunity came my way and I
23      was invited to the program and I applied.
24  Q.  How were you invited to the program?
25  A.  Through one of the training officers.

Page 21

1  Q.  So what was the application process?  What did you
2      have to -- what did you to have to do to apply for the
3      program and get accepted into training?
4  A.  You had a -- you fill out the application and you had
5      an interview with four police officer coordinators and
6      you also had a psychological exam with their
7      psychiatrist.
8  Q.  Did you have to go to any physical fitness test of
9      sorts?
10  A.  No.
11  Q.  How long was the training?
12  A.  Six months.
13  Q.  So what did you do with your Delta Air Lines position
14      during that six months?
15  A.  I was working.
16  Q.  Were you bidding for less trips so you can fit in the
17      training or --
18  A.  Yes.
19  Q.  So since 2017, July 17, you were sworn in?
20  A.  Yes.
21  Q.  How often do you work in your capacity as a reserve
22      officer?
23  A.  It varies.  They like you to do 12 hours a month.
24  Q.  So the 12 hours a month appears to be a minimum
25      requirement?

Jacqueline Meadows
May 22, 2023

Page 22

```
1   A.   Yes.
2   Q.   And how do you compare to that minimum requirement?
3        Do you actually work 12 hours or more than 12 hours a
4        month?
5   A.   No.
6   Q.   So that 12 hours a month is about what you work as a
7        police officer?
8   A.   It changes.  You know, during the pandemic, they
9        didn't want us working.  So that's just a minimum.  If
10       you work, you work; if there's details, there's
11       details.
12  Q.   Okay.
13  A.   Uh-huh.
14  Q.   So as a reserve officer, what are your duties, like
15       what do you do?
16  A.   Okay, we -- this is very broad -- we back up the sworn
17       officers, we patrol, we do events with the seniors, we
18       do events with children.  Basically, when you're on
19       patrol, you back up the officers.  If a call is made,
20       we can assist them in any way that's needed.
21  Q.   So if there is a call that requires the regular police
22       officers, you might be backing them up on the scene
23       along with them, is that right?
24  A.   Yes.
25  Q.   So in 2019, do you recall what your work schedule with
```

Page 23

```
1        Detroit Police Department was like?
2   A.   I was active.
3   Q.   So in order to be active, is it my understanding you
4        have to work 12 hours a month in order to be an active
5        police officer?
6   A.   They don't enforce it.  It's not like if you don't get
7        your hours in, you don't work.  But if you get your
8        hours in, it's good; if not, it's not like oh, you're
9        out of the program.
10  Q.   Okay.  How did you -- what kind of hours were you
11       working in 2019?
12  A.   The very minimum.
13  Q.   Okay.
14  A.   Very minimum.
15  Q.   Now, you had shared the fact that you were a reserve
16       police officer with the Detroit Police Department with
17       other folks in Detroit-based Delta Air Line folks --
18       let me rephrase that.  That was a badly worded
19       question, I apologize.
20            So you have shared the fact that you were a
21       reserve officer with the Detroit Police Department
22       with your colleagues at Delta Air Lines --
23  A.   Yes.
24  Q.   -- correct?
25  A.   Yes.
```

Page 24

```
1   Q.   I understand from time to time you wear the Detroit
2        Police Department pin on your uniform?
3   A.   Yes.
4   Q.   And how does the fact that you are a reserve officer
5        with Detroit Police Department, which is admittedly
6        unique, come up in conversation with your colleagues
7        at Delta Air Lines?
8   A.   They ask me have I been in any shootings, have I --
9        what kind of events I do.  I'm very active on my
10       social media with it, so they always ask, you know,
11       how was the event or have I been in any crisis events.
12  Q.   So is it fair to say that the fact that you are a
13       police officer on the side as a reserve officer is a
14       well-known fact at the Detroit base with Delta Air
15       Lines?
16  A.   I would say yes.
17  Q.   I think you said you also promote your role as a
18       reserve officer on social media?
19  A.   Yes.
20  Q.   That's Facebook?
21  A.   Yes.
22  Q.   Twitter?
23  A.   No.
24  Q.   Instagram?
25  A.   Yes.
```

Page 25

```
1   Q.   Anything else?
2   A.   No.
3   Q.   TikTok?
4   A.   No.  Can't figure it out.
5   Q.   I can't either but people do, so I thought I'd ask.
6   A.   That's a tough one.
7   Q.   And how many friends do you have on social media that
8        also work with Delta Air Lines?
9             MR. SANDERS:  Objection -- go ahead.
10  BY MS. KATO:
11  Q.   I don't want your friends' names; is it like 3,000
12       friends or not?
13  A.   I mean, yeah.  I mean, I don't know all 3,000, but I
14       have close to 3,900 followings on Facebook.
15  Q.   I have 200.
16  A.   You have 200.
17  Q.   Is it fair to say with such a following, if you post
18       something about your role as a reserve officer, then
19       it is visible to all your friends who you work with at
20       Delta Air Lines, right?
21  A.   Yes.
22  Q.   Are you, from time to time, called General Jackie or
23       The General while you're working at the Detroit base
24       for the Delta Air Lines?
25  A.   Yes.
```

Jacqueline Meadows
May 22, 2023

Page 26

1  Q.  That's a nickname that you're familiar with?
2  A.  I did not come up with that.
3  Q.  Do you know who did?
4  A.  No.
5  Q.  So you're not sure who came up with the nickname --
6      let me back up.
7          Is it The General, General Jackie, both,
8      interchangeable, what is it?
9  A.  I would just say The General.
10 Q.  Okay.  So if someone yells out at the downstairs
11     hallway at Detroit base of Delta Air Lines, hey,
12     General, you know they're talking about you?
13 A.  Right.
14 Q.  Or you'd answer to them?
15 A.  Yes.
16 Q.  I take it you have no objection to that nickname?
17 A.  It's been around for years.
18 Q.  Did that nickname precede you becoming a police
19     officer then?
20 A.  I would say.
21 Q.  Okay.
22 A.  Yes.
23 Q.  Do you know how long that's been around?
24 A.  I would say five, six years.
25 Q.  So that was my question:  Did that come about because

Page 27

1      you became a reserve officer or was that before you
2      became a police officer?
3  A.  I would say before.
4  Q.  Okay.
5  A.  Yeah.  It just -- sometimes I hear it, sometimes I
6      don't, you know.
7  Q.  Okay.  Do you recall how you become aware of the fact
8      that you're now -- your nickname was The General?
9  A.  No.
10 Q.  So you knew at some point that if someone called you
11     The General that they're referring to you?
12 A.  Yes.
13 Q.  But you don't recall how that came about?
14 A.  I do not.
15 Q.  Do you encourage your crew members to call you The
16     General?
17 A.  No.
18 Q.  Do crew members call you The General while they're on
19     a trip?
20 A.  No.
21 Q.  You don't hear that while in the airplane?
22 A.  I don't like it.
23 Q.  Not while you're working?
24 A.  No.
25 Q.  But you have no problem if it's outside the customers'

Page 28

1      hearing, is that right?
2  A.  I don't like -- I never did like it.  I never did like
3      it.  I would ask them to stop.
4  Q.  Do people still call you The General or General Jackie
5      today?
6  A.  No.
7  Q.  Do you know when that stopped or do you recall when
8      you realized it stopped?  I realize that you probably
9      can't put a time to it, but about when you realized,
10     oh, I'm not being called that anymore?
11 A.  Three, four years ago, maybe.
12 Q.  Okay.  So that nickname lasted for about three years?
13     If it started about five or six years ago and it
14     stopped three to four years ago, I think we're talking
15     about a two, three year period?
16 A.  And with the pandemic and everything, flying slowed
17     down, yeah.
18 Q.  All right.  One thing I wanted to ask you:  So until
19     the incident giving rise to this lawsuit, you were a
20     purser-qualified flight attendant, correct?
21          MR. SANDERS:  I'm sorry, can you repeat
22     that?
23 BY MS. KATO:
24 Q.  So until the discipline giving rise to this lawsuit,
25     you were a purser-qualified flight attendant, correct?

Page 29

1  A.  Yes.
2  Q.  When did you become purser qualified?
3  A.  Roughly, about 14 years ago.
4  Q.  What made you want to become a purser?
5  A.  I was invited to the program by my manager at the
6      time, and she asked me -- I flew a lot of lead flight
7      attendant and there was one position available and she
8      asked me if I would be interested, and I told her yes.
9  Q.  14 years ago, that would have been with Northwest
10     Airlines, correct?
11 A.  Yes.
12 Q.  Were they called purser back then --
13 A.  Yes.
14 Q.  -- or were they something else?
15 A.  Yes.
16 Q.  Do you recall the name of the manager who invited you?
17 A.  Devon Quiggly.
18 Q.  I'm sorry?
19 A.  Devon Quiggly.
20 Q.  And were you -- have you been purser qualified
21     continuously since that 14 years ago to the time you
22     lost it in 2020?
23 A.  No, I got out of the program.  Yep, I got out of the
24     program and got back in the program.
25 Q.  When did you get out of the program?

Jacqueline Meadows
May 22, 2023

Page 30

1    A.   I can't remember.
2    Q.   Was it while you were with Northwest or with Delta Air
3         Lines?
4    A.   Delta, yes.
5    Q.   Do you recall the reasons why you got out of the
6         program?
7    A.   I wanted to concentrate more on my schooling.
8    Q.   And what was the schooling at that time?
9    A.   At that time, I was going back and forth to OCC, yeah.
10   Q.   Was it when you were pursuing concentration in
11        criminal justice?
12   A.   Yes.
13   Q.   So then what made you get back in the program?
14   A.   I was working with the VP of in-flight, Sandy Gordon,
15        met her, and we would do a lot of -- what would you
16        call it -- I bring a lot of ideas to her, how to
17        improve the brand, and so I asked her could I get back
18        in the program, under her suggestion (sic).
19   Q.   Did you have to go through the training again to get
20        back in the program or did Sandy Gordon kind of get
21        you back in without having to jump through hoops?
22   A.   Correct, I got right back in the program without the
23        training.
24   Q.   At that time, do you know, if anyone coming back into
25        the program was required to go through the training

Page 31

1         again?
2    A.   For other candidates?
3    Q.   Yes?
4    A.   I'm sure, yes.
5    Q.   How did you become familiar with Ms. Gordon?
6    A.   I was introduced to her by one of our flight
7         attendants union representative at that time.
8    Q.   Did you say union representative?
9    A.   Yes.
10   Q.   So that would be under Northwest Airlines then?
11   A.   Yes.
12   Q.   I was going to say.
13   A.   Yes.
14   Q.   So a union representative introduced you to Ms. Gordon
15        while you were still with Northwest Airlines?
16   A.   We had merged at that time, yeah, but we were still
17        under our contract at that time, uh-huh.
18   Q.   So this is about 2008, thereabouts?
19   A.   Yes.
20   Q.   Until the contract ran out, right?
21   A.   Yes.
22   Q.   And what has your relationship with Ms. Gordon been
23        like since?
24   A.   Since?
25   Q.   Since you became known to her.  I mean, you became

Page 32

1         acquainted with her.
2    A.   Oh, it was a business relationship.
3    Q.   Have you gone to her from time to time to sort of seek
4         support if you were being issued a discipline?
5    A.   Yes.
6    Q.   Tell me about that.  Let's start with when in the past
7         have you gone to Ms. Gordon for support with respect
8         to potential performance development; which is Delta
9         parlance for discipline, right?
10   A.   Yes.
11   Q.   So in Delta, discipline is called performance
12        development or PD, right?
13   A.   I guess.  I don't get in trouble, so...
14   Q.   All right.  So let's use the word discipline, is that
15        fair?
16   A.   Yes.
17   Q.   I just want to make sure you understand my question.
18             So with respect to you going to Ms. Gordon
19        for support for potential discipline, tell me how that
20        worked; tell me some examples where Ms. Gordon
21        supported with you with potential discipline concerns.
22   A.   With this incident.  I wasn't getting any answers, I
23        wasn't getting any support from the base, from my
24        leader, wasn't getting support from the upper
25        management, so I reached out to her to assist me.

Page 33

1    Q.   And did she provide some assistance or some support
2         for you?
3    A.   Not to speak with anyone, not to speak with another
4         manager, or anything like that.
5    Q.   Okay.  But what did she do for you?
6    A.   We had phone conversations regarding the incident.
7    Q.   And what did she tell you, if you recall?
8    A.   At that time, I didn't know what was going on.  I just
9         knew that there was possibly an investigation during
10        this event and I asked another manager what was with
11        the investigation and never could get an answer, and I
12        asked her to help me to resolve this matter, so...
13   Q.   When you say you asked another manager, who are you
14        referring to?
15   A.   Renee Mullen.
16             MR. SANDERS:  Can you say the last name
17        again, please?
18             THE WITNESS:  Mullen.
19   BY MS. KATO:
20   Q.   So was this when Renee Mullen was still your field
21        service manager?
22   A.   Yes.
23   Q.   So this is before you were switched over to Mr.
24        Christian Gunn as your FSM, right?
25   A.   Yes.

Jacqueline Meadows
May 22, 2023

Page 34

1  Q.  If I told you that you were switched over to Mr. Gunn
2      as your FSM on November 14 or thereabouts of 2019,
3      does that comport with your recollection?
4  A.  Yes.
5  Q.  So you spoke with Ms. Gordon before that date?
6  A.  Yes.
7  Q.  How was it that you felt Ms. Mullen was not giving you
8      support or you were not getting answers from Ms.
9      Mullen?
10 A.  I was not getting any answers.
11 Q.  What kind of questions were you asking Ms. Mullen?
12 A.  Why was I being investigated, why wasn't my harassment
13     with HR, I wanted to press charges against Lynette,
14     why wasn't that moving forward, why HR didn't call me,
15     why didn't anybody -- why didn't she ask me what
16     happened.
17 Q.  We'll get into that later.
18 A.  Okay.
19 Q.  Trust me, we will.
20 A.  Okay.
21 Q.  But other than Ms. Mullen, was there anybody else that
22     frustrated you that caused you to go to Ms. Gordon for
23     support?
24         MR. SANDERS:  Objection, form.
25         You can answer.

Page 35

1          And I believe lack of foundation.
2          You can answer; go ahead.
3  A.  Spoke with Peter.
4  BY MS. KATO:
5  Q.  But did you -- my question was:  Was there anybody
6      else with whom you were frustrated that caused you to
7      go to Ms. Gordon?  Let me rephrase that.
8          MR. SANDERS:  Same objection as to form and
9      foundation.  I can explain it, if you want but --
10         MS. KATO:  No.
11         MR. SANDERS:  -- I don't want to testify.
12         MS. KATO:  That's fine.
13 BY MS. KATO:
14 Q.  So let me go back.  You said you went to Ms. Gordon
15     because you were frustrated that you could not get
16     answers from Ms. Mullen, right?
17 A.  Yes.
18 Q.  Any other reasons or any other interaction with
19     managers that frustrated you that caused you to go to
20     Ms. Gordon?
21 A.  Yes, when I spoke with Peter.
22 Q.  When was that?
23 A.  It was around, I would say, November of 2019, perhaps.
24 Q.  When you say Peter, you're referring to Mr. Peter
25     Saballa-Davis?

Page 36

1  A.  Yes.
2  Q.  So you believe you spoke with Mr. Saballa-Davis in
3      November 2019, is that your testimony, ma'am?
4  A.  Yes, sometime.  I can't recall the first time we
5      spoke.
6  Q.  And why was it that your conversation with Mr.
7      Saballa-Davis caused you to go seek support from Ms.
8      Gordon?
9  A.  I asked Peter if we could -- he contacted me first
10     when my mother was in the hospital, so I asked him
11     when we could have a meeting to discuss the incident.
12     The meeting never happened.
13 Q.  Was this the conversation in which you were advised
14     that your FSM will be switched to Mr. Gunn because you
15     were frustrated with Ms. Mullen?
16 A.  Yes.
17 Q.  So Delta Air Lines took it on itself to sort of get
18     you an FSM that you would be more comfortable with,
19     right?
20 A.  Yes.
21         MR. SANDERS:  Objection, form.
22         You can answer.
23 A.  Yes.
24 BY MS. KATO:
25 Q.  Any other discipline with which you sought support

Page 37

1      from Ms. Gordon?
2  A.  No, I can't recall.
3  Q.  So as a long-time employee of Delta Air Lines, you're
4      familiar with the documents called The Way We Fly,
5      right?
6  A.  Yes.
7  Q.  And also the document called Rules of the Road?
8  A.  Yes.
9  Q.  Those are the employee manuals for Delta employees,
10     right?
11 A.  Right.
12 Q.  Are you familiar with sort of the basics of what those
13     documents provide?
14         MR. SANDERS:  Objection, form, foundation.
15         You can answer.
16 A.  Yes.
17 BY MS. KATO:
18 Q.  Would you agree with me that Rules of the Road
19     generally outlines Delta's core values of
20     professionalism, dignity and respect towards one
21     another?
22 A.  Yes.
23 Q.  That's your understanding, right?
24 A.  Yes.
25 Q.  I'm going to give you what's been marked -- what will

Jacqueline Meadows
May 22, 2023

Page 38

1    be marked Exhibit 2.
2              MARKED FOR IDENTIFICATION:
3              DEPOSITION EXHIBIT 2
4              10:52 a.m.
5    BY MS. KATO:
6    Q.   Ms. Meadows, I've handed you what's been marked
7         Exhibit 2 to your deposition, which is The Way We Fly,
8         which is a Delta manual.  Are you familiar with this
9         document?
10   A.   Yes.
11   Q.   If you could turn to page 6 for me, please, which is
12        also Bates label Delta 52.
13   A.   Okay.
14   Q.   And I'm going to call your attention to the bottom
15        half of that page under the heading Violence, Threats
16        of Violence & Weapons Are Not Tolerated.  Do you see
17        that?
18   A.   Yes.
19   Q.   The second sentence of the first paragraph reads:  We
20        do not tolerate violence or threats of violence
21        against one another, our customers, aircraft or other
22        people or property.  Did I read that right?
23   A.   Yes.
24   Q.   And is that consistent with your understanding of
25        Delta Air Lines' policy with respect to workplace

Page 39

1         violence?
2    A.   Yes.
3    Q.   You understood that Delta had a no tolerance policy
4         for violence in the workplace, right?
5    A.   Yes.
6    Q.   And a moment ago, we talked about you're a
7         purser-qualified flight attendant for quite some time.
8         You understood as a purser-qualified flight attendant
9         that Delta Air Lines trusted you to be the leader and
10        role model for other flight attendants, right?
11   A.   Yes.
12   Q.   And as a long-time employee of both Northwest Airlines
13        and Delta Air Lines and as someone who was in a
14        position of leadership, you had a clear understanding
15        that Delta Air Lines does not tolerate any threat of
16        violence against one another?
17   A.   Yes.
18   Q.   And this would include instances in which one flight
19        attendant might threaten violence against another
20        flight attendant, including verbal threats; you
21        understood that, right?
22   A.   Yes.
23   Q.   And this was your understanding in October 2019,
24        correct?
25   A.   Yes.

Page 40

1              MARKED FOR IDENTIFICATION:
2              DEPOSITION EXHIBIT 3
3              10:54 a.m.
4    BY MS. KATO:
5    Q.   Ms. Meadows, I've handed you what has been marked as
6         Exhibit 3 to your deposition, which is Delta Security
7         Manual, specifically, workplace security chapter.
8         Have you seen this document before?
9    A.   Yes.
10   Q.   So you're familiar with this content?
11   A.   Yes.
12   Q.   If I could call your attention to page 2.  Under the
13        heading Purpose, on the second paragraph, the first
14        line, it reads:  Delta Air Lines has a policy of zero
15        tolerance for acts or threats of workplace violence by
16        anyone.  You understood this to be the policy with
17        Delta Air Lines, correct?
18   A.   Yes.
19   Q.   And this statement is consistent with your
20        understanding of Delta's policy regarding workplace
21        violence, vis-a-vis, it's a zero tolerance policy,
22        right?
23   A.   Yes.
24   Q.   And the third sentence of the same paragraph reads:
25        All employees are expected to treat co-workers,

Page 41

1         managers, customers, and other contacts in the
2         workplace in an appropriate and professional manner.
3         Now, same question:  You understood this to be the
4         Delta Air Lines policy, correct?
5    A.   Yes.
6    Q.   So this statement is consistent with your
7         understanding of Delta's expectation of its employees,
8         including yourself?
9    A.   Yes.
10   Q.   And this is particularly true for someone in
11        leadership, like yourself, that you do need to treat
12        each other with respect, right?
13   A.   Yes.
14   Q.   If I could call your attention to the next paragraph,
15        which is the last paragraph under the heading Purpose.
16        It says:  If it is determined that an act or a threat
17        of workplace violence has been committed by an
18        employee, serious administrative action will be taken,
19        up to and including termination of employment.
20              And if I could call your attention to the
21        next page under the heading Violation of Policy.  Are
22        you there?
23   A.   Yes.
24   Q.   It gives some examples, but I want to call your
25        attention to the first and the fifth bullet line.  The

Jacqueline Meadows
May 22, 2023

Page 42

1  first one is threatening or intimidating comments or
2  gestures, even said in jest.  And the fifth one down
3  says actual or threat of physical contact, such as
4  hitting, pushing, shoving, kicking, touching or
5  assault.
6            Now, you understood these to be the types
7  of workplace violence that was absolutely not
8  tolerated at Delta Air Lines, correct?
9  A.  Yes.
10 Q.  In these examples on page 3 of the security manual
11     policy is consistent with your understanding of what
12     Delta Air Lines considered to be violation of this
13     workplace security policy, correct?
14 A.  Yes.
15 Q.  And you also understood that if any employee is found
16     to have committed, or even a threat of workplace
17     violence, that it would result in a serious employment
18     action, right?
19 A.  Yes.
20 Q.  You understood that it could result in termination?
21 A.  Yes.
22 Q.  Now, do you have any understanding with respect to the
23     level of discipline that would be imposed in the event
24     of workplace violence findings?  I'm happy to rephrase
25     that.

Page 43

1  A.  Yes, please.
2  Q.  So do you know what would happen to an employee if he
3      or she is found to have committed workplace violence?
4            MR. SANDERS:  Objection, form and
5      foundation.
6            You can answer.
7  A.  Yes.
8  BY MS. KATO:
9  Q.  What would happen to that person, based on your
10     understanding?
11 A.  They would be terminated.
12 Q.  If I could call your attention to page 6 of that same
13     document, Exhibit 3.  I'm going to call your attention
14     to a heading called Workplace Security Team in the
15     middle of the page.  Are you there?
16 A.  Yes.
17 Q.  This paragraph provides that the workplace security
18     team consists of representatives from corporate
19     security, the HR department, the legal department, the
20     equal opportunity office, and employees' management,
21     and that the function of this team is to review all
22     pertinent information and assist the operation in
23     devising the appropriate response.
24            Was this consistent with your understanding
25     as to how Delta Air Lines reviews workplace violence

Page 44

1  concerns?
2            MR. SANDERS:  Objection, form, foundation.
3            You can answer.
4  A.  Yes.
5  BY MS. KATO:
6  Q.  So you're familiar with workplace security team?
7  A.  I mean, I never seen this.  I mean --
8  Q.  Well, ma'am --
9            MR. SANDERS:  Either you're familiar with
10     them or you're not.  Just answer the question.
11 BY MS. KATO:
12 Q.  If you don't know, that's fine, ma'am, you can tell
13     me, this is not a trick question.
14 A.  Okay, yes.
15 Q.  So are you familiar with the workplace security team
16     and its operations or are you not?
17 A.  I would like to say there's a lot here, but a couple
18     of the offices I am familiar with, yes.
19 Q.  So let me rephrase -- let me break it down then.
20            Were you aware, or as you sit here today,
21     are you aware that the workplace -- concerning
22     workplace violence, is referred to a workplace
23     security team or more commonly known as workplace
24     violence committee?
25            MR. SANDERS:  Objection, form and

Page 45

1  foundation.  Before she read this?  You said as you
2  sit here today, are you aware, and the question is
3  before she read this here today?
4            MS. KATO:  Well, the witness answered she's
5  familiar with this document, so I'm following up on
6  that.
7            MR. SANDERS:  Okay.
8            MS. KATO:  Your objection is noted.
9  BY MS. KATO:
10 Q.  Ma'am, as you sit here today, are you familiar with --
11     let me rephrase that.
12            As you sit here today, are you aware that
13     Delta Air Lines refers concerns of workplace violence
14     to a workplace security team or what's more commonly
15     known as workplace violence committee?
16            MR. SANDERS:  Same objection.
17            You can answer.
18 A.  Before today, no; but today, yes.
19 BY MS. KATO:
20 Q.  Is that because you just read this document?
21 A.  Yes.
22 Q.  Now, your testimony, ma'am, is that you are familiar
23     with this document, so is it because you just haven't
24     read through it?
25 A.  I haven't read all the way through.

Jacqueline Meadows
May 22, 2023

Page 46

1  Q.  So you're familiar with parts of this document, not
2      just the security section we just covered?
3  A.  Yes.
4  Q.  Do you have any personal knowledge as to how the
5      workplace security team or workplace violence
6      committee operates?
7  A.  No.
8  Q.  Now, the second part of that paragraph, going back to
9      page 6, says the WST, or the workplace security team,
10     assesses violence or potentially violent situations
11     and advises as to the best course of action in
12     response to the threatening situation.
13         Do you have any personal knowledge or
14     understanding as to how the workplace security team or
15     the workplace violence committee assesses this
16     information?
17 A.  No.
18 Q.  And I think it's fair to say that you have probably no
19     personal knowledge or facts to say one way or the
20     other how Delta Air Lines actually reviews potential
21     cases involving workplace violence or concerns that
22     was brought to the workplace security team, correct?
23 A.  Correct.
24 Q.  Just a couple questions about your job as a purser.
25 A.  Okay.

Page 47

1  Q.  Do you recall how long you were off the purser
2      program?
3  A.  I can't recall how long.
4  Q.  Can you give me a guess at all; any idea?
5  A.  Maybe a year.
6  Q.  Not the entire six years you were going to OCC on and
7      off?
8  A.  No, no.
9  Q.  And I realize you were invited, but I take it there
10     was a reason you wanted to go back to being in the
11     purser program?
12 A.  Yes.
13 Q.  Why was that?
14 A.  I saw things a little different, I missed it, I like
15     working with our -- with the business people in Delta
16     One, great employee relations with the other flight
17     attendants, and I just saw some things wasn't being
18     run structurally like they should have been.
19 Q.  What are the examples of things you saw --
20 A.  Service-wise, nothing safety, just service-wise.
21 Q.  Can you give me an example?
22 A.  Cutting back on the service, rushing through service,
23     not having formal briefings, complete briefings with
24     your crew.
25 Q.  Are these the things you observed from other pursers

Page 48

1      that you thought you could do better?
2  A.  Yes.
3  Q.  Is it fair to say you thought you would get back in
4      the program and fix it yourself?
5  A.  Yes.
6  Q.  Now, as a purser, you were expected to serve as a
7      leader for the in-flight crew and oversee other flight
8      attendants to ensure that all passengers' safety,
9      comfort and security needs are met, right?
10 A.  Yes.
11 Q.  That's consistent with your understanding of what the
12     pursers are expected to do?
13 A.  Yes.
14 Q.  Pursers also serve as a liaison between pilot and the
15     flight attendants, correct?
16 A.  Yes.
17 Q.  So you're the go-between of your crew members and
18     pilot and people in the cockpit, right?
19 A.  Yes.
20 Q.  And as a purser-qualified flight attendant, you could
21     also serve as the flight attendant leader on a
22     domestic flight, right?
23 A.  Yes.
24 Q.  And would you agree with me that the flight leader is
25     responsible for crew coordination, communication

Page 49

1      between crew members, and other employee groups?
2  A.  Yes.
3  Q.  So again, you were entrusted to lead the group, right?
4  A.  Yes.
5  Q.  Lead by example?
6  A.  Yes.
7  Q.  And if there is a crew conflict, your job is to
8      de-escalate the situation, correct?
9  A.  Yes.
10 Q.  And those are consistent with your understanding of
11     Delta's expectation of you as a purser, right?
12 A.  Yes.
13 Q.  And so these expectations we just talked about,
14     serving as a leader, representing Delta values and
15     service values, right?
16 A.  Yes.
17 Q.  Those also apply to when you were functioning as a
18     flight leader on a domestic flight, correct?
19 A.  Yes.
20 Q.  Expectations are not any different if you're on an
21     international flight as Delta One or you're just doing
22     a domestic flight leader position, right?
23 A.  Yes, correct.
24 Q.  Now, as a somewhat long-time employee with seniority,
25     were you able to bid on purser positions that you

Jacqueline Meadows
May 22, 2023

Page 50

```
1       mostly wanted?
2   A.  Yes.
3   Q.  What was your favorite route?
4   A.  Amsterdam.
5   Q.  Why is that?
6   A.  Familiar with the city, friends there.
7   Q.  And I understand you cannot bid on a purser position
8       at the moment, but setting that aside, are you able to
9       bid on the trips you want because of your seniority
10      today?
11  A.  Yes.
12  Q.  Are you still flying international routes?
13  A.  No, ma'am.
14  Q.  Now, you can still bid on international flights,
15      correct?
16  A.  Yes.
17  Q.  Are you choosing not to?
18  A.  Yes.
19  Q.  Is it because of the pandemic?
20  A.  No.
21  Q.  Why is that?
22  A.  Closer to my dad.
23  Q.  Okay.  So is it -- and I don't mean to pry -- is it
24      because you need to stay close to home?
25  A.  Yeah.  Well, when I stopped, my mom was sick, so I
```

Page 51

```
1       didn't want to be away far.
2   Q.  I'm sorry to ask you this:  When did your mom pass?
3   A.  January '21, January 19, '21.
4           MR. SANDERS:  Let's take a break.
5           (Off the record at 11:10 a.m.)
6           (Back on the record at 11:26 a.m.)
7   BY MS. KATO:
8   Q.  Ms. Meadows, follow-up questions from where we left
9       off:  In order to serve as a flight leader on a
10      domestic flight, you'd bid on that position, correct?
11  A.  Yes.
12  Q.  So calling -- getting to the October 7, 2019 incident
13      on Delta Flight 2880, did you bid on that flight to be
14      a flight leader?
15  A.  Yes.
16  Q.  And was it a roundtrip from Detroit to Orlando and
17      back?
18  A.  Yes.
19  Q.  So there was no other trip in that rotation, is that
20      right?
21  A.  No, just a turn.
22  Q.  Is that what it's called, a turn?
23  A.  Yes, a turn.
24  Q.  And that crew member for that turn trip consisted of
25      Lynette Marshall, Taylor Ramone and Kristin Moore,
```

Page 52

```
1       right; do you recall that?
2   A.  Yes, yes.
3   Q.  Did you know any of these flight attendants before you
4       got on this trip?
5   A.  Oh, I knew Lynette.
6   Q.  How about Taylor?
7   A.  No.
8   Q.  And how about Kristin?
9   A.  No.
10  Q.  How did you know Lynette Marshall?
11  A.  Flying.  I flew with her for quite a few years.
12  Q.  Did you have any issue with Lynette Marshall in the
13      past?
14  A.  No.
15  Q.  What was your impression of Lynette before this trip?
16      If someone asked you to describe Lynette Marshall,
17      what would you say?
18  A.  I don't get asked that question.
19  Q.  So that's my question:  If you were asked that, what
20      would you say?
21  A.  If I got asked it today?
22  Q.  No, before today.
23  A.  I wouldn't have a comment.
24  Q.  Kind of nondescript?
25  A.  Yes.
```

Page 53

```
1   Q.  To be sure, you didn't have any issue with her in the
2       past prior to October 7, 2019, right?
3   A.  Oh, no.
4   Q.  And we talked about the fact that your role as a
5       reserve police officer for the Detroit Police
6       Department was a pretty well-known fact at Detroit
7       base, right?
8   A.  I would say yes.
9   Q.  So if, again, this is -- I'm not asking you to
10      speculate as to what Lynette knew, but if Lynette
11      Marshall told Delta's leaders that she was aware that
12      you were a police officer, is there any reason to
13      doubt that?
14  A.  No.
15  Q.  Would that surprise you?
16  A.  No.
17  Q.  Was there any issue on that first leg of that trip
18      from Detroit to Orlando?
19  A.  No.
20  Q.  Do you recall what time the flight arrived in Orlando?
21  A.  All I know, we left in the afternoon, so I can't
22      recall the time we landed, but it was an afternoon
23      flight.
24  Q.  It's a three hour, three and a half hour?
25  A.  Two and a half, yeah.
```

Jacqueline Meadows
May 22, 2023

Page 54

1  Q.  So fair to say maybe late afternoon when you landed in
2      Orlando?
3  A.  Yes.
4  Q.  And as a flight leader, you had specific duties upon
5      arrival and post-arrival, correct?
6  A.  Yes.
7  Q.  And those duties are spelled out in on-board manual,
8      is that right?
9  A.  Yes.
10 Q.  Let me back up.  Are you familiar with a document
11     called On-Board Manual for Flight Attendants?
12 A.  Yes.
13 Q.  All right.  And that's a document you can access on
14     your SKYPRO, right?
15 A.  Yes.
16          MARKED FOR IDENTIFICATION:
17          DEPOSITION EXHIBIT 4
18          11:31 a.m.
19 BY MS. KATO:
20 Q.  Ms. Meadows, I handed you what has been marked Exhibit
21     4 to your deposition, which is an excerpt from the
22     on-board manual.  Can you tell me if you are familiar
23     with this document?
24 A.  Yes.
25 Q.  If you could turn to the last two pages, which is

Page 55

1      5.1.13 and 5.1.14.
2  A.  Uh-huh.
3  Q.  Let me know when you're there.
4  A.  Yes.
5  Q.  Okay.  The top box on the 5.1.13 says you have to
6      maintain minimum crew upon arrival.  Do you see that?
7  A.  Yes.
8  Q.  What does that mean?
9  A.  You have to have the minimum crew of flight attendants
10     to stay on board the aircraft when deplaning.
11 Q.  And minimum crew is the -- what is mandated by Federal
12     Aviation Administration or FAA, as a minimum number of
13     crew member depending on type of aircraft, right?
14          MR. SANDERS:  Objection to form and
15     foundation.
16          You can answer.
17 A.  Yes.
18 BY MS. KATO:
19 Q.  And for this trip, was the minimum crew four crew
20     members?
21 A.  Minimum was five.
22 Q.  Five, okay.  Did you have five crew members on this
23     trip?
24 A.  Yes.
25 Q.  Who was the fifth crew member?

Page 56

1  A.  I think you left out Kayla.
2  Q.  Okay.  Kayla, what's the last name, do you know?
3  A.  I can't recall.
4  Q.  If I could bring your attention to the next box, it
5      says post-arrival.  The second bullet line is for the
6      purser/FL, and FL means flight leader, right?
7  A.  Yes.
8  Q.  So this would be duties that apply to you in this
9      particular instance because you were the flight
10     leader, right?
11 A.  Yes.
12 Q.  Ensure (deplaning) minimum crew remains on board until
13     released by minimum outboard crew or all passengers
14     have deplaned.  Is that consistent with your
15     understanding that you, as a flight leader, had to
16     ensure the minimum crew remained on board until all
17     passengers had deplaned?
18 A.  Yes.
19 Q.  So if you could turn to the next page.  On the top box
20     it says post-arrival.  Do you see that?
21 A.  Yes.
22 Q.  And the first box deals with requirements for all
23     flight attendants, and it says, after all passengers
24     have deplaned, ensure all doors are disarmed and check
25     all rows and lavatories for any remaining passengers.

Page 57

1      It says confirm with purser/FL.
2              So does this mean every flight attendant is
3      required to confirm with you as a flight leader that
4      everyone has deplaned?
5  A.  Yes.
6  Q.  And the second box goes on to say door safety FA.  So
7      does that mean there is one flight attendant who is
8      assigned to deal with door safety?
9  A.  Yes.
10 Q.  In this instance, in this flight, was Lynnette
11     Marshall that flight attendant?
12 A.  Yes.
13 Q.  And if I could call your attention to the third dash
14     on that second box, it says, verbally confirm cabin
15     safety check complete to purser/FL.  What does that
16     mean?
17 A.  That means after the aircraft -- everyone is deplaned,
18     then the cabin safety flight attendant would come up
19     and let the flight leader know that the cabin safety
20     check is complete.
21 Q.  What does it mean to have the cabin safety check
22     complete?
23 A.  All passengers have deplaned, the doors are disarmed,
24     there's no passengers in the bathroom, hiding under
25     blankets.

Jacqueline Meadows
May 22, 2023

Page 58

1   Q.   That happens?

2   A.   Yeah.

3   Q.   So this means, and correct me if I'm wrong, as a

4        flight leader you needed to wait until Lynnette

5        Marshall came up to you and told you the cabin safety

6        check complete, is that right?

7             MR. SANDERS:  Objection, form, foundation.

8        I don't understand what you mean by needed to wait.

9             MS. KATO:  Can she answer the question if

10       she understood it?

11            MR. SANDERS:  You can answer.

12   A.   Rephrase.

13   BY MS. KATO:

14   Q.   So door safety FA, I think the testimony is that

15       Lynnette Marshall, as a door safety flight attendant,

16       was required to verbally confirm cabin safety check

17       complete to you?

18   A.   Yes.

19   Q.   So does that mean that you needed to remain on board

20       until you received cabin safety check complete from

21       the flight attendant?

22   A.   I would say no, because I was assisting -- I would say

23       no.

24   Q.   Okay.  Is that a no in general or no in this incident

25       because you had wheelchair?  And we'll get to the

Page 59

1        wheelchair.

2   A.   Yeah, yeah, because of the wheelchair.

3   Q.   This was sort of -- let me back up.

4             As a general rule --

5   A.   Yes.

6   Q.   -- as a flight leader, is it your understanding that

7        you are expected to wait until you receive cabin

8        safety check complete before deplaning yourself?

9   A.   Yes.

10  Q.   All right.  In this instance, there was something else

11       that happened, right?

12  A.   Yes.

13  Q.   So let's talk about the wheelchair.

14  A.   Okay.

15  Q.   Which door were you by when you saw passenger who

16       needed wheelchair assistance?  Let me back up.

17            There was a reason you deplaned early on

18       this occasion, correct?

19  A.   Yes.

20  Q.   Tell me about that.

21  A.   To assist a lady with a wheelchair.

22  Q.   Was it a passenger waiting for a wheelchair or was

23       there an issue with a wheelchair; what was the issue?

24  A.   Yeah, she was waiting, she needed assistance with her

25       bags, yeah.

Page 60

1   Q.   And by which door was this passenger located?

2   A.   She was standing at door 2.

3   Q.   Door 2?

4   A.   Yes.

5   Q.   So would door 2 be in the middle of the plane?

6   A.   Yes.

7   Q.   So that would be between the first class or in this

8        case, business class?

9   A.   First class, yes.

10  Q.   And the main cabin?

11  A.   Yes.

12  Q.   At the time you were deplaning to assist the

13       passenger, were you aware if all the passengers had

14       deplaned?

15  A.   There was a couple left, not many, yeah, maybe two or

16       three.

17  Q.   Did you know Lynnette Marshall was assisting a family

18       of six with a missing stroller --

19  A.   No.

20  Q.   -- by door 2L?

21  A.   No.

22  Q.   So you just told me there was still a couple

23       passengers left on the plane --

24  A.   Yes.

25  Q.   -- at the time you deplaned with the wheelchair.  So

Page 61

1        technically, would that be a minimum crew violation?

2   A.   No.

3   Q.   Why not?

4   A.   If you go back here, it states that you can assist

5        with wheelchairs -- page 5.1.13, Delta policy is that

6        all flight attendants remain on board until --

7             MR. SANDERS:  Can you speak up?

8   A.   I'm sorry.  Delta policy is that all flight attendants

9        remain on board until all passengers deplane unless

10       they are performing one of the following duties:

11       assisting with accompanied minors, unaccompanied

12       minors, checking on status of wheelchair, or other

13       special assistance passenger's request, consulting

14       with the gate agent, making a scheduled connecting

15       flight assignment, this does not include commuting

16       flights.

17  Q.   So your interpretation is that in this occasion there

18       was no minimum crew violation because what you were

19       doing fits within one of those exceptions?

20  A.   Yes.

21  Q.   Okay.  Now, understanding that there was no minimum

22       crew violation because you were attending to a

23       passenger with a wheelchair need, your action in sort

24       of not waiting until Lynnette came to tell you cabin

25       safety check complete still was not in compliance with

Jacqueline Meadows
May 22, 2023

Page 62

1    the on-board manual requirements, right?
2    A.   Well, I assisted her, the wheelchair, yeah.  She never
3    told me when I returned back to the plane.
4    Q.   But I think your testimony is that technically you
5    were supposed to wait until, as a flight leader, not
6    as a flight attendant, but as a flight leader you were
7    supposed to wait until one of your crew members comes
8    to says cabin safety check complete.
9              MR. SANDERS:  Objection, form, foundation.
10   Before what?
11             MS. KATO:  Before you deplane.
12             MR. SANDERS:  Same objection, asked and
13   answered.
14             You can answer again.
15   A.   I only deplaned to assist the passenger with the
16   wheelchair.
17   BY MS. KATO:
18   Q.   I understand that, ma'am.  But my question was:
19   Because you, as a flight leader, did not wait until
20   you received a cabin safety check complete from
21   Lynnette Marshall, that portion of that was not in
22   compliance with on-board manual, correct?
23             MR. SANDERS:  Same objection, asked and
24   answered, argumentative, calls for a legal conclusion.
25             You can answer again.

Page 63

1    A.   We were still deplaning, there were still passengers
2    on the plane, so do I feel like -- no.
3    BY MS. KATO:
4    Q.   So you don't think there was non-compliance -- I'm not
5    saying violation -- non-compliance with the on-board
6    manual that, as you say, technically requires you as a
7    flight leader to wait until you get a cabin safety
8    check complete before you deplane yourself?
9              MS. KATO:  Same objection is noted,
10   Counsel.
11             MR. SANDERS:  Same objections, plus now
12   mischaracterization of the witness's prior testimony.
13   She --
14             Well, go ahead.  You can answer again.
15   A.   We were still deplaning, so Lynnette wouldn't have
16   came to me if we're still deplaning while I'm
17   assisting a passenger.
18   BY MS. KATO:
19   Q.   All right.  So if you're still assisting passengers
20   and Lynnette was not coming to you, then the cabin
21   safety was not completed, right?
22   A.   Right, because we're still deplaning.
23   Q.   Okay.  Now, is this one of those situations you're
24   expected to file an ASAP report, the Aviation Safety
25   Action Program report, because you deplaned before

Page 64

1    cabin safety check complete was relayed to you, but
2    you had reason to deplane ahead of time?
3    A.   Yes, I was asked to do that.
4    Q.   Did you ever file an ASAP report on this incident?
5    A.   Yes.
6    Q.   You did?
7    A.   I did, yes.
8    Q.   In any event, so you deplaned and you went up the
9    jetway with a passenger needing wheelchair assistance,
10   correct?
11   A.   The passenger was in the wheelchair, yes.
12   Q.   Did you go up the jet bridge with that passenger?
13   A.   No.
14   Q.   So tell me what happened.
15   A.   They took the passenger away, I went to the top of the
16   jet way to get the paperwork for the return flight.
17   Q.   Did you stop around to get some food for yourself?
18   A.   No.
19   Q.   And it's our understanding that you made a call to
20   your dad or you answered your call from your dad
21   sometime during this period, right?
22   A.   Yes.
23   Q.   And can you tell me when that happened in terms of
24   sequence?  So you step off the jet bridge to assist
25   the passenger with wheelchair, right?

Page 65

1    A.   Yes.
2    Q.   And what was the assistance you provided to that
3    wheelchair passenger?
4    A.   I just handed everything over to the wheelchair
5    person.
6    Q.   Okay.
7    A.   The bags, and then they -- the person got in the
8    wheelchair.
9    Q.   So the passenger with the wheelchair needed assistance
10   with his or her bags?
11   A.   Well, I took them.  They didn't ask, I just carried
12   them off on my own, yeah.
13   Q.   So you handed the passenger's bag and the passenger
14   all to the wheelchair person, right?
15   A.   Yes.
16   Q.   You went up the jet bridge?
17   A.   Yes.
18   Q.   Picked up the paperwork for return flight from the
19   gate agent, correct?
20   A.   Yes.
21   Q.   And so where did the call with your dad fall into this
22   sequence?
23   A.   He was calling when I was in the jet way, so when I
24   came back down I called him back.
25   Q.   And my understanding is it was mistaken call, what we

Jacqueline Meadows
May 22, 2023

Page 66

| | | |
|---|---|---|
| 1 | | call pocket dial? |
| 2 | A. | Yes. |
| 3 | Q. | How long did your conversation with your dad last? |
| 4 | A. | Not long. |
| 5 | Q. | I didn't mean to call you? |
| 6 | A. | Yep.  I was panicking, of course, but it was okay. |
| 7 | Q. | Okay.  And at this time your mom was in the hospital, |
| 8 | | right? |
| 9 | A. | Yes. |
| 10 | Q. | Was she in hospice care? |
| 11 | A. | No, she was in the hospital at that time, yeah. |
| 12 | Q. | Was it an ICU situation? |
| 13 | A. | Yes. |
| 14 | Q. | So you headed back to the aircraft? |
| 15 | A. | Uh-huh. |
| 16 | Q. | And before you get back on, you had a quick call with |
| 17 | | your dad just to clarify it was a pocket dial, right? |
| 18 | A. | Yes. |
| 19 | Q. | And then you encounter Lynnette Marshall, correct? |
| 20 | A. | Yes. |
| 21 | Q. | Lynnette told you that you should not have gotten off |
| 22 | | the aircraft while there was still passengers on |
| 23 | | board, did she not? |
| 24 | A. | Yes. |
| 25 | Q. | That's what she told you, right? |

Page 67

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | As she's saying this, was she seated at the exit row |
| 3 | | at door 2? |
| 4 | A. | Yeah, in that area, yes. |
| 5 | Q. | So she was seated though, right? |
| 6 | A. | Yes. |
| 7 | Q. | You were coming in, just coming back in? |
| 8 | A. | Yes. |
| 9 | Q. | And I think this is kind of a stupid question:  So |
| 10 | | naturally you're standing up, right? |
| 11 | A. | Yes. |
| 12 | Q. | How did you respond when Lynnette said you shouldn't |
| 13 | | have gotten off the aircraft because there was still |
| 14 | | passengers? |
| 15 | A. | I let her know I was assisting other passengers with |
| 16 | | the wheelchair and retrieved the paperwork. |
| 17 | Q. | Did you say something to the effect of you have no |
| 18 | | idea what I'm going through in my life right now, my |
| 19 | | mother is in ICU and in-flight is aware of it? |
| 20 | A. | No, I don't recall that. |
| 21 | Q. | You don't recall that or you know you didn't say that? |
| 22 | A. | I don't recall saying that. |
| 23 | Q. | You might have, you just don't remember? |
| 24 | A. | I might have, I just don't remember, yes. |
| 25 | Q. | Do you recall telling Lynnette that she needed to back |

Page 68

| | | |
|---|---|---|
| 1 | | up because she was in your face? |
| 2 | A. | Yes. |
| 3 | Q. | Now, at some point Lynnette Marshall stood up from her |
| 4 | | seat, correct? |
| 5 | A. | Yes. |
| 6 | Q. | By the way, just for the record, and I don't mean to |
| 7 | | be disrespectful to anyone, how tall are you and how |
| 8 | | much do you weigh? |
| 9 | A. | I'm 5'6". |
| 10 | | MS. HARRIS:  At the time. |
| 11 | A. | At the time, I would say 152, yeah. |
| 12 | BY MS. KATO: |
| 13 | Q. | And about the same today? |
| 14 | A. | No, a little bit more today. |
| 15 | Q. | And I know you don't know -- you're not Lynnette |
| 16 | | Marshall, so you don't know how much she is, but can |
| 17 | | you give me some idea how tall she is and how much she |
| 18 | | weighs? |
| 19 | A. | I would say she's about -- a little taller, about |
| 20 | | 5'7", maybe about 160. |
| 21 | Q. | And again, this is back on October 7, 2019, right? |
| 22 | A. | Yes. |
| 23 | Q. | I know you don't know this, but Lynnette Marshall's |
| 24 | | report to Delta's safety reporting system, or SRS, is |
| 25 | | that you said, when she stood up, quote, come any |

Page 69

| | | |
|---|---|---|
| 1 | | closer to me and I will take you down.  Now, is it |
| 2 | | your testimony today, ma'am, that you did not respond |
| 3 | | to Lynnette Marshall in this manner? |
| 4 | A. | Correct, I did not. |
| 5 | Q. | Did you use the phrase, I will take you down, or words |
| 6 | | to that effect in responding to Lynnette Marshall |
| 7 | | standing up and getting in your face? |
| 8 | A. | No. |
| 9 | Q. | Can you tell me how you responded to Lynnette Marshall |
| 10 | | sort of getting in your face? |
| 11 | A. | I walked away. |
| 12 | Q. | You didn't say anything? |
| 13 | A. | Nope.  I asked her to back away from me and she |
| 14 | | refused, she came towards me, that's when I walked |
| 15 | | away. |
| 16 | Q. | Did you argue or raise voices? |
| 17 | A. | I was asking her to back away. |
| 18 | | MR. SANDERS:  I guess I object to the |
| 19 | | compound nature of the question. |
| 20 | | MS. KATO:  Understood. |
| 21 | | MR. SANDERS:  Go ahead, you can answer. |
| 22 | A. | I walked away. |
| 23 | BY MS. KATO: |
| 24 | Q. | Did you raise your voice in responding to Lynnette |
| 25 | | Marshall that she needed to walk away? |

Jacqueline Meadows
May 22, 2023

Page 70

1   A.   I just said get away from me.
2   Q.   So my question is:  Did you raise your voice in
3        staying that to Lynette Marshall?
4   A.   It could have been raised, yeah.
5   Q.   And was Lynette Marshall's voice raised, to the best
6        of your perception?
7   A.   Yes.
8   Q.   What was she saying to you other than you shouldn't
9        have gotten off the aircraft?
10  A.   She just kept repeating that, yelling at me, you
11       shouldn't have got off the plane, I needed you, why
12       did you get off the plane; she just kept repeating
13       herself.
14  Q.   Now, we just went through this that she was the door
15       safety flight attendant, right?
16  A.   Yes.
17  Q.   And as a door safety flight attendant, it was her duty
18       to come tell you cabin safety check complete, right?
19  A.   Yes.
20  Q.   And I think your testimony is that because you
21       deplaned, you weren't there to receive that
22       information?
23  A.   Correct.  But we were -- I was assisting passengers.
24  Q.   Understood.
25  A.   Yes, yes.

Page 71

1   Q.   So when Lynette says I needed you, do you know what
2        she meant?
3   A.   No.  I was like, what did you need, and then she was
4        like, I needed you, I needed you; that's all she said.
5   Q.   And she also said why did you get off the plane?
6   A.   Yes.
7   Q.   So she was essentially telling you that you deplaned
8        before other flight attendants, is that right?
9             MR. SANDERS:  Objection, form, foundation.
10            Go ahead, you can answer.
11  A.   Yes.
12  BY MS. KATO:
13  Q.   That was your understanding, she was objecting to the
14       fact that you deplaned before the rest of the flight
15       attendants?
16  A.   Yes.
17  Q.   Taylor Ramone, is it your recollection that she was
18       somewhere near this incident?
19  A.   Yes.
20  Q.   I believe at some point you indicated that she might
21       have been witness?
22  A.   Yes.
23  Q.   If Taylor Ramone's statement indicated that she heard
24       a lot of back and forth between you and Lynette and
25       the two of you tried to talk over each other as you

Page 72

1        headed to the cockpit, would you agree with her
2        assessment of how the two of you conducted each other?
3   A.   I don't know, she was coming out of the bathroom and I
4        was heading to the cockpit, and Lynette was still
5        yelling at me and I was like get away from me, get
6        away from me, so I could have been, yeah.
7   Q.   So you headed up to the cockpit and Lynette Marshall
8        followed, right?
9   A.   Yes.
10  Q.   Now, as far as you know, Captain Patrick Cooney was
11       the pilot on the return trip to Detroit, correct?
12  A.   Yes.
13  Q.   And did you see Captain Cooney board the aircraft
14       before you came back?
15  A.   Yes -- no, wait a minute.
16  Q.   Let's back up.  Did you know Captain Cooney before
17       this trip?
18  A.   Yes.
19  Q.   How did you know him?
20  A.   I flew with him many times.
21  Q.   Did you ever have any issue with working with Captain
22       Cooney?
23  A.   No.
24  Q.   The two of you got along well, right?
25  A.   Yes.

Page 73

1   Q.   Did you know Captain Cooney would be piloting the
2        flight back to Detroit?
3   A.   Yes.
4   Q.   And so when did you first see Captain Cooney on
5        October 7, 2019?
6   A.   Wow.  He walked -- gosh.
7   Q.   Let me look at it this way:  Before you headed up to
8        the cockpit or the flight deck with Lynette Marshall
9        following you, had you already seen Captain Cooney
10       that day?
11  A.   Yes.
12  Q.   Okay.
13  A.   He was getting his paperwork at the gate agent, yes.
14       So yes.  I had to think.
15  Q.   I know it's been three years, I understand.
16            So you did see Captain Cooney sort of head
17       down the jet way as you were picking up paperwork, is
18       that right?
19  A.   Yes.
20  Q.   But as you were having this initial encounter with
21       Lynette Marshall, with her saying I needed you, why
22       did you get off the plane, and you telling her she
23       needed to back away or get away from me, he was not
24       present during that initial encounter, correct?
25  A.   No.

Jacqueline Meadows
May 22, 2023

Page 74

1   Q.   And we will go over Captain Cooney's statement in a
2        while.  Essentially, Captain Cooney sided with you in
3        your argument with -- let me back up.
4             You went toward the cockpit why?
5   A.   I was afraid of Lynnette; fear of my safety.
6   Q.   What did you do once you got into the flight deck with
7        Captain Cooney?
8   A.   I sat in the jump seat and I asked him to stop her
9        from yelling at me, yes.
10  Q.   And he essentially told her to back off and get to the
11       back of the aircraft, right?
12  A.   Yes.
13  Q.   So what did you think Lynnette Marshall would do to
14       you?  Based on your testimony, two of you are about
15       the same size, right?
16  A.   Uh-huh.
17  Q.   Correct?
18  A.   Correct.
19  Q.   And you have law enforcement training --
20  A.   Uh-huh.
21  Q.   -- correct?
22  A.   Correct.
23  Q.   So what exactly was it that you feared Lynette might
24       do?
25             MR. SANDERS:  Objection, form and

Page 75

1        foundation.
2             You can answer.
3   A.   Attack me.
4   BY MS. KATO:
5   Q.   How?
6   A.   With her hands.
7   Q.   I mean, did you think she would come after you --
8   A.   Yes.
9   Q.   -- with her hands?
10  A.   Yes.
11  Q.   To grab something?
12  A.   Grab me.
13  Q.   Did you feel with your police training you couldn't
14       defend yourself?
15  A.   I'm not in police mode when I'm at Delta Air Lines.
16  Q.   So it's been -- by this time, you have had training to
17       be a police officer and work as a reserve officer for
18       over two years, correct?
19  A.   Yes.
20  Q.   And is it your testimony, and if it's not, you can
21       tell me, that certain instincts that you gained as a
22       police officer wouldn't kick in in situations like
23       this?
24             MR. SANDERS:  Objection, form, foundation.
25             Go ahead, you can answer.

Page 76

1   A.   If I was being attacked, yes.
2   BY MS. KATO:
3   Q.   That you would expect your certain training to kick
4        in?
5   A.   If I was being attacked, yes.
6   Q.   And did you feel that you couldn't defend yourself if
7        Lynnette Marshall, who is about the same size as you
8        and who doesn't have police training, came after you?
9             MR. SANDERS:  Objection, form and
10  foundation as to what Lynnette Marshall has.  We don't
11  know.  I don't know what is in the record about that.
12             You can answer.
13             MS. KATO:  The witness's testimony is she
14  thought she would come grab her, so I'm asking if she
15  felt she could defend herself.
16             MR. SANDERS:  Well, we don't know what kind
17  of training Lynnette Marshall has, and there has never
18  been a foundation laid for that.
19             With that objection noted, you can answer.
20  A.   What was your question?
21             MS. KATO:  Jenifer, could you read it back?
22             (The following portion of the record was
23             read by the reporter at 11:58 a.m.:
24             Q. And did you feel that you couldn't
25             defend yourself if Lynette Marshall, who is

Page 77

1             about the same size as you and who doesn't
2             have police training, came after you?)
3   A.   No.
4   BY MS. KATO:
5   Q.   You couldn't defend yourself?
6   A.   No.
7   Q.   I'm going to hand you what has been marked as Exhibit
8        5.
9             MARKED FOR IDENTIFICATION:
10            DEPOSITION EXHIBIT 5
11            11:59 a.m.
12  BY MS. KATO:
13  Q.   All right.  Ms. Meadows, I think your earlier
14       testimony is that you reviewed the Complaint in
15       preparation for today's deposition.  Is this the same
16       document you're referring to?
17  A.   Yes.
18  Q.   This is your amended Complaint, right?
19  A.   Yes.
20  Q.   Did you reviewed this Complaint before it was filed
21       with the Court?
22             MR. SANDERS:  Objection, attorney/client
23  privilege.
24             Without waiving the privilege to the extent
25  you recall, you can answer that question.

Jacqueline Meadows
May 22, 2023

Page 78

1   A.   Are you asking me did I see this?
2   BY MS. KATO:
3   Q.   Yes.
4   A.   Yes.
5   Q.   Now, understanding that it may have been drafted by
6        your attorney, but did you have specific facts to
7        support each allegation contained in this document?
8             MR. SANDERS:  Objection, form, foundation,
9        really borderline on attorney/client privilege.
10            But without waiving, you can answer.
11  A.   Yes.
12  BY MS. KATO:
13  Q.   If I may call your attention to paragraph 14 on page
14       3.
15  A.   Uh-huh.
16  Q.   You see that?
17  A.   Yes.
18  Q.   The allegation is that Marshall, that means Lynette
19       Marshall, right, arose from her seat and immediately
20       got into Ms. Meadows' personal space.  This is
21       consistent with what we just talked about, right;
22       Lynette Marshall was seated when you came back to the
23       aircraft, right?
24  A.   Yes.
25  Q.   Okay.  If you could turn -- call your attention to

Page 79

1        paragraph 20 on the next page, it says, Flight Captain
2        Patrick B. Cooney was present and witnessed the
3        occurrence.  See Exhibit 3.  And Exhibit 3 being
4        Captain Cooney's statement, which we will go over
5        later today.
6             Now, we just covered that Captain Cooney
7        was not present during your initial encounter with
8        Lynette Marshall, correct?
9   A.   Correct.
10  Q.   So this paragraph is referring to your subsequent
11       encounter with Lynette Marshall in Captain Cooney's
12       presence inside the flight deck, correct?
13  A.   Yes.
14  Q.   So to be clear, Captain Cooney has no knowledge as to
15       your initial encounter with Lynette Marshall when you
16       first came back to the aircraft and Lynnette was
17       seated by door 2, right?
18            MR. SANDERS:  Objection, calls for
19       speculation as to what Captain Cooney has knowledge
20       of, unless he has spoken to her and she can recite
21       what he said.
22            But with that objection noted, you're free
23       to answer.
24  A.   Question again.
25  BY MS. KATO:

Page 80

1   Q.   Sure.
2   A.   I'm sorry.
3   Q.   So Captain Cooney, to the best of your knowledge --
4        let me rephrase it with your counsel's objection.
5             Do you have any reason to believe that
6        Captain Cooney would have any knowledge as to what
7        transpired between you and Lynette Marshall when you
8        first came back to the aircraft?
9   A.   No.
10  Q.   Okay.  Let's get to Captain Cooney's statement.
11            MARKED FOR IDENTIFICATION:
12            DEPOSITION EXHIBIT 6
13            12:03 p.m.
14  BY MS. KATO:
15  Q.   Ms. Meadows, I've handed you what has been marked as
16       Exhibit 6 to your deposition, which is Captain
17       Cooney's statement dated January 15, 2020.  This is
18       also an exhibit to your Complaint.  Do you recognize
19       this document?
20  A.   Yes.
21  Q.   If I could call your attention to about just under
22       halfway through the paragraph -- this letter, it says,
23       Jackie assured me she would be okay and remained in
24       aft cabin during the flight to DTW.  I never knew the
25       circumstances that precipitated this event.  Do you

Page 81

1        see that statement?
2   A.   Yes.
3   Q.   So again, paragraph 20 of your Complaint, Exhibit 5,
4        we just went through, to be clear, that's not
5        referring to your initial altercation with Lynette
6        Marshall, but rather to the subsequent encounter in
7        the flight deck with Captain Cooney, correct?
8             MR. SANDERS:  Objection, form, foundation.
9        Captain Cooney's letter speaks for itself.  And she
10       didn't draft the Complaint, I did.
11            But with that noted, you can answer the
12       question to the extent you're able.
13  A.   I'm sorry, rephrase.
14  BY MS. KATO:
15  Q.   It's okay.  So again, I think we got this answer, but
16       Captain Cooney's statement -- let me rephrase.
17            The statement says, I never knew the
18       circumstances that precipitated this event.  Do you
19       have any reason to doubt that he did not know what
20       precipitated this event?
21  A.   I don't know what he thought.
22  Q.   All right.  If we can go back to Exhibit 5, paragraph
23       27.  The allegation is Ms. Meadows requested that a
24       manager meet the flight in Detroit so that she can
25       press harassment charges against flight attendant

Jacqueline Meadows
May 22, 2023

Page 82

1    Marshall.  Do you see that?
2  A.  Yes.
3  Q.  And is that what happened?
4  A.  Yes.
5  Q.  If I could call your attention back to Exhibit 6,
6    Captain Cooney's letter, two sentences before the one
7    I just read about I never knew the circumstances that
8    precipitated this event, it's after this flight
9    attendant left the flight deck, just about halfway
10    down.  Do you see that?
11  A.  Yes.
12  Q.  So after this flight attendant left the flight deck, I
13    discussed the situation with Jackie and whether this
14    flight attendant should be pulled off from the flight.
15    My concern being she may be too upset to properly do
16    her duties.  Jackie assured me she would be okay and
17    would remain in the aft cabin during the flight to
18    DTW.
19       So let me ask you this:  Did you give the
20    assurance to Captain Cooney?
21  A.  Yes, and I was not in the aft of the aircraft though.
22  Q.  I think this is referring to Lynnette being in the
23    aft --
24  A.  Okay, okay, yes, then, yes.
25  Q.  So you weren't looking to get Lynnette off the flight

Page 83

1    back to Detroit, right?
2  A.  No.
3  Q.  You were fine with both of you working the flight back
4    to Detroit since you would be working the front and
5    she would be working the back?
6  A.  Yes, and for her to stay in the back, unless there was
7    a medical or safety issue.
8  Q.  All right.  So you did not request intervention from
9    leader at Orlando but rather you were fine waiting
10    until you got back to Detroit to file a harassment
11    charge against Lynette Marshall, correct?
12  A.  Yes.
13  Q.  All right.  If you could go back to the Complaint,
14    paragraph 28, the allegation is that Ms. Meadows sent
15    text messages to her managers, Renee Mullen and Steven
16    Jones, to make them aware that she had been verbally
17    assaulted by flight attendant Marshall.  Do you see
18    that?
19  A.  Yes.
20  Q.  We asked for this text message and the response is
21    that you do not have any.  Was it actually a text
22    message or some different mode of communication?
23  A.  Text message and I made a phone call.
24  Q.  But you don't have that text message anymore?
25  A.  I have to look and see.

Page 84

1  Q.  Okay.  Because we asked for it in discovery and I
2    believe your response was you do not have them.
3  A.  Yes, probably don't then.
4  Q.  Did you change your phone between 2019 and this year?
5  A.  Yes.
6  Q.  Did your text message get lost in the process or were
7    you able to retain all of your text messages?
8  A.  I didn't check.
9  Q.  You didn't check whether you had text messages --
10  A.  I mean, some came and some didn't.  Some text messages
11    came and some didn't come across.
12  Q.  Okay.  Did you look for this text message that you're
13    referring to?
14  A.  I don't recall.
15  Q.  When you say you changed phone, what does it mean; you
16    changed carrier?
17  A.  Yes.
18  Q.  What did you change from?
19  A.  AT&T to T-Mobile.
20  Q.  Did the physical phone stay the same?
21  A.  No.
22  Q.  What did you change from?
23  A.  I can't remember the model.
24  Q.  What do you have now?
25  A.  I have 13 Max now.

Page 85

1  Q.  What kind of phone is it?
2  A.  iPhone.
3  Q.  Did you change from iPhone to iPhone?
4  A.  Yes.
5  Q.  So from iPhone to iPhone, you just changed from AT&T
6    to T-Mobile?
7  A.  Yes.
8  Q.  Did you back up anything to the iCloud?
9  A.  That's not something that I consistently look at.
10    It's not something -- I mean, they say everything goes
11    to iCloud, but I don't look at it, like I don't go to
12    iCloud and look for it.
13  Q.  So your testimony is, and if I'm incorrect, let me
14    know, but after, you switched the phone and carrier at
15    the same time?  Let me back up.
16       So when you went from AT&T to T-Mobile, did
17    you retain the same phone?
18  A.  I can't remember.
19  Q.  Okay.
20  A.  I can't remember.
21  Q.  So when you went from AT&T to T-Mobile, is it your
22    testimony that some text messages carried over but
23    others didn't?
24  A.  Correct.
25  Q.  So are you certain that your communication to Ms.

Jacqueline Meadows
May 22, 2023

Page 86

1  Meadows (sic) and Mr. Jones was on text messages and
2  not a telephone call on October 7 of 2019?
3  A.  It was both.
4  Q.  You're sure about that?
5  A.  Yes.
6  Q.  So did you connect with FSM -- so Renee Mullen was
7     your field service manager at this time, right?
8  A.  Yes.
9  Q.  Did you connect with Ms. Mullen?
10 A.  Not on that day.
11 Q.  You didn't speak with her at all?
12 A.  The next day.
13 Q.  Did you connect with Mr. Jones?
14 A.  Yes.
15 Q.  And Steven Jones at the time was a field service
16    manager, right?
17 A.  Yes.
18 Q.  He wasn't your FSM though, right?
19 A.  No.
20 Q.  Why did you reach out to him?
21 A.  I'm sorry?
22 Q.  Why did you reach out to him?
23 A.  He was a field service manager.
24 Q.  But he just wasn't yours?
25 A.  No, he was not, no.

Page 87

1  Q.  Any reason you chose Mr. Jones as someone you wanted
2     to contact?
3  A.  We had a relationship, a professional relationship,
4     yes.
5  Q.  You were familiar with FSM Jones?
6  A.  Yes.
7  Q.  And were you able to reach Mr. Jones?
8  A.  Yes.
9  Q.  What did he tell you?
10 A.  He told me that he would request to have a manager
11    meet the flight when we arrived in Detroit.
12 Q.  Did he tell you that base was already aware of this
13    incident?
14 A.  He may have, yes.
15 Q.  So he told you that there will be managers meeting the
16    flight upon arrival?
17 A.  Yes.
18 Q.  When you connected with Ms. Mullen the next day, did
19    you call her or did she call you?
20 A.  I think she called me.
21 Q.  So Ms. Mullen followed up with you, right?
22 A.  Yes.
23 Q.  Did she ask you to submit a statement of what happened
24    from your point of view?
25 A.  Yes.

Page 88

1  Q.  Did you ever send her a statement?
2  A.  I sent a statement to Courtney Ebert and to Ms.
3     Mullen.
4  Q.  Before you headed back to Detroit, did you come to
5     understand that while you were fine with waiting until
6     you got back to Detroit to deal with Ms. Marshall, Ms.
7     Marshall notified the operations and customer center,
8     or the OCC, of the incident and asked for manager at
9     Orlando?
10          MR. SANDERS:  Objection, form, foundation.
11          You can answer.
12 A.  Yes.
13 BY MS. KATO:
14 Q.  And so to be sure, it was not your request that a
15    manager from Orlando come meet the flight, right?
16 A.  Correct.
17 Q.  It was Ms. -- to the best of your understanding, it
18    was Ms. Marshall's request?
19 A.  Yes.
20          MARKED FOR IDENTIFICATION:
21          DEPOSITION EXHIBIT 7
22          12:16 p.m.
23 BY MS. KATO:
24 Q.  Ms. Meadows, I handed what has been marked as Exhibit
25    7 to your deposition, and understanding that you have

Page 89

1  not seen this document, you're not copied on it, so
2  that's not what I'm going to ask you about.  Actually
3  let me ask you this:  Have you seen this document --
4  A.  No.
5  Q.  -- as of today?
6  A.  No.
7  Q.  All right.  This is, for the record, a company's
8     record of Joshua Monette, M-O-N-E-T-T-E, who was an
9     OCC desk manager who received an OCC page from Lynette
10    Marshall.
11          First question:  Do you know who Joshua
12    Monette is?
13 A.  No.
14 Q.  Have you ever met him?
15 A.  No.
16 Q.  Have you ever heard his name?
17 A.  No.
18 Q.  Do you know anything about him?
19 A.  No.
20 Q.  Okay, fair enough.  So I just want to go through this
21    representation and see if that jives with your
22    recollection of what happened.  It's not necessary --
23    this is not something you said, okay?
24 A.  Okay.
25          MR. SANDERS:  I'd ask before you do that

Jacqueline Meadows
May 22, 2023

Page 90

1    that she be allowed to read it.
2         MS. KATO: Oh, absolutely, sure.
3    A.   Okay, I'm finished.
4    BY MS. KATO:
5    Q.   Is this the first time you've seen this statement,
6         ma'am?
7    A.   Yes.
8    Q.   All right.  On the fourth line halfway through, Mr.
9         Monette reports that FA Marshall was unable to locate
10        FL Meadows.  I take it FL means flight leader, right?
11   A.   Yes.
12   Q.   So that's a true statement, right?
13        MR. SANDERS: Objection, form, foundation.
14        It assumes facts not in evidence as to what Marshall
15        was doing and I don't know that she can answer that if
16        she was off the plane.
17   BY MS. KATO:
18   Q.   Well, when you came back to the aircraft, Lynette was
19        saying I needed you, she was saying she couldn't find
20        you when she needed you, correct?
21   A.   Right.
22   Q.   Now, next skip two lines, it says, FA Marshall
23        reminded her, as in Ms. Meadows, that minimum staffing
24        should remain on board the aircraft until all
25        customers are deplaned.

Page 91

1         Is that consistent with your recollection
2         of what Lynnette was complaining about?
3         MR. SANDERS: Objection, form.
4         You can answer.
5    A.   No.
6    BY MS. KATO:
7    Q.   It's not?
8    A.   No.
9    Q.   So you don't recall Lynnette complaining about your
10        violation of minimum crew?
11   A.   No.
12        MR. SANDERS: Objection, form and
13        foundation.  I don't believe it's been established in
14        the record that there was a violation of minimum crew.
15        In fact, I believe it was a mischaracterization of the
16        witness's prior testimony.
17        You can answer.
18   A.   No.
19        MS. KATO: To be clear, Counsel, I'm not
20        suggesting there was a minimum crew violation.  There
21        was a belief there was one but I think we can
22        establish there wasn't one.
23   BY MS. KATO:
24   Q.   Now, she also told Mr. Monette -- at least he conveys
25        that you told Ms. Marshall that IFS, in-flight

Page 92

1    service, has authorized her, Ms. Meadows, to get off
2    the aircraft as she needs to because she has a parent
3    in ICU.
4         Now, I realize -- I think we established
5    the fact that you have a parent in ICU portion is
6    correct, right?
7    A.   Yes.
8    Q.   Did you -- do you recall telling her that you had been
9         authorized to get off the aircraft because of your
10        mom's situation?
11   A.   No.
12   Q.   You don't recall that or you didn't tell her that?
13   A.   I didn't tell her that.
14   Q.   And Mr. Monette also goes on to report that Lynette
15        Marshall said that FL Meadows stated, if you get any
16        closer to me, I will take you down.  Do you see that?
17   A.   Your question?
18   Q.   So did you make that statement --
19   A.   No.
20   Q.   -- if you get any closer to me, I will take you down?
21   A.   No.
22   Q.   Now, if you go down to the second paragraph, third
23        line from the bottom, it says, per the captain, FA
24        Marshall confronted flight leader Meadows in an
25        unprofessional manner.  Do you agree with that

Page 93

1    assessment?
2    A.   Yes.
3    Q.   He also goes on to say both flight attendants agreed
4         to work together.  Is that a true statement?
5    A.   Yes.
6    Q.   How did the two of you agree to work together or did
7         you like talk to each other and say, yeah, we can work
8         this out, or how did this understanding come about?
9    A.   The captain asked me, she was not with me when the
10        captain and I discussed it.
11   Q.   So this goes back to Captain Cooney's letter that you
12        told him that you would be fine because she will be in
13        the aft and --
14        MR. SANDERS: I guess I'd object to the
15        form and the foundation as to whether or not the
16        summary in Exhibit 7 is pursuant to a conversation
17        with Captain Cooney.  We don't know how that
18        information got in Exhibit 7.
19        MS. KATO: Well, that's what I'm trying to
20        understand.
21   BY MS. KATO:
22   Q.   So back to my question:  Is that captain asked you if
23        the two of you can work together, right?
24   A.   Yes.
25   Q.   And your response was what?

Jacqueline Meadows
May 22, 2023

Page 94

1  A.  Yes, as long as she stays in the aft of the aircraft
2      and we wouldn't have any contact unless it was safety
3      or medical related.
4  Q.  Okay.  Now, understanding that you probably don't
5      agree with some of the statements that's in Mr.
6      Monette's statement, and I know you don't know him at
7      all, right?
8  A.  Correct.
9  Q.  Do you have any reason to suggest that Mr. Monette
10     would not be accurate and truthful in articulating
11     Lynette Marshall's complaint to OCC?
12            MR. SANDERS:  Objection, form and
13     foundation.
14            MS. KATO:  I'm asking if there is any
15     foundation to that.  I'm asking if she has any reason
16     to believe that he might not be truthful.
17  A.  I don't know this guy.  I don't know.
18  BY MS. KATO:
19  Q.  So you know nothing about this gentleman, right?
20  A.  No.
21  Q.  All right.  Let me hand you the next exhibit.
22            MARKED FOR IDENTIFICATION:
23            DEPOSITION EXHIBIT 8
24            12:25 p.m.
25  BY MS. KATO:

Page 95

1  Q.  Ms. Meadows, I handed you what has been marked Exhibit
2      8.  Go ahead and take your time to read that and let
3      me know when you're done.
4  A.  Okay.  I'm done.
5  Q.  All right.  On October 7, 2019, while in Orlando, you
6      were met with Field Service Manager Neil Mohammed,
7      correct?
8  A.  Yes.
9  Q.  Did you know Mr. Mohammed?
10  A.  No.
11  Q.  Have you ever had any prior dealings with Mr. Mohammed
12     in any way, shape or form?
13  A.  No.
14  Q.  What was your understanding as to why he was speaking
15     with you?
16  A.  My understanding was he wanted to know what happened
17     on the flight since Lynnette had called the OCC.
18  Q.  So you were aware Lynnette Marshall had called OCC?
19  A.  Yes.
20  Q.  How did you come to that understanding?  How did you
21     find out that Lynnette had called OCC?
22  A.  When the captain asked her to leave the cockpit, she
23     was yelling I'm going to call the OCC.
24  Q.  Okay.
25  A.  Yes.

Page 96

1  Q.  I realize you were not copied on this communication,
2      but is this the first time you've seen this statement?
3  A.  Yes.
4  Q.  If I could call your attention to the second paragraph
5      that starts with Jacqueline said.
6  A.  Uh-huh.
7  Q.  Are you there?
8  A.  Yes.
9  Q.  So Neil Mohammed represents that Jacqueline said that
10     she stepped off the aircraft to call her home as she
11     has a parent in hospice care and wanted to ensure all
12     was okay.  Do agree with that statement?
13  A.  No.
14  Q.  Tell me what part you don't agree with.
15  A.  My mom was not in hospice care.
16  Q.  She was in the hospital, right?
17  A.  Yes.
18  Q.  How about the first part that you acknowledge that you
19     stepped off the aircraft to call home?
20            MR. SANDERS:  Objection to the form of the
21     question.
22            You can answer.
23  A.  I didn't step off the aircraft to call home, no.
24  BY MS. KATO:
25  Q.  Okay.  If you could keep going on the second sentence,

Page 97

1      second line of second paragraph, it says, she did
2      acknowledge that there was still passengers in the
3      aircraft when she stepped off to make the call and did
4      apologize for doing so.  I advised her to submit an
5      ASAP as she did violate the crew limitation of having
6      minimum crew on board.
7            Do you recall having that conversation with
8      Neil Mohammed?
9  A.  No.
10  Q.  Going down to the next line, next sentence, Jacqueline
11     said when she got on the aircraft she was approached
12     by FA Lynnette who was working in the back in a very
13     negative and hostile manner and in her space, that she
14     felt threatened by Lynette's attitude.  Let's stop
15     there.
16  A.  Okay.
17  Q.  Do you agree with that statement?
18  A.  Yes.
19  Q.  And do you recall that's what you told Mr. Mohammed?
20  A.  Yes.
21  Q.  So that's consistent with your recollection of your
22     conversation with Neil Mohammed, is that right?
23  A.  Yeah, I wouldn't say -- yeah, yeah, yes.
24  Q.  He goes on to say that you did tell Lynnette to get
25     out of her face or she will take her down.  Do you see

Page 98

1  that?

2  A.  Yes.

3  Q.  And he goes on to say that you explained to him that

4      your training as a police officer kicked in and you

5      didn't mean you were going to hurt anyone, you just

6      wanted Lynnette to get out of your face.  Do you see

7      that?

8  A.  I don't see where it says training.

9  Q.  I'm sorry, it says, since she was a cop prior to

10     coming to Delta, so she was reacting to her training

11     she had but didn't mean she was going to hurt anyone.

12     She just said it so Lynnette would get out of her

13     face.  Do you see that?

14 A.  Yes, I see that.

15 Q.  All right.  So is it your testimony, ma'am, that none

16     of this happened?

17 A.  No.

18 Q.  You didn't tell Neil Mohammed that, yeah, I told

19     Lynnette that I would take her down?

20 A.  No.

21 Q.  You didn't tell Neil Mohammed that your training

22     kicked in?

23 A.  No.

24 Q.  And you did not tell Neil Mohammed that you didn't

25     mean to hurt anyone, you just wanted Lynnette to get

Page 99

1      out of your face?

2  A.  No.

3  Q.  If I could call your attention to the next paragraph,

4      towards the end, last two lines.

5  A.  Uh-huh.

6  Q.  He's talking about Captain Cooney's representation and

7      Neil Mohammed says, Captain did say that Lynnette was

8      very unprofessional to him even when he tried to

9      resolve the matter before getting managers involved.

10         Based on your point of view, do you agree

11     with that assessment?

12 A.  Yes.

13 Q.  I think you already told me this, you don't know Neil

14     Mohammed, right?

15 A.  No.

16 Q.  Never had any dealings with him?

17 A.  No.  Prior to this incident?

18 Q.  Correct.

19 A.  Right; no, I didn't.

20 Q.  Did he say anything to you that would indicate that he

21     knew you were a police officer?

22 A.  No.

23 Q.  Is it true that you spoke to Mr. Mohammed before he

24     spoke with Lynette Marshall, if you know?

25 A.  I don't know.

Page 100

1  Q.  Okay.

2  A.  I don't know if he spoke to her first or me.

3  Q.  At any point, did Mr. Mohammed say, Lynnette said

4      this, what about that; anything along that line in

5      your discussion with Neil Mohammed that you recall?

6  A.  No, I don't recall.

7  Q.  Setting aside the fact that your testimony is I never

8      said I'll take you down, let's set that aside for a

9      moment, I just want to talk about some policy aspects

10     with your understanding as a purser.

11         So again, setting aside the dispute in this

12     case, as a long-time purser-qualified flight attendant

13     trusted with representing Delta's values, right, and

14     setting examples, you'd agree with me that any flight

15     attendant, let alone a flight leader, saying to

16     another flight attendant, I will take you down, is a

17     big problem?

18         MR. SANDERS:  Objection to form and

19     foundation, and the context.

20         But you can answer.

21 A.  I would say if someone said that to someone, yes.

22 BY MS. KATO:

23 Q.  And that's a bigger problem if it's coming from a

24     purser-qualified flight attendant, right?

25         MR. SANDERS:  Objection, form and

Page 101

1  foundation.  Bigger problem pursuant to what?

2         MS. KATO:  Witness can answer.  I mean, if

3      she doesn't understand --

4         MR. SANDERS:  You can answer.

5  BY MS. KATO:

6  Q.  I mean, as a purser, you're a leader, right?

7  A.  Right.

8  Q.  You're supposed to lead by example, right?

9  A.  Yes.

10 Q.  You would not expect someone in a purser position to

11     tell another flight attendant I will take you down?

12 A.  I wouldn't expect anyone to say that.

13 Q.  So you would agree with me that would be a potential

14     threat, right?

15 A.  If someone --

16         MR. SANDERS:  Objection, form, foundation.

17     Are you giving that in a hypothetical of this

18     circumstance or any circumstance?

19 BY MS. KATO:

20 Q.  Like I said, setting aside the fact that we have

21     dispute as to whether or not it was said.  Generally

22     speaking, if a purser, a leadership-position person

23     tells another flight attendant, I will take you

24     down --

25         MR. SANDERS:  Object to the form and

Page 102

```
1    foundation.  If a flight attendant is attacking a
2    passenger and she said to the flight attendant, get
3    off of him or I'll take you down, that's a violation
4    of rules -- it's such a broad question.
5           MS. KATO:  It's not, no.  I'm just asking
6    the witness's understanding as to Delta's
7    expectations.  She's a purser-qualified attendant.  I
8    think she knows what is expected of her as a purser.
9           MR. SANDERS:  Absolutely.
10   BY MS. KATO:
11   Q.   And my question is:  As a purser, you understand that
12        Delta Air Lines would not tolerate a purser telling
13        another flight attendant, in any context, I will take
14        you down?
15   A.   I didn't say it.
16   Q.   Well, I understand that.  I'm asking for your
17        understanding as to Delta's expectation of you as a
18        purser.  You're a leader, right?
19   A.   Yes.
20   Q.   Again, my question is:  You would agree with me that
21        Delta Air Lines would not tolerate any purser telling
22        a flight attendant in any circumstances, I will take
23        you down?
24          MR. SANDERS:  Objection, form, foundation,
25        calls for speculation as to what Delta Air Lines, the
```

Page 103

```
1    corporate entity, would do in any circumstance.  I
2    don't know how she can answer that.
3           But to the extent you can, go ahead.
4    A.   I didn't say it, that's my answer.  I didn't say it,
5    so I can't speculate, because I didn't say those
6    things.
7    BY MS. KATO:
8    Q.   I understand that, ma'am.
9    A.   So how can I answer when you're saying me as a
10        leader -- I didn't say that.
11   Q.   So if you heard another purser tell a flight
12        attendant, I will take you down, do you consider that
13        to be an acceptable behavior by a fellow purser?
14   A.   No.
15          MR. SANDERS:  Objection, form, foundation
16        calls for speculation.
17          You answered.
18   A.   No.
19          MR. SANDERS:  Are we ready for lunch?
20          MS. KATO:  Yes.  Actually, I was coming to
21        that point.  Let me ask, if I may, ask a couple more,
22        but I will --
23          MR. SANDERS:  Go ahead.
24   BY MS. KATO:
25   Q.   That's a no, right?
```

Page 104

```
1    A.   Yes.
2    Q.   And any purser telling a flight attendant, I will take
3        you down, regardless of context, all right, is a
4        threat of violence, even if it is provoked or said in
5        jest?
6           MR. SANDERS:  Objection, form, foundation,
7        calls for speculation.
8           You can answer.
9    A.   I would think if anybody threatened anybody with those
10       words.
11   BY MS. KATO:
12   Q.   So you'd agree with me those are threatening words,
13       right?
14   A.   If someone said, I will take you down, depending on
15       the situation.
16   Q.   But that's a threatening word, right?
17   A.   It depends on the situation.
18   Q.   In what situation would it not be a not threatening
19       word?  And again, we're talking about a purser to a
20       flight attendant, not on a playground.
21   A.   Right, right.  I don't know.
22   Q.   So just --
23   A.   In general, I think if anybody said that, obviously
24       something had to transpire for someone -- if someone
25       said that to somebody.  Somebody could have got
```

Page 105

```
1    physically hurt, somebody could have got physically
2    attacked.  Just having an argument, no.
3    Q.   And if a flight attendant provoked a purser, it's your
4        job to de-escalate it, right?
5    A.   Yes.
6    Q.   Your job is not sort of to rise to the occasion and
7        say I got a bigger stick, right?
8    A.   Right.
9    Q.   And again, based on your experience, long-time
10       experience as a purser with Delta Air Lines and with
11       Northwest Airlines, would you agree with me that Delta
12       Air Lines, as a company, would be concerned if any
13       purser said the words, I will take you down, to
14       another flight attendant?
15          MR. SANDERS:  Objection, asked and
16       answered, calls for speculation as to what Delta Air
17       Lines would be concerned about.  Who is Delta Air
18       Lines?  Who are we talking about?
19          MS. KATO:  It's her employer.
20          MR. SANDERS:  Go ahead.  You can tell them
21       what Delta Air Lines would be concerned with, the
22       corporate entity, incorporated in Delaware, tell them
23       what you know they would be concerned with.
24   A.   I don't know.  I don't know what corporate would do.
25       I don't know -- in Delaware, I don't know.  I didn't
```

Jacqueline Meadows
May 22, 2023

Page 106

1    say those things.
2    BY MS. KATO:
3    Q.   Ma'am, I understand that.  This entire line of
4         questioning, like I said, setting aside the fact that
5         your testimony is you didn't say it, but would you
6         expect the company to be concerned about that as a
7         purser-qualified flight attendant with years of
8         experience?
9    A.   I would expect, yeah, and that's with any employee.
10   Q.   Right.
11   A.   Any employee, just not a purser, but with any
12        employee.
13   Q.   So if anyone tells -- again, the issue here is, I
14        understand, and I think you're right, any employee
15        saying that, but it's more problematic if it's coming
16        from leaders, right, because you're supposed to
17        de-escalate, not react, correct?
18             MR. SANDERS:  Objection to the form and
19        compound nature of the question.  Is this a
20        hypothetical or is this referring to the situation
21        with Lynette Marshall, when she walked away and
22        Lynette Marshall pursued her, or is this a
23        hypothetical?
24             MS. KATO:  I'm actually asking for the
25        witness's understanding based on her experience,

Page 107

1    that's what I was asking for.
2    BY MS. KATO:
3    Q.   So I think you're giving me responses that, based on
4         your experience, based on the years of work --
5             MR. SANDERS:  Objection, you said you think
6         she's giving her responses, so why are you asking the
7         question again?  Asked and answered.
8             MS. KATO:  Can you repeat the last
9         question?
10            (The following portion of the record was
11        read by the reporter at 12:39 p.m.:
12            Q. So if anyone tells -- again, the issue
13            here is, I understand, and I think you're
14            right, any employee saying that, but it's
15            more problematic if it's coming from
16            leaders, right, because you're supposed to
17            de-escalate, not react, correct?)
18   BY MS. KATO:
19   Q.   Can you answer that one, please?
20   A.   So you're asking me personally as a purser how I would
21        react if I heard another employee tell another
22        employee that they will take them down; how would I
23        react?
24   Q.   Not how you'd react, how you'd expect the company to
25        react.

Page 108

1             MR. SANDERS:  Objection, calls for
2         speculation.
3    BY MS. KATO:
4    Q.   Again, expectation.  Let me put it this way:  If that
5         was brought to your attention that another purser told
6         another flight attendant I'll take you down, you don't
7         expect them to do nothing, right?
8             MR. SANDERS:  Same objection.
9             MS. KATO:  Objection noted, but she can
10        answer.
11            MR. SANDERS:  Well, I think you've got to
12        give some circumstance.  Are you referring to Lynette
13        Marshall or some other situation?  I'd expect the
14        company to do a thorough investigation, which they
15        haven't done in this circumstance.
16            MS. KATO:  I will object to that, but
17        setting that aside -- look, it's not an argument
18        between attorneys.
19   BY MS. KATO:
20   Q.   Ms. Meadows, I'm just asking you.
21   A.   Yeah, that's a good point.  Is it towards me or just
22        your generalization of another purser and another
23        flight attendant, or are you referring to me and
24        Lynnette?
25   Q.   Well, because you didn't say it, so I know this would

Page 109

1    be a fruitless exercise, so that's why I'm saying
2    setting aside the fact there's a dispute, your
3    testimony is that anyone saying, I will take you down,
4    unless there's some special circumstances, is a threat
5    of violence, is unacceptable, right?
6             MR. SANDERS:  Objection, form and
7         foundation.
8             You can answer.
9    A.   I would have to know the situation of why someone
10        would say I will take you down.
11   BY MS. KATO:
12   Q.   And I asked you to tell me a situation in which such a
13        statement would be acceptable between a purser and a
14        flight attendant.
15            MR. SANDERS:  Calls for speculation.
16            You can answer.
17   A.   Okay, once again, I think if the company was going to
18        investigate why another purser or another flight
19        attendant, and if a purser said that to a flight
20        attendant, I'll take you down, depending on the
21        situation; was there a threat there, was someone
22        yelling at someone while they were de-escalating the
23        situation, walking away from a hostile situation?
24   BY MS. KATO:
25   Q.   Would you consider, and again, just you --

Jacqueline Meadows
May 22, 2023

Page 110

1   A.   Just me?

2   Q.   Would you consider as a purser responding to a flight

3        attendant and saying I will take you down to be

4        de-escalating a conflict?

5   A.   You're asking me when I was a purser --

6   Q.   Yes.

7   A.   -- if I heard another flight attendant say I'll take

8        you down to another flight attendant or --

9                 MR. SANDERS:  I guess I'll object to the

10       form and foundation.  Objection to de-escalating what

11       kind of situation?  The flight attendant charging her

12       with a knife or the flight attendant in her face?  It

13       calls -- there's no substance to this hypothetical.

14                MS. KATO:  All right.  Let's take a lunch

15       break and I may come back to this.

16                (Off the record at 12:47 p.m.)

17                (Back on the record at 1:48 p.m.)

18  BY MS. KATO:

19  Q.   Ms. Meadows, before lunch we left off on what happened

20       in Atlanta, so to let's get to Detroit.  You flew --

21       I'm sorry, Orlando.

22  A.   Yes.

23  Q.   Orlando back to Detroit, right?

24  A.   Yes.

25  Q.   This is after you spoke with Neil Mohammed, and do I

Page 111

1        have that correct, you do not know Mr. Mohammed or you

2        did not know him before you spoke to him October 7,

3        2019?

4   A.   Correct.

5   Q.   Have you had any communication with Neil Mohammed

6        since October 7, 2019?

7   A.   No.

8   Q.   That's the only time you ever met him?

9   A.   Yes.

10  Q.   And you were met with -- by -- you were met by field

11       service managers Austin Lynch and John Arila upon

12       arriving at Detroit, right?

13  A.   Yes.

14  Q.   Did you have any dealings with -- any prior dealings

15       with field service manager John Arila?

16  A.   No.

17  Q.   Did you ever have a chance to speak with him, say

18       hello?

19  A.   Oh, yes.  Actually, earlier that day.  He was at the

20       duty desk and I said hello.

21  Q.   Okay.  On your way out?

22  A.   On my way out for that flight, yes.

23  Q.   How about Austin Lynch?

24  A.   No.

25  Q.   Have you ever had dealings with him?

Page 112

1   A.   No.

2   Q.   Have you ever like exchanged pleasantries with him at

3        all?

4   A.   No.

5   Q.   So based on that, am I correct that when you came back

6        to Detroit, it was not the first time you met FSM John

7        but the first time you met FSM Austin?

8   A.   Yes.

9   Q.   All right.  And I believe the allegation is that

10       Austin Lynch spoke with the other flight attendants

11       and John spoke with you, correct?

12  A.   Correct.

13  Q.   Do you have any understanding as to how these two

14       field service managers divided up the duties of

15       interviewing the crew members?

16  A.   No.  John had told me that I needed to speak to John

17       -- I mean, John told me I needed to speak with Austin

18       and to wait, but Austin never spoke with me.

19  Q.   Did Lynette Marshall ever speak with John, if you

20       know?

21  A.   No.  Not to my recollection, no.

22  Q.   So do I have it correct that you spoke with John,

23       Lynnette spoke with Austin, and two other flight

24       attendants spoke with Austin?

25  A.   Yes.

Page 113

1   Q.   So what did John tell you that you had to speak to

2        Austin?

3   A.   He stated to me that he was leaving the base and that

4        Austin was in charge of the case and to speak with

5        him.

6   Q.   Was he referring to speak with him at that point or in

7        the future, do you know?

8   A.   That point.

9   Q.   So what exactly did John say?

10  A.   He said you need to speak with Austin because he's in

11       charge of the case.

12  Q.   And how did you come to the understanding he was

13       leaving the base?

14  A.   He told me, yeah.

15  Q.   Did he explain to you that you needed to speak to

16       Austin because he was leaving the base?

17  A.   No.  He said that -- actually, he was leaving the base

18       to go back to Atlanta because his mom was sick as

19       well, and he said that Austin was in charge of the

20       case and I needed to speak with Austin regarding the

21       incident.

22  Q.   Okay.  But regardless, did you have an opportunity to

23       convey everything you wanted to convey to John?

24  A.   No.

25  Q.   All right.  I'm going to show you Exhibit 9.

Jacqueline Meadows
May 22, 2023

Page 114

```
 1                MARKED FOR IDENTIFICATION:
 2                DEPOSITION EXHIBIT 9
 3                1:53 p.m.
 4  BY MS. KATO:
 5  Q.   Ms. Meadows, have you seen this document before?
 6  A.   No.
 7  Q.   Go ahead and take time to read it, and let me know
 8       when you're done.
 9  A.   Okay.  All right.
10  Q.   Have you had a chance to read that?
11  A.   Yes.
12  Q.   I take it this is the first time you've seen this
13       document, correct?
14  A.   Yes.
15  Q.   Having read that, this is John -- flight attendant
16       John's -- I'm sorry, FSM John's contact log describing
17       your conversation with him.
18            Tell me, number one, does this accurately
19       reflect your recollection of your conversation with
20       John Arila?
21  A.   Not all of it.
22  Q.   What is not in this report that you recall telling
23       John?
24  A.   I didn't tell him that -- I don't remember mentioning
25       to him that my mom was ill.
```

Page 115

```
 1  Q.   Okay.
 2  A.   I don't even remember telling him what happened,
 3       because he told me to tell Austin, to tell Austin
 4       everything.  I don't even remember telling him any of
 5       this.
 6  Q.   Okay.  Well, let me ask you a different question then:
 7       Is there anything missing from this statement that you
 8       would have told Austin Lynch?
 9            MR. SANDERS:  Objection to the form of the
10       question.  Go ahead.
11  A.   I would have explained to Austin everything that
12       happened.
13  BY MS. KATO:
14  Q.   Well, so tell me what it is that --
15  A.   I would have told him that once I got off the aircraft
16       and I came back, Lynnette was being very aggressive
17       towards me and that I went to the cockpit to get away
18       from Lynnette because I felt like I was in fear of my
19       life, of her hurting me, that's what I would have told
20       Austin.  Also, just to get away from her.
21  Q.   So it is your testimony, ma'am, that you don't recall
22       having this conversation with John Arila --
23  A.   No.
24  Q.   -- as reflected in this note?
25  A.   I don't.
```

Page 116

```
 1  Q.   This was the first time you met with John in terms of
 2       actual speaking with him, right?  I mean, you had
 3       pleasantries earlier in the day --
 4  A.   Yes.
 5  Q.   -- but beyond that, this is the first time you spoke
 6       with John Arila about what happened in Orlando, right?
 7  A.   Yes.
 8  Q.   Was there any other opportunity since October 7, 2019
 9       that you spoke with FSM John Arila about what happened
10       in Orlando?
11  A.   No.
12  Q.   So is it possible that you had told all this to John
13       and you just don't remember, because you perhaps maybe
14       were upset?
15  A.   I don't remember getting into detail, because I was
16       still upset.  I was still upset.
17  Q.   Understood.
18  A.   So I don't remember telling him.  All he said was you
19       need to talk to Austin because Austin is in charge of
20       the case, so explain everything to Austin, that's what
21       he said.
22  Q.   Okay.
23  A.   The captain did more talking to him than I did.
24  Q.   All right.  So let me ask you this:  You just told me
25       what you have told Austin Lynch that's not in this
```

Page 117

```
 1       statement.  Is there anything in this statement that's
 2       not right?
 3  A.   I didn't say -- I didn't explain anything to John of
 4       the incident.
 5  Q.   Are you saying this entire statement is incorrect?
 6            MR. SANDERS:  Objection to the form and the
 7       foundation of the question.
 8  A.   I would say -- of course I agreed to work back to
 9       Detroit and --
10            MR. SANDERS:  I guess my question is --
11  A.   I didn't even say that to him.
12            MR. SANDERS:  -- are you asking her is the
13       substance of this document accurate or is this an
14       accurate portrayal of what she said to John?
15            MS. KATO:  Let's go with the first one.
16  BY MS. KATO:
17  Q.   Is the representation made in this statement, setting
18       aside the fact that you don't recall speaking to John
19       Arila, is that accurate?
20  A.   I didn't explain to him at all.
21  Q.   That's not the question, ma'am.  I understand that you
22       don't recall speaking with him, but somehow we have
23       this log prepared by John Arila, which seems to, at
24       least, reflect some of what happened in Orlando.  Now
25       I don't want to go through line by line but we will if
```

Jacqueline Meadows
May 22, 2023

Page 118

1   we have to given the fact that Mr. Sanders wants to be
2   done by 4:00, but having read through this, is there
3   any part of this paragraph that jumps out at you as to
4   that is an incorrect statement of what happened in
5   Orlando?
6   A.   Once again, I didn't have that conversation with John.
7   Q.   I understand that.
8   A.   He asked me to talk to Austin.
9   Q.   Okay.
10  A.   So all he asked me was -- all he said was you have to
11       talk to Austin.  He talked more to the captain.  The
12       captain explained a lot to him, not me, Captain Cooney
13       did.  I was sitting down and John came over to see and
14       leaned over and then the captain was like this is what
15       happened.  So I never -- I never talked to John.  I
16       was waiting to speak to Austin.
17  Q.   Were you privy to Captain Cooney's conversation with
18       John?
19  A.   Yes.  He explained, yes.
20  Q.   Did you have any -- at any point, did you interject
21       into Captain Cooney's conversation with John Arila of,
22       no, no, that's not what happened or anything like
23       that?
24  A.   No.
25  Q.   So ma'am, again, I don't want to repeat the same

Page 119

1   question over and over again, and I understand you
2   didn't speak to John.  But as you sit here, as you
3   read this, and we can go through sentence by sentence,
4   I'm wondering if there's any sentence in here that as
5   you read it strikes you as that's not what happened in
6   Orlando, not what you said to John, but that's not
7   what happened.
8          MR. SANDERS:  Object to the form of the
9   question.  The witness has testified as to what
10  happened in Orlando.  What you're asking her to do is
11  compare her recollection to this record that's not
12  signed, that's not dated, that's alleged to be from
13  John, sentence by sentence.  It's burdensome.  When
14  you say is it accurate, do you mean is it lacking any
15  information or some of the statements in there are not
16  reflective of the truth?
17         MS. KATO:  Counsel --
18         MR. SANDERS:  Because she's testified way
19  beyond what's in here.
20         MS. KATO:  Look, Mr. Sanders, I think we
21  have gotten to the point that you're coaching the
22  witness and I'm going to put an objection to that.  I
23  have no problem with legal objections, but I think we
24  need to keep moving.
25         MR. SANDERS:  That's my point exactly.

Page 120

1   She's testified as to what happened on that day.  You
2   have a statement that you allege is from someone, it
3   is what it is; her testimony is what it is.  Let's
4   keep moving.
5   BY MS. KATO:
6   Q.   Ma'am, your testimony is that Captain Cooney spoke to
7        John Arila, not you, is that it?
8   A.   Yeah, they had a conversation.
9   Q.   So that's a yes?
10  A.   Yes, they had a conversation.
11  Q.   And you were present for that conversation, you at
12       least was in hearing shot, right?
13  A.   Yes.
14  Q.   And you heard what Captain Cooney was telling John
15       Arila, right?
16  A.   I don't recall every word.
17  Q.   But you heard what Captain Cooney conveyed to John
18       Arila, right?
19  A.   Yes.
20  Q.   Do you recall the content of that conversation?
21  A.   He was just saying that Lynnette --
22         MR. SANDERS:  That's a yes or no question.
23  Do you recall the content of the conversation?
24  A.   Yes.
25  BY MS. KATO:

Page 121

1   Q.   And at the time, did you feel that Captain Cooney had
2        conveyed accurately what had transpired?
3   A.   I don't even remember certain parts.
4   Q.   So let's go through this.  I hate to do this but I
5        think we need to do this.  Let's go through Exhibit 9.
6           First line says, met with Jacqueline to
7        discuss an interaction between her and another crew
8        member on her flight from MCO to DTW.
9           So your testimony is that you met with John
10       but you did not discuss what happened, is that right?
11  A.   Yes.
12  Q.   Okay.  Next line, Jacqueline stated that after all
13       passengers had deplaned in MCO she received a phone
14       call from her dad at which point she stepped onto the
15       jet bridge to make sure everything was okay.
16          Now, that is what happened, right?
17  A.   No, that's not what happened.
18  Q.   Okay.  Tell me why.  What's wrong with it?
19  A.   Because I got off the aircraft to assist with the
20       wheelchair passenger.  While I was in the jet way my
21       dad called at that time.  So I didn't get off the
22       aircraft to call my dad.
23  Q.   All right.
24         MR. SANDERS:  Asked and answered.  Let's
25  go.

Jacqueline Meadows
May 22, 2023

Page 122

```
 1  BY MS. KATO:
 2  Q.   Next sentence, when she re-entered the plane, she
 3       advised that FA Lynette Marshall asked what she was
 4       doing off the aircraft in a confrontational way.
 5       Anything wrong with that statement?
 6  A.   No.
 7  Q.   Okay.  Next line, Jacqueline advised her mom was very
 8       ill and she was answering the call from her dad to
 9       make sure everything was good and also she didn't
10       appreciate the way Lynnette approached her.
11            Now, I think that line is correct,
12       right, you did not appreciate the way Lynnette
13       approached her?
14  A.   I don't have a problem with anyone asking me a
15       question.
16  Q.   Okay.  Ma'am, this is the -- this is the sentence I'm
17       going over.
18  A.   So the sentence from what John is saying that I said
19       that I didn't have -- I didn't appreciate Lynnette
20       asking me a question.  I don't have a problem with
21       anyone asking me a question.  These are John's words.
22  Q.   Ma'am --
23  A.   These are John's words, right?
24  Q.   These are John's words.  I'm asking you if this is an
25       accurate representation of what happened --
```

Page 123

```
 1  A.   No, it's not accurate.  It's not accurate.
 2  Q.   So are you saying none of this happened?
 3            MR. SANDERS:  You just asked her about that
 4       line and she gave you the answer.
 5            MS. KATO:  No, she didn't, sir.
 6  A.   I just answered.
 7            MR. SANDERS:  She said she didn't have a
 8       problem with anyone asking her a question.
 9  BY MS. KATO:
10  Q.   All right.  Let's go back to the first part.
11       Jacqueline advised her mom was very ill and she was
12       answering the call from her dad to make sure
13       everything was good.
14  A.   Uh-huh.
15  Q.   Anything wrong with that statement?
16  A.   Advised who?  I advised who?
17  Q.   Well, you advised someone.
18  A.   Let's ask John.
19  Q.   So are you saying you did not tell John that your
20       mother was very ill and you were answering a call from
21       your dad to make sure everything was okay?
22            MR. SANDERS:  Asked and answered.  She
23       already said she didn't have a substantive
24       conversation with John.  She answered that question.
25  BY MS. KATO:
```

Page 124

```
 1  Q.   Ma'am, is that your testimony, you just did not have
 2       any substantive conversation whatsoever with John
 3       Arila?
 4  A.   That's correct.
 5  Q.   Okay.
 6  A.   These words are wrong.  I didn't have this discussion
 7       with John.
 8  Q.   But you did -- but your mom was ill and you were
 9       answering a call from your dad, right?
10  A.   Yes, my mom was ill.
11            MR. SANDERS:  Objection, asked and
12       answered.
13            Answer again.
14  A.   Uh-huh.
15  BY MS. KATO:
16  Q.   So if you didn't tell John all of this, do you have
17       any idea as to how he would have gained this
18       information?
19  A.   I wouldn't know.
20  Q.   Do you recall Captain Cooney relaying this information
21       to John about your mom and you taking a call?
22  A.   No.
23  Q.   Okay.  Next sentence, Jacqueline stated, again, I
24       understand that's not what you said, but she walked to
25       the flight deck to de-escalate the situation and
```

Page 125

```
 1       Lynette followed her stating if your mom is so sick,
 2       she shouldn't be on this trip, while being very close
 3       to Jacqueline.
 4            Now, you did walk to the flight deck,
 5       right?
 6  A.   Yes.
 7  Q.   And that was to de-escalate the situation?
 8  A.   Yes.
 9  Q.   And Lynnette did follow you, right?
10  A.   Yes.
11  Q.   Okay.  Is it your testimony that Lynnette did not say
12       your mom is so sick, you shouldn't be here on this
13       trip?  Did Lynnette ever say that to you about you
14       shouldn't be on this trip?
15  A.   Yes, she did.
16  Q.   So she did?
17  A.   Uh-huh.
18  Q.   Okay.  So how -- all right.  Let's back up.
19            So she did tell you that you shouldn't be
20       on this trip if your mom is so sick?
21  A.   Not when I was walking to the cockpit.  She said that
22       to me --
23  Q.   When?
24  A.   -- when she approached me.
25  Q.   Well, how does she know your mom was sick if you
```

Jacqueline Meadows
May 22, 2023

Page 126

1    didn't tell her?
2  A.  I didn't tell her.
3  Q.  How --
4  A.  I didn't tell her my mom was sick.  I never discussed
5      that.  I discussed that with the captain.
6  Q.  Okay.
7  A.  He knew.  I was like this is my first trip back, you
8      know.  I didn't discuss that.  I did not discuss that
9      with John.
10 Q.  So how -- help me understand here.  So Lynnette
11     Marshall told you that you shouldn't be working if
12     your mom is sick, words to that effect, do I have that
13     right?
14 A.  If I recall, she said that at some point in time but I
15     don't remember when --
16 Q.  Okay.
17 A.  -- because it happened fast.
18 Q.  And you didn't tell her the reason you had to kind of
19     step off the plane and you were a little bit
20     disorganized was because your mom is sick and you
21     don't know what's going on because I'm so worried
22     about my mom?
23 A.  I didn't mention it to Lynnette.
24 Q.  At all?
25 A.  No.

Page 127

1  Q.  At any time?
2  A.  No.
3  Q.  And Lynnette just said if your mom is so sick, you
4      shouldn't be here?
5  A.  I didn't discuss it with Lynnette.
6  Q.  You discussed it with the captain?
7  A.  Yes.  I may have, I don't recall.
8  Q.  Okay.
9  A.  I don't recall.
10 Q.  Was Lynnette in the cockpit when this conversation
11     took place?
12 A.  What conversation?
13 Q.  Your conversation with Captain Cooney discussing your
14     mother.
15 A.  No.
16 Q.  So how -- I understand that you don't know what
17     Lynnette was thinking, so is it your testimony that
18     Lynnette was nowhere when you were discussing the
19     situation with your mom and yet she told you that you
20     shouldn't be working if your mom is so sick; do I have
21     that right?
22 A.  You can have it right, but I don't remember.  I don't
23     recall.
24 Q.  I'm just trying to understand your recollection,
25     ma'am.  I'm a little confused here.

Page 128

1  A.  Me too.
2  Q.  Help me understand.
3  A.  I am.  I'm really confused.  This is something from a
4      manager with no date, no e-mail, nothing.  I don't
5      know -- how do I know that John wrote this?
6  Q.  Well, that's what I'm trying to understand.
7  A.  Here's the other one from Mohammed, his name is on it,
8      but this is -- how do I know John wrote this?
9  Q.  Let's set that aside.  My question right now is that
10     you just gave me testimony that Lynnette did, indeed,
11     tell you that you shouldn't be working here if your
12     mom is so sick.  Are we on the same page?
13 A.  She may have said that, I just don't remember when in
14     the incident it happened.
15 Q.  Okay.  So my next question was:  Did you tell her
16     yourself that your mom was sick, and I think your
17     answer was no?
18 A.  No, I didn't tell her.
19 Q.  Okay.  So then your next -- what you told me was that
20     you might have told Captain Cooney when you were in
21     the flight deck about your mother; do I have that
22     right?
23 A.  Yeah.
24 Q.  And my question was:  Was Lynnette Marshall in the
25     flight deck when you told Captain Cooney about your

Page 129

1      mother's situation?
2  A.  No.
3  Q.  Okay.  So we're left with you never told Lynnette
4      Marshall about your mom, yet you recall her saying you
5      shouldn't be working if your mom is so sick; do I have
6      that right?
7          MR. SANDERS:  Objection, asked and
8      answered.  She's answered that three or four times.
9          MS. KATO:  I'm sure she did, but I'm still
10     confused, unfortunately.
11         MR. SANDERS:  But you're going to get the
12     same answer.  Because you're confused doesn't mean you
13     get to continue to ask the same question because you
14     don't like the answer.
15         MS. KATO:  I like the answer, I'm trying to
16     put it together.
17         MR. SANDERS:  Then ask a different
18     question, because she answered that one.
19 BY MS. KATO:
20 Q.  Ma'am, do I have that right?
21 A.  I answered it.
22 Q.  Is that a yes?
23         MR. SANDERS:  Do you have what right?
24 A.  What do you have right?
25 BY MS. KATO:

Page 130

1  Q.  So your testimony is that you never told Lynnette
2      Marshall about your mom, right?
3  A.  Correct.
4  Q.  Are you with me?
5  A.  Yes.
6  Q.  You might have told Captain Cooney about your mom,
7      right?
8  A.  Correct.
9  Q.  As far as you know, Lynnette Marshall was not in the
10     flight deck when you told Captain Cooney about your
11     mom; do I have that right?
12 A.  Correct.
13 Q.  But your testimony also is that Lynnette Marshall did
14     tell you if your mom is so sick, you shouldn't be
15     working?
16         MR. SANDERS:  Objection, asked and
17     answered, mischaracterization of the witness's
18     testimony.
19 A.  I don't recall.
20 BY MS. KATO:
21 Q.  Well --
22 A.  I don't recall her saying it at what point in the
23     incident, because the incident happened so fast.
24 Q.  I don't care at what point in the incident.  Did she
25     say that or not?  That's all I need to know, ma'am.

Page 131

1          MR. SANDERS:  She answered that.
2          MS. KATO:  Did she?
3  BY MS. KATO:
4  Q.  Is it your recollection that --
5  A.  She said it at some point in time.
6  Q.  On October 7 --
7  A.  Yeah.
8  Q.  -- 2019, while you're --
9  A.  Yeah.
10 Q.  -- in Orlando?
11 A.  Yes, at some point in time while we're in Orlando.
12 Q.  Let's try not to talk over each other.
13 A.  I'm sorry.
14 Q.  So let's go back to what prompted this is that this
15     statement says:  And then Lynnette followed you
16     stating if your mom is so sick, you shouldn't be on
17     this trip, while being very close to Jacqueline.
18         So is that, as far as you recall, is that
19     an accurate representation of what happened?  Not what
20     you told John, but taking that sentence as it is --
21 A.  Lynnette did follow me to the cockpit.
22 Q.  Okay.  And did she say you shouldn't -- if your mom is
23     so sick, you shouldn't be on this trip?
24 A.  She was saying a lot.  I don't remember what she was
25     saying.  She was yelling at the top of her voice.

Page 132

1  Q.  Okay.  Next sentence:  Jacqueline stated that the
2      pilot witnessed this and asked Lynnette to leave the
3      front of the aircraft and go to the back at which
4      point Lynnette advised she wanted to be removed from
5      the trip.
6  A.  Yes.
7  Q.  That's true?
8  A.  Yes.
9  Q.  Okay.  FSM was called to the gate to speak with the
10     crew.  Neil Mohammed was called --
11 A.  Yes, yes.
12 Q.  The crew agreed to work together to DTW; true
13     statement?
14 A.  Yes.
15 Q.  And I thanked Jacqueline for the information and asked
16     her to send in an ASAP report and to also type up a
17     statement as well.
18 A.  He never asked me to submit an ASAP report and he
19     never asked me for a statement.
20 Q.  It says, Jacqueline thanked me for support and advised
21     that she also wanted to make a complaint about
22     harassment on FA Lynnette.  So do you recall making
23     that --
24 A.  I don't recall.
25 Q.  -- representation, that you wanted to make a complaint

Page 133

1      about Lynnette Marshall?
2  A.  Not to John, no.
3  Q.  Did you make that representation to anyone?
4  A.  Yes.
5  Q.  To whom?
6  A.  What, that I wanted to make a complaint?
7  Q.  That you wanted to make a harassment complaint about
8      Lynnette Marshall.
9  A.  Yeah, to Renee Mullen and Courtney Ebert.
10 Q.  Okay.  And when was that?
11 A.  The following day, so that would be October 18.
12 Q.  October 8?
13 A.  October 18.  This happened on the 17th.
14 Q.  On the 7th.
15 A.  On the 7th.  Oh, the 8th then, yeah.
16 Q.  Okay.  I understand your testimony is that you did not
17     have a conversation with John Arila, but looking at
18     this statement, your testimony is that you would have
19     also told Austin you were fearful of what Lynnette
20     might do to you?
21 A.  I didn't speak with Austin.
22 Q.  I'm asking what would you have told -- what additional
23     information would you have provided to Austin, had you
24     spoken with him that day?
25         MR. SANDERS:  Objection to the form of the

Jacqueline Meadows
May 22, 2023

Page 134

1      question.
2              MS. KATO:  The witness's testimony is that
3      I would have told Austin the things I wouldn't have
4      told John.  I'm trying to ask what it is she would
5      have told Austin.
6              MR. SANDERS:  That's a different question.
7      If you're asking her what she would have told Austin,
8      go ahead and testify to that.  If you're asking what
9      additional she would have told Austin when we're
10     talking about John's statement that wasn't totally
11     accurate, in my mind that creates confusion.
12             Tell her what you would have told Austin.
13 BY MS. KATO:
14  Q.  **Tell me what you would have told Austin.**
15  A.  I would have told Austin that Lynnette confronted me
16     coming back on the aircraft in a very hostile, very
17     violent way.  I walked away trying to de-escalate the
18     situation.  She started yelling at me at the top of
19     her voice and followed me all the way to the cockpit.
20     Captain saw what happened and asked Lynnette to go to
21     the aft of the aircraft.
22  Q.  **Okay.**
23  A.  And I wanted to file a harassment against Lynnette.
24  Q.  **All right.  Anything else?**
25  A.  No.

Page 135

1   Q.  **If you could pull out Exhibit 1, which is the**
2      **interrogatories.**
3   A.  Uh-huh.
4   Q.  **If I can call your attention to pages 3 and 4, which**
5      **is interrogatory numbers 3 and 5.  Are you there?**
6   A.  Uh-huh.
7   Q.  **All right.  In interrogatory number 3, we asked you to**
8      **give us facts that support the allegation that this**
9      **lawsuit -- allegation in this lawsuit that you were**
10     **subjected to disparate treatment as a result of your**
11     **race and that your race was a determining factor in**
12     **your performance development or discipline.**
13             **And your response is that John had advised**
14     **me that I would have to speak with Austin since he**
15     **oversaw the case.**
16             **Did you ever come to understand whether**
17     **Austin Lynch ever actually oversaw this case?**
18  A.  No, no one ever told me.
19  Q.  **And you did not speak to Austin Lynch at any point,**
20     **right?**
21  A.  Correct, no.
22  Q.  **But you did speak with Renee Mullen, your FSM?**
23  A.  The next day, yes.
24  Q.  **Anything else that -- I understand this was a while**
25     **ago that you answered this question, but as you sit**

Page 136

1      here, is there anything else that supports your belief
2      that your race was a factor in why you ended up with
3      an FCAN?
4              MR. SANDERS:  Object to the form of the
5      question and the foundation to the extent that raises
6      discrimination as a particular definition under
7      Michigan and federal law that this witness may not be
8      aware of as to what constitutes race discrimination.
9              With that objection noted, you're free to
10     answer.
11  A.  I felt that Lynnette got a fairer chance than me.
12             MR. SANDERS:  I couldn't hear you.
13  A.  I felt that Lynnette, being a white woman, got a
14     fairer chance than me.
15 BY MS. KATO:
16  Q.  **What do you mean by that?**
17  A.  That Austin interviewed her after we landed in Detroit
18     and Austin looked at me and kept walking.  He didn't
19     acknowledge me or anything.
20  Q.  **Okay.  In response to number 5, which essentially asks**
21     **you the same question, your response was when I spoke**
22     **to Peter during a phone conversation while Austin, who**
23     **was in charge of the case, did not interview me or**
24     **take my statement.  He said, and I quote, Austin is**
25     **afraid of you.**

Page 137

1   A.  Uh-huh.
2   Q.  **So that's what Peter Saballa-Davis said?**
3   A.  Yes.
4   Q.  **What was the context in which that comment was made?**
5      **Let me ask you this:  When did he make that comment?**
6   A.  In a phone conversation.
7   Q.  **When?**
8   A.  It had to be maybe a month or two after the incident.
9   Q.  **Was this in connection with a conversation that we**
10     **previously discussed where you were advised that your**
11     **FSM would be changing to Christian Gunn?**
12  A.  No.
13  Q.  **So you had a different conversation with Mr.**
14     **Saballa-Davis?**
15  A.  Yes, I had plenty of conversations with him.
16  Q.  **And what -- how did this come about that he, Mr.**
17     **Saballa-Davis, said Austin is afraid of you?**
18  A.  I had asked Peter if we can all meet, if all of us
19     could meet, the captain, Lynnette, himself, and try to
20     resolve this issue, and he stated that Austin was
21     afraid of me.
22  Q.  **Did you follow up as to why that is?**
23  A.  No.
24  Q.  **Did you ask any questions, like what do you mean?**
25  A.  Yes, I did; I said why would he be afraid of me?

Page 138

```
 1   Q.   What did he say?
 2   A.   You're a cop.
 3   Q.   Did you ask any other follow-up question?
 4   A.   No.
 5   Q.   When you say you were trying to have a meeting to
 6        resolve this matter, how -- what was the resolution
 7        you were envisioning?
 8   A.   The truth coming out.
 9   Q.   And what would be that truth?
10   A.   The truth that I was attacked.
11   Q.   And I just want to make sure the record is clear,
12        we're talking verbal attack, right?
13   A.   Yes.
14   Q.   To be clear, Lynnette Marshall never grabbed you and
15        made physical contact with you, right?
16   A.   Right, right.
17   Q.   All right.  So let me ask you about this verbal attack
18        by Lynnette Marshall.  So far your testimony, and
19        correct me if I'm wrong, is that she kept on saying I
20        needed you, you shouldn't have gotten off the plane?
21   A.   Yes.
22   Q.   Anything else she said that you considered to be
23        verbal attack?
24   A.   She was just yelling at me and coming towards me, she
25        was yelling at me and walking towards me at the same
```

Page 139

```
 1        time.
 2   Q.   Right.  But her words were that I needed you, you
 3        shouldn't have gotten off the plane?
 4             MR. SANDERS:  Objection, form, foundation.
 5        Are you saying those are some of her words, all of her
 6        words?
 7   BY MS. KATO:
 8   Q.   So let me ask you an open-ended question:  When you say
 9        verbal attack, what are the words that constitute your
10        concept of verbal attack?
11   A.   She was just yelling.  It happened so fast.  But she
12        was charging at me, yelling at me, so that's when I
13        turned away and walked away.  I can't remember what
14        she was saying, but it was very angry, it was very
15        hostile, she was coming at me, and that's when I
16        turned away and walked towards the cockpit.
17   Q.   So as you sit here -- I mean, I'm sorry, but you're
18        suing your employer for quite a bit of money, so I
19        have to ask you this.
20   A.   Yes.
21   Q.   What was she yelling?  What were her words, to the
22        best of your recollection as you sit here today, what
23        did she say to you?
24   A.   Oh, when I was walking away, she was saying come back
25        here, I'm talking to you, come back, I'm talking to
```

Page 140

```
 1        you.  I remember that.
 2   Q.   Okay.  Anything else?
 3   A.   No.
 4   Q.   So in your mind, when you said a resolution and truth
 5        coming out, what were you hoping as an end result?  I
 6        mean, were you looking to have Lynnette disciplined or
 7        what?  What were you looking for?
 8   A.   I feel like, yeah, she should have been disciplined,
 9        yes.
10   Q.   And is it your belief that you should not have been
11        disciplined at all?
12   A.   Yes.
13   Q.   So it is your recollection, Ms. Meadows, that you did
14        not connect with Renee Mullen on October 7th?
15   A.   I sent her a text message to let her know.
16   Q.   Did you ever connect with her over the phone?
17   A.   No, I don't recall.
18   Q.   You don't recall that?
19   A.   No.
20   Q.   Are you sure you didn't talk to her or you're just not
21        sure?
22   A.   I'm not sure.
23   Q.   Is it possible you might have spoken to Renee on
24        October 7th?
25   A.   No.  I spoke to her the next day; for sure I remember
```

Page 141

```
 1        the next day.
 2   Q.   Is it possible you might have had a brief conversation
 3        on the 7th?
 4   A.   No, I don't recall.
 5   Q.   Okay.  So other than John indicating to you that
 6        Austin oversaw the case, do you have any other basis
 7        to -- for your contention that Austin Lynch was in
 8        charge of the case?
 9   A.   That was my recollection, yes.
10   Q.   All you know is that John said Austin is in charge of
11        the case?
12   A.   Yes.
13   Q.   Do you have any understanding or facts as to whether
14        Austin Lynch did anything further with respect to
15        investigating this case?
16   A.   I was not made aware.
17   Q.   You did not speak to Austin, right?
18   A.   No.
19   Q.   All right.  So next day, Renee Mullen, your FSM,
20        contacted you, correct?
21   A.   Correct.
22   Q.   And eventually this investigation was passed on to
23        your new FSM, Christian Gunn, right?  If you know.
24   A.   If I remember, yeah.
25   Q.   Do you recall Mr. Gunn coming to you and saying --
```

Jacqueline Meadows
May 22, 2023

Page 142

1     asking for a statement?
2  A.  No.
3  Q.  You don't recall that?
4  A.  No.
5  Q.  You don't recall telling him that I already submitted
6     my statement, you can go look in the file?
7  A.  I don't remember that.
8  Q.  You don't remember that or you know that didn't
9     happen?
10 A.  I don't recall.  I don't remember.
11 Q.  Okay.  So on October 8th, you had a conversation with
12    Renee Mullen, correct?
13 A.  Yes.
14 Q.  What did you tell her?
15 A.  I explained to her what happened, the incident.
16 Q.  Did she ask you to submit a statement?
17 A.  Yes.
18 Q.  And you also spoke with Courtney Ebert, the HR manager
19    for Detroit base, right?
20 A.  Yes.
21 Q.  It was on the same day?
22 A.  Yes.
23 Q.  Who did you speak with first?
24 A.  I think it was Courtney.
25 Q.  Did you reach out to her or did she reach out to you?

Page 143

1  A.  I reached out to her.
2  Q.  Why did you reach out to her?
3  A.  Because I wanted to file a complaint against Lynnette.
4  Q.  Ms. Meadows, you have been -- you're a long-term
5     employee, long-time employee of Delta Air Lines,
6     right?
7  A.  Uh-huh.
8  Q.  You didn't know how to file a complaint against
9     another employee?
10 A.  No.
11 Q.  Did you look in the SKYPRO and see if you could find
12    that information?
13 A.  No.
14 Q.  You just went straight to Courtney Ebert?
15 A.  Yes.
16 Q.  Were you familiar with Ms. Ebert?
17 A.  Yes.
18 Q.  Did you ever have an issue with Courtney Ebert in the
19    past?
20 A.  No.
21 Q.  Did you get along well with her?
22 A.  Yes.
23 Q.  Did you find her to be helpful?
24 A.  No.
25 Q.  In general or in this instance?

Page 144

1  A.  In this instance.
2  Q.  Okay.  Let me ask you this:  So prior to October 7,
3     2019, how often did you interact with Courtney Ebert?
4  A.  Just in passing.
5  Q.  Did you ever receive support from her in her HR
6     position?
7  A.  No, ma'am.
8  Q.  So what was the context in which you would be
9     interacting with Courtney Ebert?
10 A.  Just saying hi, bye.  We had a purser event and she
11    sat at the table with us.
12 Q.  Social interactions, is that right?
13 A.  Yes.
14 Q.  When you say Ms. Ebert was not helpful in this
15    situation, what do you mean by that?
16 A.  I never got a follow-up phone call with her.
17 Q.  Did she promise you a follow-up phone call?
18 A.  Yes.
19        MARKED FOR IDENTIFICATION:
20        DEPOSITION EXHIBIT 10
21        2:31 p.m.
22 BY MS. KATO:
23 Q.  Before we get to that statement, let me ask a couple
24    questions, Ms. Meadows:  Has Courtney Ebert ever made
25    a comment or act in a way to suggest that she would be

Page 145

1     treating your case differently from anybody else
2     because of your race?
3        MR. SANDERS:  Objection, form and
4     foundation.
5        You can answer.
6  A.  Can you repeat?
7  BY MS. KATO:
8  Q.  Did she ever say anything to you or act in a way that
9     would make you wonder if she would consider your case
10    differently from anything else because of your race?
11 A.  No, she never said anything.
12 Q.  Did she ever act in a way that would make you think
13    that might be the case?
14 A.  Yes.
15 Q.  Tell me about that.
16 A.  She just never followed back up with me.
17 Q.  Okay.  Anything else?
18 A.  No.
19 Q.  All right.  If you can take a look at Exhibit 10 for
20    me, please.  Go ahead and read it over, if you'd like,
21    and then let me know when you're done.
22 A.  I'm done.
23 Q.  Do you recognize this statement, ma'am?
24 A.  Yes.
25 Q.  Now, the bottom portion of Exhibit 10 appears to be an

Page 146

1  e-mail from you to Courtney Ebert on October 8th, 2019
2  at 1:03 p.m.
3  A.  Yes.
4  Q.  And subject statement, flight 2880, correct?
5  A.  Yes.
6  Q.  Do you recall sending this statement?
7  A.  Yes.
8  Q.  And is this something that Ms. Ebert requested of you
9  or did you do so on your own?
10  A.  Requested.
11  Q.  Now, when you spoke with Ms. Ebert, I believe -- let
12  me back up.
13          When you wrote this statement, had you
14  already connected with Renee Mullen?
15  A.  Yes.
16  Q.  So when you composed this statement, is it fair to say
17  you already knew that Renee Mullen was also requesting
18  a statement from you?
19  A.  She just asked me -- Renee just asked me to submit
20  that I got off the aircraft; she didn't ask for a
21  statement.
22  Q.  So Renee Mullen did not ask you to submit a statement
23  outlining your version of the event?
24  A.  No.
25  Q.  All right.  So is that why Renee Mullen is not copied

Page 147

1  on your statement to Courtney Ebert on October 8 of
2  2019?
3          MR. SANDERS:  Objection, form.
4          You can answer.
5  A.  I would say yes.
6  BY MS. KATO:
7  Q.  Okay.  You didn't think it was something your FSM
8  should know?
9  A.  I did explain it to her, what happened.
10  Q.  Okay.
11  A.  That I wanted to make a harassment charge against
12  Lynnette; I did let Renee know that.
13  Q.  Okay.
14  A.  Uh-huh.
15  Q.  So if you look at -- you had a chance to review your
16  statement, right?
17  A.  Yes.
18  Q.  Does this appear to be accurate as to what -- does it
19  comport with what you sent to Courtney Ebert on
20  October 8?
21  A.  Yes.
22  Q.  All right.  Now, if I look at this statement, it does
23  say that you told Lynnette Marshall that your mother
24  was ill at the time and your father had called while
25  you were on the jet way and that you answered the

Page 148

1  call.  Do you see that?
2  A.  Yes.
3  Q.  So is it now the case that you did tell Lynnette about
4  your mom being ill?
5  A.  I got it stated here.
6  Q.  Okay.
7  A.  Yep.
8  Q.  And this was written the day after the incident,
9  right?
10  A.  Yes.
11  Q.  And Lynnette, once again, began to yell at me and said
12  you'd rather make money than be home with your mother?
13  A.  Yes.
14  Q.  So that's your recollection of what -- is that one of
15  the things she was yelling at you for?
16  A.  Yes.
17  Q.  And you also say Lynnette yelled at you that you
18  should not be here working, at which time you felt
19  threatened by Lynnette and asked her to stop?
20  A.  Yes.
21  Q.  And you walked to the cockpit to seek safety after
22  feeling you may be hurt by Lynnette, right?
23  A.  Yes.
24  Q.  Now, Ms. Ebert did not limit you to how long your
25  statement could be, right?

Page 149

1  A.  No.
2  Q.  Did you feel that this statement was as complete as
3  you wanted to relate to Delta Air Lines about your
4  version of the event?
5          MR. SANDERS:  Objection to the form.
6          You can answer.
7  A.  Yes.
8  BY MS. KATO:
9  Q.  So this is your statement, your version of the event,
10  right?
11  A.  Yes.
12  Q.  As of October 8, 2019, this was, to the best of your
13  ability, to be a comprehensive narrative of the event,
14  correct?
15  A.  Yes.
16  Q.  Now, if you move up just a little bit, Courtney Ebert
17  does respond to you, right?
18  A.  Yes.
19  Q.  She says I will share this with base leadership as
20  they review the situation, correct?
21  A.  Yes.
22  Q.  You will hear from one of your leaders soon with an
23  update on their review, right?
24  A.  Yes.
25  Q.  Please feel free to reach out if there's anything I

Jacqueline Meadows
May 22, 2023

Page 150

1  can do to support you in the interim, correct?
2  A.  Yes.
3  Q.  I don't see anything in here that says Courtney
4     promising to return your phone call.
5  A.  Well, that was the conversation that I had with
6     Courtney in the phone call.
7  Q.  So Courtney tells you in a phone call that I will call
8     you back?
9  A.  Yes.
10 Q.  But in a subsequent e-mail, she tells you you will
11    hear from one of your leaders?
12 A.  Yes.
13 Q.  I have one question about your statement.  Second from
14    the bottom line, it says, Captain Patrick did instruct
15    Lynnette not to approach me and stay in the aft during
16    the flight home.  Do you see that?
17 A.  Yes.
18 Q.  If you can pull out Exhibit 6 for me side by side,
19    which is Captain Cooney's statement.
20 A.  Okay.
21 Q.  Make sure Exhibits 6 and 10 are side by side.
22 A.  Okay.
23 Q.  If you look at Captain Cooney's statement, which is
24    Exhibit 6, is that his recollection or his statement
25    is that Jackie assured me that she would be okay --

Page 151

1  that you would be okay -- and would remain in the aft
2  cabin during the flight to DTW, which I think this is
3  referring to Lynette Marshall would remain in the aft.
4  A.  Yes.
5  Q.  Your statement to Courtney Ebert is that Captain
6     Cooney is the one who instructed Lynnette not to
7     approach you and to stay in the aft during the flight
8     home.  Do you see that?
9  A.  Yes.
10 Q.  Okay.  So who ordered Lynnette to go to the back of
11    the plane?
12 A.  The captain did.
13 Q.  Okay.  And you felt that was enough to deal with the
14    situation on the return trip?
15 A.  At that time, yes.
16 Q.  Does the captain have authority to direct flight
17    attendants which position to work, if you know?
18 A.  He's the commander of the ship.  I never had that
19    incident, but he's a commander.
20 Q.  Now, as a flight leader, you could position your
21    flight crew, right?
22 A.  Yes.
23 Q.  So on November 1st -- well, let me ask you this:  When
24    was the next time you spoke with Renee Mullen?
25 A.  I don't recall.

Page 152

1  Q.  Does November 1 sound about right?
2  A.  Could be.
3  Q.  Did Ms. Mullen reach out to you asking for a copy of
4     your statement?
5  A.  Yes.
6  Q.  Did she also ask for a copy of your ASAP or SRS
7     report?
8  A.  I don't remember that.  I just remember she wanted a
9     statement, yes.
10 Q.  And is this the first time Renee Mullen asked you for
11    a statement?
12 A.  Yes.
13 Q.  And if you go back to Exhibit 10 at the top, it
14    appears you had forwarded this statement October 8 to
15    Renee Mullen on November 3, 2019?
16 A.  Yes.
17 Q.  Do you recall doing that?
18 A.  Yes, yes.
19 Q.  As of November 3, 2019, were you aware Renee Mullen
20    was investigating this case?
21 A.  I don't remember.
22 Q.  Okay.
23 A.  If there was an investigation at that time, I don't
24    recall.
25 Q.  But she was asking you for information about what

Page 153

1  happened, right?
2  A.  Yes.
3  Q.  Did she ever tell you that she was investigating the
4     incident on October 7, 2019?
5  A.  I don't recall.
6  Q.  You don't recall then -- you don't remember or that
7     might have happened, or you kind of know that was not
8     said?
9  A.  I don't remember her saying that she was
10    investigating.
11 Q.  Okay.  You'd been with Delta for quite some time,
12    right, ma'am?
13 A.  Yes.
14 Q.  And you had to have had some instance of crew conflict
15    where it had to be investigated, right?
16 A.  Yes.
17 Q.  And in those situations, were you usually contacted by
18    your FSM and asked for your statement?
19 A.  Yes.
20 Q.  So this is in line with your past experience, right --
21 A.  Yes.
22 Q.  -- your FSM asking you for a statement?
23 A.  Yes.
24 Q.  And in those past occasions, you understood there was
25    some sort of investigation going on and you were being

Jacqueline Meadows
May 22, 2023

Page 154

1    asked to submit a statement as part of that
2    investigation?
3  A.   Yes.
4  Q.   Now, I understand that Renee Mullen may or may not
5    have said that she was investigating this, but was it
6    your understanding that -- well, did you have an
7    understanding as to why Renee was asking you for a
8    statement?
9  A.   No.  I mean, I'm sure she wanted a statement regarding
10   what happened, the incident, yes.
11 Q.   I'm going to show you Exhibit 11.
12              MARKED FOR IDENTIFICATION:
13              DEPOSITION EXHIBIT 11
14              2:43 p.m.
15 BY MS. KATO:
16 Q.   Ms. Meadows, have you seen this statement before?
17 A.   No.
18 Q.   Take the time to read it through and let me know when
19   you're done.
20 A.   Okay, I'm finished.
21 Q.   Have you seen this statement, this document before
22   today?
23 A.   No.
24 Q.   Now, first of all, you had -- do you recall having a
25   telephone conversation with Renee Mullen about the

Page 155

1    October 7, 2019 incident on or about November 3, 2018?
2    Should be 2019 actually.
3  A.   Yes.
4  Q.   I think the date is wrong on this note.
5  A.   Yes, uh-huh.
6  Q.   Because you certainly didn't have this conversation
7    about this flight on November 3, 2018, right?
8  A.   Right.
9  Q.   I know you just read this, but let me ask you sort of
10   a general question:  Does this appear to be an
11   accurate representation of your telephone conversation
12   with Renee Mullen?
13 A.   Some of it is right, some of it is not.
14 Q.   Tell me what part is right.
15 A.   She didn't ask me how many times I got off the
16   aircraft.
17 Q.   She didn't?
18 A.   No, she didn't ask me how many times.
19 Q.   Are we talking about things that aren't right?
20 A.   Oh, I'm sorry.
21 Q.   Let's talk about what's not right in this statement
22   then.
23 A.   Okay, okay.  She didn't ask me how many times I
24   stepped off the aircraft.  I never told her that it
25   was prospect, I just couldn't remember their name,

Page 156

1    without wheelchairs, there was wheelchairs in the jet
2    way --
3  Q.   So you never said there was a prospect?
4  A.   No.  But there was the, you know, wheelchair people.
5    I don't know if it's prospect, but I don't remember
6    saying prospect.  I don't remember telling her that I
7    saw a family in the jet bridge.
8  Q.   You didn't see a family on jet bridge?
9  A.   When I came back down, I don't remember seeing anybody
10   in the jet bridge, no.  I don't remember telling her
11   that I would have it at the end of the day, because my
12   mom was placed back on a ventilator that day and I
13   wasn't around any computers or in a mental capacity to
14   fight -- I wrote a statement that day,
15   because my mom was just placed back on a ventilator.
16 Q.   Anything else?
17 A.   No.
18 Q.   All right.  So in this statement about halfway down,
19   it starts with, she said that FSM John spoke to her
20   and I reenforced that they were both there to support
21   and that we all partner together to gather facts.  Do
22   you see that?
23 A.   Yes.
24 Q.   Do you recall Renee Mullen explaining that to you?
25 A.   No, I don't.

Page 157

1  Q.   This was after you said Austin never spoke to her
2    despite the fact that he was handling the case, right?
3  A.   Right.
4  Q.   So you don't recall Renee saying, no, we all partner
5    together to gather facts?
6  A.   No.
7  Q.   Do you recall any response from Renee Mullen about
8    Austin and John speaking to different flight
9    attendants on October 7, 2019?
10 A.   No, she didn't.
11 Q.   So she didn't have no response when you said Austin
12   never spoke to me?
13 A.   Like I said, that was a real stressful day.
14 Q.   Okay.  Ms. Meadows, I don't mean to harp on that, but
15   is it possible you might not recall some of the
16   details of this conversation because you had more
17   pressing things going on?
18 A.   Could be.
19 Q.   Now, as we just looked at in Exhibit 10, you went
20   ahead and forwarded your previous statement to
21   Courtney Ebert to Renee Mullen on November 3rd, 2019,
22   correct?
23 A.   Yes.
24 Q.   Did you feel that was sort of a sufficient statement
25   to respond to Renee Mullen's request?

Jacqueline Meadows
May 22, 2023

Page 158

1   A.   Yes.
2   Q.   About ten days after your conversation with Renee
3        Mullen, you were reassigned to field service manager
4        Christian Gunn, correct?
5   A.   I would say so, yes.
6   Q.   About November 14, 2019, thereabouts, does that sound
7        familiar?
8   A.   Yes.
9   Q.   Did you request that you be reassigned to a different
10       FSM?
11  A.   Yes.
12  Q.   Why was that?
13  A.   I just didn't like the way Renee was treating me
14       during this incident with my mom being placed back on
15       a ventilator that day and she was demanding that I
16       submit a statement to her that day.
17  Q.   Did you feel perhaps Renee was insensitive to your
18       situation?
19  A.   Yes.
20  Q.   How long have you known Renee Mullen?
21  A.   Since the Northwest days.
22  Q.   Going way back, huh?
23  A.   Yes.
24  Q.   Until this incident, had you ever had issue with Renee
25       Mullen being your FSM?

Page 159

1   A.   No.
2   Q.   Renee tends to be the FSM for pursers, right?
3   A.   Yes.
4   Q.   As a purser, I take it you had Renee as your FSM for
5        some period of time?
6   A.   Yes.
7   Q.   Until this sort of incident in which she was
8        insensitive to more pressing things in your life, any
9        issues with her?
10  A.   Yes.
11  Q.   What are those?
12  A.   When we were transitioning to the new uniform, I
13       requested to have the male uniform for personal
14       reasons; she never assisted me with doing that.
15  Q.   Okay.  Did she promise assistance or how did that
16       conversation go down?
17  A.   She never -- she would say she would look into it.
18  Q.   And she never followed up?
19  A.   Right, and there was a deadline.
20  Q.   Anything else?
21  A.   No.
22  Q.   So you requested being reassigned because Renee was
23       being rather insensitive?
24  A.   Yes.
25  Q.   Who did you make that request to?

Page 160

1   A.   With Peter.
2   Q.   Peter Saballa-Davis?
3   A.   Yes.
4   Q.   And was that request in person, in a conversation; how
5        did you convey that request?
6   A.   In a telephone conversation.
7   Q.   And what did Mr. Sabala-Davis tell you when you first
8        asked that?
9   A.   He agreed.  He agreed.
10  Q.   Did you feel he was sympathetic?
11  A.   Yes.
12  Q.   Did you feel he was very respectful of your mother's
13       situation?
14  A.   Yes.
15  Q.   Did Peter honor your request that you be assigned to a
16       new FSM?
17  A.   Yes.
18  Q.   Did you request that Christian Gunn be assigned as
19       your FSM?
20            MR. SANDERS:  Objection.  Can you repeat
21       the question?
22            MS. KATO:  Sure.
23  BY MS. KATO:
24  Q.   Did you specifically request that Christian Gunn be
25       assigned as your new FSM?

Page 161

1   A.   No.
2   Q.   And did you know FSM Christian Gunn before he became
3        your FSM on or about November 14, 2019?
4   A.   Yes.
5   Q.   How did you know him?
6   A.   He was a flight attendant.
7   Q.   Did the two of you fly together?
8   A.   Years ago.
9   Q.   Did you ever have any issue with Mr. Gunn?
10  A.   No.
11  Q.   Now, at any point, did -- at some point, did Mr. Gunn
12       tell you he was taking over the investigation from
13       Renee Mullen?
14  A.   No.
15  Q.   Do you recall a conversation with Mr. Gunn on or about
16       December 2nd in which he asked you for your statement
17       as part of the investigation?
18  A.   No, I don't recall that.
19  Q.   Okay.  Was this during the time you were dealing with
20       your mom?
21  A.   Yes, ma'am.
22  Q.   And I don't mean to imply anything, but is it possible
23       that some of these conversations might have fallen to
24       the wayside because you had more pressing things going
25       on in your life?

Jacqueline Meadows
May 22, 2023

Page 162

1   A.   Yes.
2   Q.   So you don't recall advising Mr. Gunn that you had
3        already provided a statement to HR?
4   A.   I don't recall.  I could have, but I don't remember.
5   Q.   Does it sound vaguely familiar?
6   A.   Could have been, yes.
7   Q.   So beyond your conversation with Renee Mullen after
8        which you requested to having a new FSM assigned and
9        possibly a conversation with Mr. Gunn about a
10       statement of the October 7 incident, do you know what
11       Delta Air Lines did to continue investigating the
12       incident of October 7, 2019?
13  A.   No.
14  Q.   Okay.  Were you advised that the investigation was
15       still ongoing?
16  A.   No.
17  Q.   You weren't?
18  A.   No one told me.
19  Q.   Okay.  Do you recall a crew conflict on or about
20       January 20, 2021 -- actually, I'm sorry, January 20,
21       2020 I think?
22  A.   No, I don't remember.
23  Q.   Do you recall an incident in which a crew member
24       complained that you assigned positions out of
25       seniority order --

Page 163

1   A.   Oh, yes.
2   Q.   -- and he thought you were being a little belligerent?
3   A.   That's his opinion.
4   Q.   Of course.
5   A.   That's his opinion.
6   Q.   But you do recall that complaint?
7   A.   Yes.
8   Q.   Do you recall on that incident you met with FSM
9        Cheronda Davis and Kara Vannaman?
10  A.   What date?
11  Q.   On or about early February of 2020.
12  A.   Yes.
13  Q.   And do you recall in that -- on that occasion, Ms.
14       Vannaman advised you that your investigation -- or the
15       investigation about the October incident was still
16       ongoing?
17  A.   Yes.
18  Q.   So you were told at some point?
19  A.   Oh, at some point, yeah.  I don't remember everything,
20       yeah.
21  Q.   That's why we do this.
22  A.   Okay.
23  Q.   Trust me, you're not the first plaintiff to not
24       remember things.
25              MS. KATO:  Do you want a break?

Page 164

1              MR. SANDERS:  That's fine with me.
2              (Off the record at 2:58 p.m.)
3              (Back on the record at 3:11 p.m.)
4   BY MS. KATO:
5   Q.   Ms. Meadows, before we took a break, we talked about
6        the fact that last time you spoke to Renee Mullen
7        about your statement, or your version of the story,
8        was on November 3rd or thereabout, followed by a
9        possible conversation with Christian Gunn in which he
10       asked you for a statement and you directed him that
11       you had already provided one to human resources,
12       right?
13  A.   Yes.
14  Q.   And just to refresh your recollection that in early
15       February you were advised that the investigation was
16       still ongoing?
17  A.   Yes.
18  Q.   And the next -- is it fair to say -- when was the next
19       time you heard about the outcome of the investigation?
20  A.   I would say April, sometime around April, yeah.
21  Q.   So do you have any understanding as to what was
22       happening with respect to the investigation on the
23       Delta Air Lines end during that time?
24  A.   No.
25  Q.   So I take it you have no knowledge that your case was

Page 165

1        referred to a workplace violence committee review?
2   A.   No, I did not.
3   Q.   And I take it you didn't know that Lynnette Marshall's
4        case was also referred to a review by the workplace
5        violence committee?
6   A.   No, I did not.
7   Q.   And am I correct that you don't know who from
8        Detroit's leadership team submitted you and FA
9        Marshall's case to be reviewed by the workplace
10       violence committee?
11  A.   No.
12  Q.   And I think the answer is no on this one, but I want
13       to make sure:  You're not aware what position that
14       Detroit base team took with respect to recommendation
15       for your discipline, right?
16  A.   No, I did not know.
17  Q.   By the way, do you know who made a decision as to your
18       FCAN?  And FCAN being the final corrective action
19       notice, right?
20  A.   From the letter I got, it was from Peter and
21       Christian, uh-huh.
22  Q.   So you're assuming based on Christian Gunn's name on
23       the letter and -- let me back up.
24              That's the letter that Mr. Christian Gunn's
25       name was on it, but it was signed by Mr.

Jacqueline Meadows
May 22, 2023

Page 166

1    Saballa-Davis, right?
2    A.   Yes.
3    Q.   And from that, you assumed that they were the
4    decision-makers?
5              MR. SANDERS:  Objection.  Can you repeat
6         that?
7              MS. KATO:  Sure.
8    BY MS. KATO:
9    Q.   Based on that letter, is it your assumption that they
10        were the decision-makers with respect to your
11        discipline?
12   A.   Yes.
13   Q.   Do you have any other knowledge, personal knowledge or
14        facts, to suggest that these two gentlemen made the
15        decision with respect to your discipline?
16   A.   No.
17   Q.   If I told you that your case was reviewed by a
18        workplace violence committee, along with the case with
19        Lynnette Marshall, you have no reason to dispute that,
20        right?
21   A.   No.
22   Q.   And if I told you that the Detroit leadership actually
23        recommended that -- let me back up.
24             So if I told you that the leadership at
25        Detroit actually advocated for you in front of the

Page 167

1    workplace violence committee, you have no reason to
2    dispute that, right?
3    A.   No.
4    Q.   You just don't know what happened?
5    A.   No.
6    Q.   If I told you that the Detroit leadership actually
7         recommended to the workplace violence committee that
8         your comment of I will take you down was not a
9         workplace violence, you have no reason to dispute
10        that?
11   A.   Rephrase that.
12   Q.   Sure.  If I told you that the Detroit leadership team
13        advocated for you by suggesting to the workplace
14        violence committee what happened on October 7th was
15        not a workplace violence on either side, you have no
16        reason to dispute that, right?
17             MR. SANDERS:  Objection, form.
18             You can answer the question.
19   A.   I'm not understanding the question.
20   BY MS. KATO:
21   Q.   So what I'm saying is that if what I told you that
22        what Detroit leadership did, what they told the
23        workplace violence committee that we just talked about
24        earlier today, was that in our view, Jackie did not
25        engage in workplace violence despite the fact there is

Page 168

1    a comment about I'll take you down, you have no reason
2    to dispute that, right?
3    A.   No.
4    Q.   As you sit here today, Ms. Meadows, can you name me
5         any Delta employee based in Detroit whose conduct was
6         found to be workplace violence by the workplace
7         violence committee but was not terminated?
8              MR. SANDERS:  Object to form and
9         foundation.
10             MS. KATO:  I'm asking if she knows.
11   A.   No.
12   BY MS. KATO:
13   Q.   Okay.  It's either you know --
14   A.   Yeah, yeah, I get it.
15   Q.   Can you name me any Delta employee, whether or not
16        they were based in Detroit, whose conduct was found to
17        be workplace violence by the workplace violence
18        committee but was not terminated?
19             MR. SANDERS:  Same objection.
20             You can answer.
21   A.   Yes.
22   BY MS. KATO:
23   Q.   Okay.
24   A.   I read an article.  A flight attendant assaulted
25        another flight attendant on a plane and wasn't

Page 169

1    terminated.  Michael, I can't remember the last name.
2    Q.   Where did you read that article?
3    A.   Bloomberg Report.
4    Q.   Was that a Delta flight attendant?
5    A.   Yes.
6    Q.   Do you know when you read that article?
7    A.   About a year ago.
8    Q.   And do you recall where that flight attendant was
9         based?
10   A.   Detroit.
11   Q.   Is this someone you know?
12   A.   No.
13   Q.   His first name is Michael?
14   A.   I'm assuming.
15   Q.   What do you mean?
16   A.   I have to look at the article again, but I want to say
17        yes, but I can't remember his last name.
18   Q.   Do you still have a copy of that article, ma'am?
19   A.   Not with me.  I mean, I didn't save it.  You can
20        Google it.
21   Q.   Okay.  It was about a year ago?
22   A.   Yep.
23   Q.   It was in Bloomberg?
24   A.   Yes.
25   Q.   And the article was this flight attendant named

Jacqueline Meadows
May 22, 2023

Page 170

1    Michael assaulted another flight attendant but was not
2    terminated?
3  A.  Yes.
4  Q.  Do you know what discipline this Michael got?
5  A.  Reading the court cases, I think 18 months.
6  Q.  What do you mean court cases?
7  A.  When you click on the article, you can click on the
8    court case.
9  Q.  Was this part of a litigation?
10  A.  Yes.
11  Q.  Okay.  This is about a year ago?
12  A.  Yes.
13  Q.  Anybody else?
14  A.  Gina Henderson was the flight attendant that was
15    assaulted.
16  Q.  Gina Henderson got terminated, didn't she?
17  A.  Yes.
18  Q.  So I guess my question was:  Can you name me any Delta
19    employee whose conduct was found to be workplace
20    violence by the workplace violence committee but not
21    terminated.  So does Michael still fit into that --
22  A.  I would assume, yes.
23  Q.  You would assume?
24  A.  I don't know if he's still active as a flight
25    attendant.

Page 171

1  Q.  Okay.
2  A.  But from reading the article, he was still employed.
3  Q.  Okay.  So that's -- and that was the article about
4    ongoing litigation?
5  A.  It was.
6        MR. SANDERS:  Objection to the form of the
7    question.
8  BY MS. KATO:
9  Q.  I think when you say court case -- well, let me ask
10    you this:  Describe the article for me.  What was the
11    context in which this article was portraying this
12    Michael's case?
13  A.  They got into an argument and he pushed her into the
14    airplane door and she broke her wrist and he called
15    her the N word.
16  Q.  And this is something Michael did?
17  A.  Yes.
18  Q.  And you believe that's a Detroit-based flight
19    attendant?
20  A.  Yes, both of them were, yes.
21  Q.  Gina Henderson was terminated, so she doesn't fit the
22    bill, right?
23  A.  No.
24  Q.  So other than Michael, anybody else?
25  A.  No.

Page 172

1  Q.  Okay.  Now, do you know of any Detroit-based Delta
2    employee who was actually advised that their case was
3    being reviewed by the workplace violence committee?
4  A.  No.
5  Q.  Ms. Meadows, have you dealt with any member of Delta's
6    legal team --
7  A.  No.
8  Q.  -- aside from having the pleasure of meeting Ms. Erin
9    Harris this morning?
10  A.  No.
11  Q.  Anybody else?
12  A.  Uh-uh.
13  Q.  Have you dealt with anyone from Delta's equal
14    employment opportunity department?
15  A.  No.
16  Q.  And have you dealt with anyone from Delta's corporate
17    security team?
18  A.  No.
19  Q.  So let me put a date on this conversation with
20    Cheronda Davis and Kara Vannaman.  Our record is that
21    on February 6, 2020, you met with FSM Davis and Base
22    Manager Kara Vannaman regarding a crew complaint
23    against you arising out of your location on January
24    20, 2020.
25  A.  Yes.

Page 173

1  Q.  And I think your testimony is you do recall that
2    complaint?
3  A.  Yes.
4  Q.  With that incident, you were ultimately issued an
5    informal verbal coaching, correct?
6  A.  I don't recall.
7  Q.  Do you recall getting disciplined for that?
8  A.  No.
9  Q.  Do you understand that informal verbal coaching has no
10    probation attached to it?
11  A.  Yes.
12  Q.  So do you understand what we call the IVC is sort of
13    on paper only, right?
14  A.  Yes.
15  Q.  And I think your testimony was that on this occasion
16    on February 6 of 2020, Kara Vannaman informed you that
17    the investigation was still ongoing?
18  A.  Yes.
19  Q.  You do recall that conversation?
20  A.  Yes.
21  Q.  Was that the only time you ever dealt with Kara
22    Vannaman?
23  A.  Yes.
24  Q.  Have you dealt with Ms. Vannaman since?
25  A.  No.

Jacqueline Meadows
May 22, 2023

Page 174

1  Q.  Had you worked with Ms. Vannaman before that date?
2  A.  No.
3  Q.  So that's the only time?
4  A.  Yes.
5  Q.  Now, this wasn't the first time you were issued an
6      informal verbal coaching for crew conflict about your
7      leadership style, right?
8  A.  I don't recall any.
9  Q.  Do you recall in November 2017 you were given coaching
10     for a crew conflict complaint filed by a flight
11     attendant named Dior?
12 A.  I remember that incident.
13 Q.  And it was a crew member, Dior, who complained that
14     you did not follow the established process assigning
15     positions, right?  Do you recall that?
16 A.  No.
17 Q.  What do you recall about that incident?
18 A.  She was the speaker on the flight and she was working
19     on one side of the aisle and a passenger didn't want
20     to be disturbed.  She disturbed the lady.  She was
21     saying she was talking too loud, that Dior was talking
22     too loud, and the lady -- the passenger didn't want
23     Dior to have any interaction with her.
24 Q.  When you say speaker, she's the destination --
25 A.  LD, yes.

Page 175

1  Q.  What language was she speaking?
2  A.  French.  It was to Paris.
3  Q.  Were you a purser on this flight?
4  A.  Yes.
5  Q.  Do you recall that there was a complaint against you
6      that you were rather unkind when Dior was having an
7      asthma attack in the galley?
8  A.  I was not aware that Dior had an asthma attack in the
9      galley.
10 Q.  Did you come to learn that that was the complaint
11     filed against you, that you were unkind to her when
12     she was having an asthma attack?
13 A.  I didn't know she had an asthma attack in the galley.
14 Q.  Was that ever brought to your attention, that was her
15     allegation against you?
16 A.  No.
17 Q.  Do you recall being coached on this occasion that you
18     do need to work on your relationship with the crew
19     members and to foster positive crew member
20     interactions?
21 A.  No.
22 Q.  You don't recall being coached about that?
23 A.  No.
24 Q.  You don't recall having this conversation with Renee
25     Mullen?

Page 176

1  A.  I did have a conversation with Renee, yes.
2  Q.  All right.  So what was your conversation with Renee
3      back in 2017 then?
4  A.  She asked me what happened and I told her that the
5      passenger didn't want to have any interaction with
6      Dior, and so I had them switch sides, because we still
7      had another service to do before we landed, just so
8      there would be no conflict between the passenger and
9      her.  I did speak to Dior and let her know that I'm
10     going to switch sides with you.  She wasn't happy and
11     I said let's just keep an even keel, let's work
12     together as a team, you switch sides, I can't remember
13     who the other flight attendant was, and then we'll be
14     landing like in two hours and it will be over with.
15 Q.  So you don't recall in that occasion Renee Mullen had
16     a conversation like Jackie, maybe you do need to work
17     a little bit on your crew communication skills?
18 A.  No.
19         MR. SANDERS:  Objection, asked and
20     answered.
21 BY MS. KATO:
22 Q.  On or about February 24 you texted Mr. Saballa-Davis
23     and asked to connect with him so you can tell him your
24     side of the story.  Do you remember that?
25 A.  Yes.

Page 177

1  Q.  Did Mr. Saballa-Davis respond back to you?
2  A.  Yes.
3  Q.  What did he say?
4  A.  He said we'll schedule a time and date.
5  Q.  Now, February 21, 2020 sounds awfully close to the
6      start of the pandemic.
7  A.  Yes.
8  Q.  So essentially, did you connect with Mr. Saballa-Davis
9      before the world kind of went upside down?
10 A.  I can't remember.
11 Q.  Essentially pretty much all of our lives turned
12     upsidedown, right?
13 A.  Yes.
14 Q.  Now, on April 3rd you were contacted by base manager
15     Melissa Drue to schedule a meeting to close out the
16     investigation.  Do you recall that?
17 A.  Yes.
18 Q.  What was your conversation with Ms. Drue like?
19 A.  I just asked her -- I told her that I was supposed to
20     have a meeting with Peter to discuss everything and
21     she said she was unaware of that and she would contact
22     Peter and then she would get back with me.
23 Q.  And did Ms. Drue later confirm that meeting for you
24     with Peter?
25 A.  I don't recall.  I can't remember.

Page 178

1  Q.  All right.  Let's see if we can help you out.
2                MARKED FOR IDENTIFICATION:
3                DEPOSITION EXHIBIT 12
4                3:33 p.m.
5  BY MS. KATO:
6  Q.  Ms. Meadows, I handed you what has been marked as
7      Exhibit 12 to your deposition.  This, I believe, is an
8      e-mail that was addressed to you, but go ahead and
9      take a moment to read it and let me know when you're
10     done.
11 A.  Okay.
12 Q.  Do you recognize this e-mail?
13 A.  No.
14 Q.  You don't?
15 A.  No.
16 Q.  Do you recall receiving it?
17 A.  No.
18 Q.  All right.  Jacqueline.meadows@delta.com, that's your
19     e-mail address?
20 A.  Yes.
21 Q.  You don't recall this at all?
22 A.  I don't.  I don't.  I don't remember seeing it.  I
23     don't.
24 Q.  I will tell you, ma'am, we did pull this out of your
25     e-mail account.  Is it possible you just may not have

Page 179

1      seen it?
2  A.  Could have been.
3  Q.  Well, then let me ask a question then:  Did Ms. Drue
4      help you sort of lock in a meeting with Mr.
5      Saballa-Davis on April 13th at 10:00?
6  A.  Yes.
7                MR. SANDERS:  Objection to the form and
8      foundation.  Are you asking her based upon what she's
9      looking at or her recollection?
10               MS. KATO:  Both, actually.
11 BY MS. KATO:
12 Q.  Well, the e-mail says that she -- meeting at your
13     request, second line, at your request, a meeting will
14     be on Monday, April 13 at 10:00 a.m., as you expressed
15     a desire to not meet on a day you have a rotation.  Do
16     you see that?
17 A.  Yes.
18 Q.  So does that comport with your recollection that you
19     actually had a meeting with Mr. Saballa-Davis on April
20     13 at 10:00?
21 A.  I don't remember.
22 Q.  All right.
23 A.  I don't.
24 Q.  Well, do you remember having a telephone conversation
25     with Mr. Saballa-Davis?

Page 180

1  A.  Yes.
2  Q.  All right.  And tell me about that conversation.  What
3      do you recall?
4  A.  I think I have -- I think I had a few conversations
5      with him that week.
6  Q.  How many conversations?  Let's start with that.
7  A.  I can't recall.  It was more than one.
8  Q.  So this is the week of April 13, 2020?
9  A.  Yes.
10 Q.  I'm not sure April -- that's a Monday, so the week of
11     April 13?
12 A.  It says 2020 at the top.
13 Q.  It says Monday, so I'm assuming that's the start of
14     the week.
15 A.  Yes.
16 Q.  Tell me about -- tell me generally what you recall of
17     your conversation with Peter Saballa-Davis during the
18     week of April 13.
19 A.  I remember we scheduled a phone conversation.  I can't
20     remember the day, but I do remember having a phone
21     conversation with him regarding the investigation.
22 Q.  All right.  So tell me what the content of that
23     conversation was between you and Mr. Saballa-Davis.
24 A.  That I was being placed on an FCAN for 36 months and
25     being removed from the purser program immediately.

Page 181

1  Q.  Ms. Meadows, are you sure that's not the meeting on
2      April 29th?
3  A.  I can't remember.
4  Q.  All right.  So let me ask you this:  Before you had
5      this conversation with Mr. Saballa-Davis in which you
6      were advised of your discipline, did you have a
7      conversation with Mr. Saballa-Davis in which you said,
8      I want to tell you my side of the story; do you recall
9      that?
10 A.  No.
11 Q.  You don't?
12 A.  No.
13 Q.  You don't recall Mr. Saballa-Davis asking you, have
14     the leaders asked you to provide statements?
15 A.  No.
16 Q.  Okay.  So when you said several conversations, what
17     else do you recall with respect to your conversations
18     with Mr. Saballa-Davis?
19 A.  Conversation was I was having a -- he had to clear it
20     with the regional director, if we can just have the
21     conversation over the phone regardless -- versus me
22     coming into the office, because it was COVID.
23 Q.  Right.
24 A.  Yeah.
25 Q.  Was anything discussed about the incident or the

Jacqueline Meadows
May 22, 2023

Page 182

1    investigation?
2    A.    During that conversation?
3    Q.    Yes.
4    A.    No.  We were trying to schedule a day.
5    Q.    So is it your testimony, ma'am, that prior to being
6          handed an FCAN, you did not have any substantive
7          conversation with Mr. Saballa-Davis about the
8          investigation?
9    A.    No, just when I was given the discipline.
10   Q.    Okay.
11   A.    Yes.
12   Q.    Did you have a substantive conversation with Mr.
13         Saballa-Davis when you were given FCAN?
14   A.    No.
15   Q.    Okay.  Let's see if we can get a timeline in place
16         here.
17                  MARKED FOR IDENTIFICATION:
18                  DEPOSITION EXHIBIT 13
19                  3:39 p.m.
20   BY MS. KATO:
21   Q.    Ms. Meadows, I handed you -- well, the court reporter
22         has handed you Exhibit 13 to your deposition, which
23         appears to be your e-mail with Mr. Saballa-Davis in
24         which you actually respond, so I'm hoping you recall
25         this e-mail.

Page 183

1    A.    Okay, yes.
2    Q.    So this starts on April 25th of 2020 at the bottom
3          with you reaching out to Mr. Saballa-Davis and
4          proposing that conversation -- that following your
5          conversation on April 23, 2020, that you agree to have
6          a telephone conversation with him on Monday, April 27,
7          2020 any time after 11 a.m.
8    A.    Yes.
9    Q.    You see that?
10   A.    Yes.
11   Q.    So does that refresh your recollection as to you had a
12         telephone conversation with Mr. Saballa-Davis before
13         you were given FCAN?
14   A.    Yes.
15   Q.    Because it says as per our conversation?
16   A.    On April 23rd, right, that's when we were trying to
17         set up a date.
18   Q.    So you had a telephone conversation with Mr.
19         Saballa-Davis on April 23rd?
20   A.    Yes.
21   Q.    And what did you talk about on the 23rd?
22   A.    Setting up a date and time to explain to him what
23         happened.
24   Q.    Okay.  So you don't recall the conversation -- the
25         content of the conversation on the 23rd; you guys

Page 184

1          didn't talk about anything substantive?
2    A.    I can't recall the conversation April 23rd.
3    Q.    Is it possible that you told him that I was never
4          given a chance to tell my side of the story?
5    A.    I could have said that, yes.
6    Q.    It's possible --
7    A.    Yes.
8    Q.    -- you just don't remember?
9    A.    That specific day, yes.
10   Q.    This was before you were given FCAN, right?
11   A.    Yes.
12   Q.    Again, this is three years ago, so as we talk, I know
13         some things come back to you, so I'm going to ask you
14         to let me know if that happens.
15   A.    Uh-huh.
16   Q.    Backing up, so is it your recollection that now that
17         I've given you some papers to refresh your
18         recollection, that you made have had a conversation
19         with Mr. Saballa-Davis about the substance of the
20         investigation; namely, you saying I want to tell my
21         side of the story or I was never given an opportunity
22         to tell my side of the story?
23   A.    I don't recall that.
24   Q.    You don't recall making that representation to Mr.
25         Saballa-Davis, that I didn't get to tell my side of

Page 185

1          the story?
2    A.    No.
3    Q.    Okay.  Did you feel like you couldn't tell your side
4          of the story?
5    A.    Yes.
6    Q.    Well, you were given -- you gave a statement to
7          Courtney Ebert on October 8th, right?
8    A.    Yes.
9    Q.    And Renee Mullen asked you for a statement on November
10         3rd, understanding you had more pressing things going
11         on in your life, but there was another opportunity in
12         which Delta invited you to give your statement, right?
13   A.    No.
14   Q.    Why not?
15   A.    I don't know.
16   Q.    Well, because Renee Mullen asked you for a statement,
17         and I understand that --
18   A.    Yes, I did --
19   Q.    -- you felt that her timing was rather insensitive,
20         but she did ask you for your statement, right?
21   A.    Yes.
22   Q.    And you chose to just forward the statement you
23         already had provided to Courtney Ebert, correct?
24   A.    Yes.
25   Q.    And I think we went over this, that -- there might

Jacqueline Meadows
May 22, 2023

Page 186

1   have been, to the best of your recollection, a
2   conversation with Christian Gunn in which he asked you
3   for a statement and you also indicated to him that you
4   already provided one?
5   A.   Yes.
6   Q.   So what makes you think that you didn't get a chance
7        to tell your side of the story?
8   A.   No one ever came and asked me what happened.
9   Q.   But you were asked to give a statement, that was your
10       opportunity to say what happened, right?
11                MR. SANDERS:   Objection, argumentative.
12  A.   No.
13  BY MS. KATO:
14  Q.   You didn't see that as an opportunity to tell your
15       side of the story?
16  A.   No.
17  Q.   What did you see that request for a statement as?
18  A.   Nobody came and asked me what happened; nobody asked
19       me what happened on that airplane.
20  Q.   Okay.  So we can go -- we can review your statement to
21       Courtney Ebert, but does that not represent your side
22       of the story?
23  A.   Yes.
24  Q.   Okay.  So that was something you did give Delta Air
25       Lines, right?

Page 187

1   A.   Yes.
2   Q.   So beyond that statement that you provided Courtney
3        Ebert on October 8 that you subsequently forwarded to
4        Renee Mullen, what else would you have told Delta Air
5        Lines as part of your story?
6   A.   Well, I would've liked to have a conversation with
7        someone versus an e-mail on what happened.
8   Q.   Okay.  Well, you had a conversation with Renee Mullen
9        on November 3rd, right?  Again, understanding that her
10       timing wasn't great.
11  A.   That was not a good day.
12  Q.   Right.  And again, you had a conversation with
13       Christian Gunn, or possibly a conversation with Mr.
14       Gunn, and I understand that was not great timing
15       either.
16  A.   And I don't remember having a conversation with him.
17  Q.   So who did you want to have a conversation with?
18  A.   With Peter.
19  Q.   Okay.  And what would you have told him that you
20       didn't already tell Courtney Ebert?
21  A.   I would have asked him, like I did before, if we all
22       could meet and everybody tell their side of the story
23       about what happened from me, the captain, Lynnette,
24       witnesses, to tell the story.
25  Q.   Okay.  So you wanted to have sort of like a, for lack

Page 188

1   of better terms, kumbaya meeting?
2                MR. SANDERS:   Objection, form.  Maybe more
3        or less an opportunity to confront the witnesses
4        against her.
5                MS. KATO:   Is that what kumbaya is?
6        MR. SANDERS:   I don't know, that sounded
7        like what she said to me.
8   BY MS. KATO:
9   Q.   So other than the fact that you -- you wanted to have
10       a meeting where everybody basically sat around the
11       table and told their stories?
12  A.   Told the truth.
13  Q.   Well --
14  A.   Tell the truth.
15  Q.   Okay.  And then what?
16  A.   Once the truth come out, it's your side, your side,
17       your side, my side, and then the truth comes out, then
18       a decision can be made.
19  Q.   All right.  What if the truth -- well, Lynnette
20       Marshall certainly had a different version of the
21       truth than you did, right?
22  A.   I'm assuming.  I never saw anything that she's
23       written.  I don't know what she said.
24  Q.   Well, so how would you know what the truth is in that
25       situation?

Page 189

1   A.   Because I asked.  I'm like what -- who said something
2        about me?  I wanted to know who said something about
3        me.
4   Q.   But that's different than everyone having a meeting,
5        right?
6   A.   Well, if she's included in the meeting, she can tell
7        her side of the story, yeah.
8   Q.   All right.  So that was one thing you wanted.
9   A.   Yeah.
10  Q.   Anything else?
11  A.   No.
12  Q.   Okay.  So that's possibly the conversation that took
13       place on April 23rd?
14                MR. SANDERS:   Objection, form.
15                MS. KATO:   I'm asking.
16                MR. SANDERS:   What's possibly the
17       conversation that took place?
18  BY MS. KATO:
19  Q.   So the conversation -- you told Peter that you wanted
20       to tell your side of the story and you wanted to have
21       a meeting with everyone around the table, is that what
22       you believe -- what you might have conveyed to Peter
23       April 23rd?
24  A.   Yes.
25  Q.   But not 100 percent sure?

Jacqueline Meadows
May 22, 2023

Page 190

1    A.   Not 100 percent sure, but yes.
2    Q.   All right.  So back to Exhibit 13.  Now, that post --
3         so your e-mail is following that conversation, right?
4    A.   Uh-huh.
5    Q.   Did Mr. Saballa-Davis tell you that he had to schedule
6         a meeting to close out the investigation?
7    A.   I don't recall that.  I don't recall him saying I got
8         to close this out.
9    Q.   Okay.
10   A.   I don't remember that, no.
11   Q.   Well, he asked you to give him your availability,
12        right?
13   A.   Yes.
14   Q.   Do you recall why he was asking you for your
15        availability?
16   A.   No, he just wanted to speak with me.
17   Q.   If we go through this exchange on Exhibit 13, you end
18        with the two of you agreeing to speak on April 29,
19        2020 at 12:30 --
20   A.   Yes.
21   Q.   -- correct?
22   A.   Yes.
23   Q.   Do you recall having that conversation with Peter on
24        April 29th?
25   A.   I'm going to say that's the conversation when I was

Page 191

1         given the discipline.
2    Q.   All right.
3              MARKED FOR IDENTIFICATION:
4              DEPOSITION EXHIBIT 14
5              3:48 p.m.
6    BY MS. KATO:
7    Q.   Ms. Meadows, I handed you what has been marked as
8         Exhibit 14.  I presume you're familiar with this
9         document, but please feel free to take the time to
10        read it, if you'd like.
11   A.   Yes, I'm familiar.
12   Q.   How was this document given to you?
13   A.   It was given to me by Tracy Coram.
14   Q.   Tracy?
15   A.   Coram, I think that's it.
16             MR. SABALLA-DAVIS:  That's C-O-R-A-M.
17   BY MS. KATO:
18   Q.   And when did Tracy hand you the document?
19   A.   It was after this date.  In '21, I believe.
20   Q.   In 2021?
21   A.   I believe.  I can't remember, yeah.  I can't remember.
22             MR. SANDERS:  Did you say 2021?
23             THE WITNESS:  Yeah, I can't remember when
24        she gave me this, because this was -- she gave this to
25        me, but the FCAN was already in effect.

Page 192

1    BY MS. KATO:
2    Q.   All right.
3    A.   But I can't remember the date that she gave this to
4         me.
5    Q.   Okay.  So tell me about your conversation with Mr.
6         Saballa-Davis on April 29th.
7    A.   He basically repeated what was here to me.
8    Q.   Did he read it out to you, do you recall?
9    A.   I wouldn't say it was, oh, this is what happened.  He
10        was saying that I was being placed on a final
11        correction notice and I would be removed from the
12        purser program.
13   Q.   Did he advise you that the reason you were being
14        placed on FCAN is because you violated Delta Air
15        Lines' workplace violence policy?
16   A.   Yes.
17   Q.   So you were aware of that?
18   A.   Yes.
19   Q.   Did he make a reference to your comment, I will take
20        you down?
21   A.   Yes.
22   Q.   So you were aware as of April 29th that was the reason
23        you were being placed on FCAN?
24   A.   Yes.
25   Q.   And you were told that open door policy was available

Page 193

1         for you to seek support from leadership, right?
2    A.   Yes.
3    Q.   Was this something you were already aware of?
4    A.   Yes.
5    Q.   As a long-time Delta employee, that's something -- I
6         mean, Delta has a policy of letting you guys reach out
7         to any leaders you'd like, right?
8    A.   Yes.
9    Q.   And that's part of the open door policy, right?
10   A.   Yes.
11   Q.   And if I could call your attention to Exhibit 2, which
12        is The Way We Fly, if you can turn to page 11 for me.
13        Let me know when you're there.
14   A.   I'm here.
15   Q.   So page 11 has a heading Our Open Door Policy.  Do you
16        see that?
17   A.   Uh-huh.
18   Q.   Okay.  And halfway down the paragraph, I'm thinking
19        maybe second or third sentence, is while you are
20        encouraged to first speak with the immediate leader,
21        you may work through divisional and corporate
22        leadership as appropriate, speak directly with a human
23        resources professional or the equal opportunity
24        department or contact Delta's ethics and compliance
25        help line.  Do you see that?

Jacqueline Meadows
May 22, 2023

Page 194

1    A.    Yes.
2    Q.    So that's Delta's open door policy, right?
3    A.    Yes.
4    Q.    And have you utilized the open door policy in the
5          past?
6    A.    No.
7    Q.    You haven't?
8    A.    No.
9    Q.    But this policy essentially meant you could discuss
10         your discipline with any leader, including the vice
11         presidents, right?
12   A.    Yes.
13                 MR. SANDERS:  Objection, form, foundation.
14         You can answer.
15   A.    Yes.
16   BY MS. KATO:
17   Q.    I'm going to hand you what has been marked as Exhibit
18         15.
19                 MARKED FOR IDENTIFICATION:
20                 DEPOSITION EXHIBIT 15
21                 3:52 p.m.
22   BY MS. KATO:
23   Q.    I've handed you what has been marked as Exhibit 15 to
24         your deposition.  This is an e-mail chain, which
25         includes you, so I'm hopeful you recall this, but let

Page 195

1          me know.  Do you recall this e-mail?
2    A.    Yes.
3    Q.    Okay.  First of all, middle of the page, this is an
4          e-mail from Captain Patrick Cooney to you on February
5          10 of 2020.  It simply says statement.  But it is
6          actually sent to what appears to be your personal
7          e-mail address of groomingbyjacqueline@gmail.com.  Do
8          you see that?
9    A.    Yes.
10   Q.    Can you tell me how Captain Cooney had your personal
11         e-mail address?
12   A.    He asked me for it.
13   Q.    Okay.  When did he ask you for your personal e-mail?
14   A.    Sometime like in February.
15   Q.    And how did he reach out to you?
16   A.    We flew together on a trip, yes.
17   Q.    Since October 7th, 2019?
18   A.    Yes, after.
19   Q.    And he personally asked you for your personal e-mail
20         address?
21   A.    Yes.
22   Q.    Did he tell you why he needed it?
23   A.    Yes.
24   Q.    What did he say?
25   A.    He wanted me to have a copy of his statement.

Page 196

1    Q.    If you go to the top of that page, on April 28th, so
2          this is a day before you were handed your FCAN, you
3          reached out to Captain Cooney to say, hello, Patrick,
4          I hope all is well.  Can you please call me?  And you
5          provided what appears to be your personal number?
6    A.    Yes.
7    Q.    First, did he ever call you?
8    A.    No.
9    Q.    He didn't?
10   A.    No.
11   Q.    Okay.  What were you hoping to discuss with Captain
12         Cooney by asking him to call you?
13   A.    I wanted to talk to him about us getting together to
14         talk about what happened.  I wanted his support on it.
15   Q.    So this is back to sort of the roundtable discussion
16         we've been talking about?
17   A.    Yes.
18   Q.    Are you aware that Captain Cooney retired in 2020?
19   A.    Yes, I heard.
20   Q.    When did you hear that?
21   A.    I can't remember.  One of the other pilots told me he
22         retired.
23   Q.    Was it shortly after he retired?
24   A.    I don't know the timeframe when he retired.
25   Q.    He retired sometime in 2020 shortly after COVID hit.

Page 197

1    A.    Okay.
2    Q.    Does that refresh your recollection as to --
3    A.    I don't recall.  I remember one of the other pilots
4          telling me that he retired, yeah.
5                  MARKED FOR IDENTIFICATION:
6                  DEPOSITION EXHIBIT 16
7                  3:54 p.m.
8    BY MS. KATO:
9    Q.    Ms. Meadows, I handed you what has been marked Exhibit
10         16.  Again, this is an e-mail that includes you, so
11         I'm hopeful that you are familiar with it.  But go
12         ahead and take your time and let me know when you're
13         done.
14   A.    Yes, I remember.
15   Q.    All right.  So at the bottom of the page on April 22nd
16         you reach out to Allison Ausband, and Ms. Ausband is
17         executive vice president and chief customer experience
18         officer, correct?
19   A.    I think that's her new position.
20   Q.    What was your understanding of her position at the
21         time you reached out to her?
22   A.    Vice president of in-flight.
23   Q.    Why were you reaching out to her?
24   A.    Because I wanted to talk about the case.
25   Q.    And were you still, at this point, hoping for the

Jacqueline Meadows
May 22, 2023

Page 198

1    roundtable discussion we've been talking about today?
2    A.   Yes.
3    Q.   Anything else that you were hoping to sort of get
4         support from Ms. Ausband?
5    A.   Yes.
6    Q.   What were those?
7    A.   Yes, for all of us to get together.
8    Q.   I think we got distracted.  The question was:
9         Anything else you were seeking from Ms. Ausband?
10   A.   No.
11   Q.   And Vice President Ausband also -- her reply to you
12        also mentioned that you had reached out to Sandy
13        Gordon, senior vice president of airport operations,
14        and I think we talked about your discussion with Ms.
15        Gordon earlier today.
16            So had you reached out to Ms. Gordon since
17        the -- since you switched FSM to Mr. Gunn?  Because I
18        think your conversation with Ms. Gordon, your
19        testimony was that it was when Renee was still your
20        FSM, right?
21   A.   I think so, yes.
22   Q.   Have you reached out to her since then?
23   A.   No.
24   Q.   So that was the only time you reached out to Ms.
25        Gordon?

Page 199

1    A.   Yeah.
2    Q.   And Vice President Ausband told you that she would ask
3         Claudine Rydstrand, who is the corporate director of
4         IFS, field operations center region, to reach out to
5         you, right?
6    A.   Yes.
7    Q.   And did you, in fact, connect with Ms. Rydstrand after
8         you were issued FCAN?
9    A.   Yes.
10   Q.   And did she reach out to you or did you reach out to
11        her?
12   A.   I reached out to her first, yes.
13            MARKED FOR IDENTIFICATION:
14            DEPOSITION EXHIBIT 17
15            3:56 p.m.
16   BY MS. KATO:
17   Q.   Ms. Meadows, I handed you what has been marked as
18        Exhibit 17 to your deposition.  It's two sets of
19        e-mails, although I think the attachment appears to be
20        identical, so I don't mean to go through both of
21        those, but look through those and let me know if they
22        look familiar to you.
23   A.   Yes.
24   Q.   Do you recognize those?
25   A.   Yes.

Page 200

1    Q.   So the first page, which is Delta2407, starts with
2         your -- starts with Ms. Claudine Rydstrand's e-mail to
3         you on April 28th, which is the day before you were
4         given FCAN, saying, thank you for taking the time to
5         speak with me today and for sharing your concerns.  As
6         we discussed, please feel free to send me any
7         information that you would like for us to have
8         regarding the situation that occurred on October 7,
9         2019.
10            What was the content -- what was the
11        substance of your conversation with Ms. Rydstrand on
12        April 28th, if you recall?
13   A.   I just, once again, was reaching out to her so I could
14        find out what was said about me or the details of the
15        event.
16   Q.   So you were looking for sort of the detailed
17        information of what was going inside the
18        investigation, is that fair?
19   A.   Yes.
20   Q.   What did she tell you?
21   A.   That she would meet with me.
22   Q.   Was she offering to meet with you in April 2020?  I
23        mean, this is like a month after COVID hit.
24   A.   Yes.
25   Q.   In person?

Page 201

1    A.   Yes.
2    Q.   All right.  On April 30th, the top of the page on the
3         first page, your message is, good morning, Claudine, I
4         hope all is well with you.  Enclosed is my statement.
5         If time permits today, please give me a call anytime
6         after 1 p.m. today.  Do you recall sending that
7         e-mail?
8    A.   Yes.
9    Q.   And so next page appears to be what was prepared and
10        using your personal e-mail address and that was sent
11        to yourself on April 29th.
12   A.   Uh-huh.
13   Q.   So tell me how did this -- how did you compose this
14        message?
15   A.   I don't know.  I don't recall.  I don't know why I did
16        it.
17   Q.   Let me ask you this:  Is this the statement you typed
18        up yourself?
19   A.   Yes.
20   Q.   Okay.  So the entire page, right?
21   A.   Yes.
22   Q.   Going into a little bit of the following page?
23   A.   Yes.
24   Q.   All right.  Was this a message you sort of typed into
25        your e-mail, using your own e-mail address?

Jacqueline Meadows
May 22, 2023

Page 202

1  A.  Yes.
2  Q.  And you just don't recall why you did that?
3  A.  Yes.
4  Q.  All right.  If you could turn to the next page.  On
5      top, it is the -- also appears to be an e-mail from
6      you, on May 7 this time, again, to Claudine Rydstrand
7      saying, good morning, Claudine, sorry for the delay.
8      Enclosed is the my statement.  I think you meant
9      enclosed is my statement.
10 A.  Uh-huh.
11 Q.  And thank you and be safe.
12         Do you recall, did something go wrong with
13     your communication on April 30th that Ms. Rydstrand
14     didn't get it?
15 A.  I don't recall.
16 Q.  Do you recall why you end up sending what appears to
17     be the same statement on May 7th?
18 A.  No, I don't recall why.
19 Q.  All right.  Take a look at your sort of comprehensive
20     message on Delta2410 and 2411, the last two pages, and
21     feel free to read through it, if you like; but does
22     that appear to be the message you sent to Ms.
23     Rydstrand?
24 A.  Yes.
25 Q.  Now, what was the purpose of you preparing this

Page 203

1      statement?
2  A.  This is what I -- my statement to everything that
3      happened, that I wanted to give to Claudine and
4      Allison.
5  Q.  Is there any reason you didn't provide a similar
6      comprehensive statement to Courtney Ebert in October
7      of 2019 when you were asked for a statement?
8          MR. SANDERS:  Object to the form.
9              You can answer.
10 A.  Probably I just -- there was so much going on at that
11     time, and then this is where I had more time to really
12     sit down and put this together.
13 BY MS. KATO:
14 Q.  When you put this statement together, had you already
15     been issued FCAN?
16 A.  No.
17 Q.  You weren't?
18 A.  I don't think so.  I can't remember.
19 Q.  Okay.  Well --
20 A.  I think I was.
21 Q.  Let me help you out.  On the top of that e-mail, it
22     says on April 29, 2020 at 4:04 p.m., Jacqueline
23     Meadows wrote, and then it goes to that, and I believe
24     your meeting with Peter was at 12:30 on April 29th.
25 A.  Okay, yeah, so I had already written this out before.

Page 204

1  Q.  Before?
2  A.  Before, yes.  Because I spoke to him earlier in the
3      day and I think Claudine asked for my statement and I
4      sent her this.
5  Q.  Okay.
6  A.  I sent her this.
7  Q.  So was this statement prepared after you were advised
8      of FCAN --
9  A.  Before, before.
10 Q.  So you had it already prepared?
11 A.  Yes.
12 Q.  Did you know you were going to get an FCAN?
13 A.  No.
14 Q.  So what did you prepare this statement for?
15 A.  I feel like I needed more.
16 Q.  Okay.
17 A.  I feel like I needed more than what I wrote before.
18 Q.  Okay.  But you reached out to Claudine Rydstrand the
19     day before you were advised of FCAN?
20 A.  No, the day of.
21 Q.  Well, the meeting was on April 29th, right?
22 A.  The phone meeting, yes.
23 Q.  So the first page, if you go back to the first page of
24     Exhibit 17, has from Claudine Rydstrand to you on
25     April 28th, 2020 thanking you for your conversation --

Page 205

1      so I'm sorry, the first page, so first page halfway
2      through.
3  A.  Okay, I see it.
4  Q.  That was April 28 of 2020, right?
5  A.  Yes.
6  Q.  So that's a day before you had a conversation with
7      Peter Saballa-Davis about FCAN?
8  A.  Could have been, but I know she called me prior to
9      that, too.
10 Q.  I'm wondering why you were reaching out to her before
11     you were aware of what discipline you were getting?
12 A.  Oh, no, I had got the discipline and then I reached
13     out to her, yeah; because I contacted her the same day
14     when I got the FCAN.
15 Q.  All right.  So I think we have established the FCAN
16     conversation was April 29th and this e-mail is April
17     28th.
18 A.  But I didn't speak to her until the day I got the
19     FCAN, yeah.
20 Q.  Well --
21 A.  I don't know.  Maybe my dates are wrong.  I don't
22     know.
23 Q.  So your recollection -- this is my confusion here --
24 A.  Me too.
25 Q.  -- because Claudine is thanking you for taking time to

Jacqueline Meadows
May 22, 2023

Page 206

1    speak with her and sharing your concern, but this is
2    dated the day before you have FCAN meeting with Peter.
3    A.   Okay.
4    Q.   So you don't recall why you were reaching out to
5         Claudine?
6    A.   No, I don't remember.  I just know the first time I
7         spoke with her was the date I got the FCAN.
8    Q.   All right.  So let's get to the last two pages, which
9         I think is a little bit easier to manage.
10            Other than a little bit more detail, I
11        don't really see anything new, per se, in this
12        statement.  You know, we can go through paragraph by
13        paragraph, but I think your counsel don't want us to
14        do that, but was there any new information you added
15        in this communication that you sent to Claudine
16        Rydstrand?
17               MR. SANDERS:  Objection, form.
18               You can answer.
19   A.   No.
20               MR. SANDERS:  I guess the reason for my
21        objection, any new information as compared to what she
22        had told people, what she had previously written?
23   BY MS. KATO:
24   Q.   So let me ask you this:  Is there any information in
25        this communication that you had not previously relayed

Page 207

1    to anyone at Delta Air Lines?
2    A.   No, this is what I've been telling.
3    Q.   Okay.  So as you were writing this, there wasn't the
4         moment that you thought, oh, I forgot to tell them
5         that, I'm going to tell them now; nothing like that?
6    A.   No.
7    Q.   Okay.  If I can call your attention to the second
8         paragraph, the last line of that paragraph you put it
9         into all caps of Lynnette Marshall shouting to you
10        you'd rather come back to work than stay at home and
11        take care of your mother.
12   A.   Uh-huh.
13   Q.   So that's one of the things she was yelling at you
14        for, right?
15   A.   Yes.
16   Q.   If I can call your attention to the eighth paragraph,
17        which is the top paragraph on the last page.
18   A.   Uh-huh.
19   Q.   It's talking about I submitted a report in FACTS but
20        FSM Mullen never inquired about my well-being, nor did
21        she ask what happened.
22            She asked you what happened on November
23        13th, right?
24   A.   I can't remember the day, but I remember her asking.
25   Q.   So at some point she did ask you --

Page 208

1    A.   I called her and I let her know what was going on.
2    Q.   Okay.
3    A.   Yes.
4    Q.   Was that the day after?
5    A.   The day after the incident, yes.
6    Q.   All right.
7    A.   Yes.
8    Q.   And then subsequently, she calls you and asked you
9         what happened and then asked you to submit the
10        statement.  I understand that was bad timing, but --
11   A.   Yes.
12   Q.   All right.  So she did ask you what happened at some
13        point, right?
14   A.   Yes.
15   Q.   Okay.  Going on to the next sentence, and I want to
16        focus at the end, I called HR Representative Courtney
17        Ebert on October 8, 2019.  I wanted to know how to
18        file a complaint against FA Marshall and I wanted to
19        alert her that I was unsure about feeling comfortable
20        in coming to work.  Do you see that?
21   A.   Yes.
22   Q.   So I want to focus on this sentence, I was unsure
23        about feeling comfortable in coming to work.  That was
24        not part of your statement to Courtney Ebert on
25        October 8th, was it?

Page 209

1    A.   No.
2    Q.   Is this new information you were providing?
3    A.   I told her over the phone.  I just was stressed,
4         mentally stressed from the day before, and I was
5         flying internationally the next day, which was on the
6         8th, so I just wanted to be mentally ready for the
7         crew, for the flight, for the passengers.
8    Q.   All right.  And the next paragraph, the last line,
9         this is talking about -- this appears to be a
10        conversation you had with Renee Mullen on October 13th
11        of 2019.  Do you see that?
12   A.   I'm sorry, where?
13   Q.   The next paragraph.  The second paragraph --
14   A.   Yes, yes, I see it.
15   Q.   You say, approximately October 13, 2019 I received
16        another call from FSM Mullen while I was sitting in
17        ICU with my mother who had been placed on a
18        ventilator.  She wanted a statement regarding a
19        passenger whom I had helped off the aircraft.  She
20        stated that she'd never received a statement from me.
21        I told FSM Mullen that I didn't know when I would be
22        leaving the hospital, yet FSM Mullen demanded I need
23        to submit a report by the end of the day.
24            So is this the conversation we're talking
25        about, right, where her timing was bad?

Jacqueline Meadows
May 22, 2023

Page 210

1  A.  Yes.
2  Q.  So does it refresh your recollection that you actually
3      had a conversation with Renee Mullen on October 13th?
4  A.  Yes.
5  Q.  So this is like the week after you talked to Courtney
6      Ebert on 8th of October, right?
7  A.  Yes.
8  Q.  Okay.  And do you recall you had a subsequent
9      conversation with Renee Mullen on November 3rd, after
10     which point you said I want somebody else because
11     she's being insensitive?
12 A.  Yes.
13 Q.  Okay.  So you had multiple conversations with Renee
14     Mullen?
15 A.  Yes.
16 Q.  All right.  If you could look at third paragraph from
17     the bottom.
18 A.  Uh-huh.
19 Q.  You tell Ms. Rydstrand that in my humble opinion, I
20     have experienced racism, bullying and sexism on the
21     workplace.  I presume you mean in the workplace?
22 A.  Yes.
23 Q.  Now, this is the first time you bring up concern with
24     racism with respect -- in connection with this
25     incident, correct?

Page 211

1  A.  Yes.
2          MR. SANDERS:  Objection, form, foundation,
3      mischaracterization as to what's in the record.
4  BY MS. KATO:
5  Q.  That's a yes, right?
6          MS. KATO:  I mean, she answered the
7      question so I'll take it.
8  BY MS. KATO:
9  Q.  At no point prior to this lengthy message you say this
10     is race-related, right?
11 A.  No, but after I thought about it long enough in the
12     way I was being treated, yes, I felt like I was
13     racially --
14 Q.  And is it because Lynnette Marshall did not get FCAN?
15 A.  I didn't know Lynnette Marshall got any discipline;
16     they wouldn't disclose that to me.
17 Q.  As you sit here today, do you know she was given
18     written coaching?
19 A.  No, I did not know.
20 Q.  Okay.
21         MR. SANDERS:  Counsel, there was a previous
22     document that you provided, Exhibit 16, in which the
23     witness states, I've been bullied, experienced racism,
24     and to this day I still do not know the outcome, nor
25     what was said about me.  So this is not the first time

Page 212

1      she's mentioned that she believes these allegations
2      are as a result of racism.
3          MS. KATO:  Okay.
4  BY MS. KATO:
5  Q.  Back to my question.  Tell me why you think -- let me
6      ask you this:  Is it your belief that you've
7      experienced racism in general or racism with respect
8      to this incident?
9          MR. SANDERS:  Objection to the compound
10     nature of the question.
11         But you can answer.
12 A.  This incident.
13 BY MS. KATO:
14 Q.  Tell me why.
15 A.  Because I was given -- I was attacked by this white
16     woman, I was verbally attacked by this white woman,
17     and seemed like she got a better shot after accosting
18     me and violently yelling at me.
19 Q.  Okay.
20 A.  The manager that came to the plane didn't talk to me,
21     didn't look my way.  He spoke with Lynnette for about
22     40 minutes and she got to tell her side of the story,
23     I didn't.
24 Q.  Anything else?
25 A.  No.

Page 213

1  Q.  And this manager you're referring to is Austin Lynch,
2      right?
3  A.  Yes.
4  Q.  Now, and you were assured by Detroit-base leadership
5      that they did consider Captain Cooney's statement as a
6      part of the investigation, right?
7          MR. SANDERS:  Objection, form and
8      foundation, mischaracterization of the record.
9          But you can answer.
10 A.  I don't recall.
11 BY MS. KATO:
12 Q.  If you can go back to Exhibit 16.
13 A.  Uh-huh.
14 Q.  On the top, this is Allison Ausband's response to you
15     on April 28th; and I believe you actually attached
16     Captain Cooney's statement to your original message to
17     Allison, is that right?
18 A.  Could have been.
19 Q.  Okay.  She says on the second paragraph, in follow-up
20     to your previous e-mail, I reviewed Captain Cooney's
21     statement and I reached out to your DTW leadership
22     team as well.  I know they included his statement in
23     their investigation of the October event.  Right?
24 A.  You said this was on Exhibit 16?
25 Q.  Yes.

Jacqueline Meadows
May 22, 2023

Page 214

1   A.   Oh, there is it, yes.
2   Q.   Start over?
3   A.   No, no, no.  I'm fine.
4   Q.   So you were told by Ms. Ausband that DTW leadership
5        did consider Captain Cooney's statement as part of the
6        investigation, right?
7   A.   Yes, I see it.
8   Q.   So when you made -- so the recommendation that
9        everyone comes to the table and talks, do you recall
10       what Peter's response was?
11  A.   I don't recall.
12  Q.   Did you make the same suggestion to Allison Ausband in
13       your telephone conversation with her?
14  A.   Don't recall.
15  Q.   How about Claudine Rydstrand?
16  A.   Don't recall.
17  Q.   Did you make the same suggestion to Claudine Rydstrand
18       or you don't recall making that suggestion?
19  A.   I don't recall.
20  Q.   But you do recall making that suggestion to Peter?
21  A.   Yes.
22  Q.   But you don't recall his response to that?
23  A.   I can't, no.
24  Q.   I think you gave me your testimony on this, I want to
25       make sure, you did have an opportunity to ask Peter as

Page 215

1        to why Austin Lynch was "scared to meet with you", and
2        the response was because you're a cop?
3   A.   Yes.
4   Q.   What came of your communication with Claudine
5        Rydstrand?
6   A.   She came to meet with me in Detroit, yes.
7   Q.   What did the two of you discuss?
8   A.   The incident.
9   Q.   And can you elaborate a little bit more on your
10       discussion with Ms. Rydstrand?
11  A.   Just everything that I wrote down here, I used this as
12       my reference, and told her what happened.
13  Q.   What was her response?
14  A.   That she would look further into it and get back with
15       me.
16  Q.   Aside from your comment to Claudine that in your
17       humble opinion you have experienced racism, and as
18       your counsel pointed out reference in Allison
19       Ausband's e-mail, did you file a formal complaint of
20       race discrimination with Delta Air Lines?
21            MR. SANDERS:  Object to the form and
22       foundation of the question as to what constitutes a
23       formal complaint.
24            MS. KATO:  Any complaint.
25            MR. SANDERS:  Other than what she's already

Page 216

1        testified to and what's in the record?
2            MS. KATO:  Yes.
3   BY MS. KATO:
4   Q.   Other than those two things we just looked at, did you
5        file any complaint, formal or otherwise, of race
6        discrimination with Delta Air Lines?
7   A.   I tried to.
8   Q.   Okay.  What do you mean by that?
9   A.   I reached out to Courtney and wanted to file a
10       complaint of --
11  Q.   Of race?
12  A.   -- harassment and racism.
13  Q.   Okay.  When did you reach out to Courtney Ebert about
14       that?
15  A.   October 8th.
16  Q.   So in October 2019, you wanted -- is it your testimony
17       you wanted to file a complaint of harassment and
18       racism against Lynnette Marshall?
19  A.   Yes.
20  Q.   Well, ma'am, I think your -- never mind.
21            Can you turn to Exhibit 2, please.  Take a
22       look at page 10.
23  A.   Okay.
24  Q.   Calling your attention to the bottom of the page,
25       second paragraph under the heading Harassment,

Page 217

1        Bullying or Other Forms of Intimidation Are Not
2        Tolerated.  Do you see that?
3   A.   Yes.
4   Q.   Second sentence on the second paragraph -- let me
5        start over.  Second paragraph says, if you believe
6        that you have been subjected to discrimination,
7        harassment, bullying or intimidation, or if you became
8        aware of such behavior in the workplace, report the
9        matter.  Notify your leader, any manager in your
10       department, your human resources professional, or the
11       equal opportunity department.  You may also call
12       Delta's ethics and compliance help line at 1-800
13       number.  Do you see that?
14  A.   Yes.
15  Q.   And The Way We Fly is a document that's accessible to
16       you as a flight attendant, right?
17  A.   Yes.
18  Q.   You can look this up pretty much any time, right?
19  A.   Yes.
20  Q.   Is it accessible on the intranet?
21  A.   Yes.
22  Q.   And this is something you can look up on your SKYPRO,
23       right?
24  A.   Yes.
25  Q.   So other than telling Courtney Ebert that you wanted

Jacqueline Meadows
May 22, 2023

Page 218

1  to file a complaint of harassment and racism against
2  Lynnette Marshall, did you -- and two mentions you
3  made on your communication to Allison Ausband and
4  Claudine Rydstrand, did you file any other complaint?
5          MR. SANDERS:  Object to the form of the
6  question.
7  BY MS. KATO:
8  Q.  So did you notify your manager in your department that
9     you wanted to file a complaint of racism or race
10    discrimination?
11 A.  Yes.
12 Q.  When was that?
13 A.  I may not have said the racism, but I definitely
14    wanted to file a complaint on the harassment.
15 Q.  Right.
16 A.  Yes.
17 Q.  That's fine.  I think we're on the same page.  You
18    wanted to file a complaint of harassment?
19 A.  Yes.
20 Q.  Because of her aggressively coming after you, yelling
21    at you, being unkind to you?
22 A.  Yes.
23 Q.  And that's what you conveyed to Courtney Ebert, right?
24 A.  Yes.
25 Q.  Did you contact -- so she would be the HR

Page 219

1  professional, right?
2  A.  Yes.
3  Q.  Did you contact anyone in equal opportunity
4     department?
5  A.  No.
6  Q.  Did you call Delta's ethics hotline?
7  A.  No.
8  Q.  So to the extent you were seeking to file a complaint,
9     and it was certainly a complaint of harassment against
10    Lynnette Marshall, right?
11 A.  Yes.
12        MR. SANDERS:  Objection to form and
13    foundation of the question.  Seeking to file a
14    complaint when, with whom?
15        MS. KATO:  That's my next question.
16 BY MS. KATO:
17 Q.  So you had this conversation with Courtney Ebert on
18    October 8, 2019, correct?
19 A.  Yes.
20 Q.  Any other time you had this conversation or made such
21    a request to Courtney Ebert?
22 A.  No.
23 Q.  Did you make similar requests to Christian Gunn?
24 A.  No.
25 Q.  Did you make similar requests to Renee Mullen?

Page 220

1  A.  No.
2  Q.  How about Peter Saballa-Davis?
3  A.  Yes.
4  Q.  When did you make that request to Mr. Davis?
5  A.  To meet with him.
6  Q.  It was to meet with him.  Did you specifically tell
7     him, I want to file a complaint of harassment against
8     Lynnette Marshall, or was it something you wanted to
9     tell him --
10 A.  Yes.
11 Q.  -- if there was a meeting on the table?
12 A.  Yes, that I was being harassed; that I was harassed by
13    Lynnette Marshall, yes.
14 Q.  Was it part of the conversation in which you were
15    asking -- where you were suggesting there would be a
16    roundtable discussion with everyone coming to the
17    table and talking about it?
18 A.  Yes.
19        MARKED FOR IDENTIFICATION:
20        DEPOSITION EXHIBIT 18
21        4:25 p.m.
22 BY MS. KATO:
23 Q.  Ms. Meadows, I've handed you what has been marked as
24    Exhibit 18.  Go ahead and take a look and let me know
25    when you're done, or let me know if you're familiar

Page 221

1  with that document.
2  A.  I'm done.
3  Q.  Have you seen this document before?
4  A.  No.
5  Q.  Are you aware that there is an equal employment
6     opportunity policy at Delta Air Lines?
7  A.  I learned of it after the incident.
8  Q.  How did you become aware of it?
9  A.  In our training modules.
10 Q.  Can you explain a little bit more?
11 A.  Our CQ.
12 Q.  And CQ stands for?
13 A.  Continuing qualifications.
14 Q.  Okay.  And when was this CQ training?
15 A.  It was sometime after this incident, I can't remember
16    what year or date, but I do remember reading this,
17    yes.
18 Q.  So during this incident in which you're seeking to
19    file a complaint of harassment against Lynnette
20    Marshall, you didn't look through SKYPRO and see if
21    there was any EEO policy that you might access?
22 A.  No.
23 Q.  You didn't look up any discrimination policy?
24 A.  No.
25 Q.  You didn't look up any harassment policy?

Jacqueline Meadows
May 22, 2023

Page 222

1   A.   No.
2   Q.   You didn't look up any complaint procedure that may be
3        available to you?
4             MR. SANDERS:  Objection to form.
5             You can answer.
6   A.   No.
7   BY MS. KATO:
8   Q.   If you can turn to the third page of that document,
9        which is Delta111.  Our open door policy, do you see
10       that?
11  A.   Yes.
12  Q.   I think we have previous testimony that you were
13       familiar with the open door policy with Delta Air
14       Lines, right?
15  A.   Yes.
16  Q.   You can pretty much reach out to any leader for
17       support?
18  A.   Yes.
19  Q.   If you -- if I can call your attention to about
20       halfway down that paragraph, it starts with, you may
21       also work through divisional and corporate leadership
22       as appropriate.  Do you see that?
23  A.   Yes.
24  Q.   Speak directly with your human resources professional
25       or the equal opportunity department.  You may also

Page 223

1        contact Delta's safety ethics and compliance help
2        line, which is available toll-free 24 hours a day, 7
3        days a week by calling the 1-800 number within the
4        U.S. and Canada.  Do you see that?
5   A.   Yes.
6   Q.   Again, this is about the same information we just went
7        over in The Way We Fly.  Were you aware that the open
8        door policy was available to you in terms of
9        expressing any concerns of discrimination?
10  A.   No.
11  Q.   Did you think that was something you couldn't talk to
12       your leaders about?
13  A.   I tried.
14  Q.   What do you mean you tried?
15  A.   That's why I wanted to have the meeting, to let them
16       know how I felt.
17  Q.   So who would be at this meeting?  I think we talked
18       about you, Lynnette, Captain Cooney; who else?
19  A.   Peter.
20  Q.   Anybody else from Detroit?
21  A.   No.
22  Q.   Your FSM?
23  A.   Christian was my FSM at the time.
24  Q.   Would you have envisioned Christian being there?
25  A.   Yes.

Page 224

1   Q.   Anybody else other than Peter?
2   A.   No.
3   Q.   So that was sort of what you were seeking --
4   A.   Yes.
5   Q.   -- when you said we should have a meeting about that
6        so you can express these feelings?
7   A.   Yes.
8   Q.   Did you elaborate that with Peter or did you stop with
9        we should have a meeting?
10  A.   No, I told him that I was feeling bullied by Renee, I
11       felt like Austin wouldn't talk to me.  Once he saw it
12       was a white woman and a black woman, I felt like he
13       didn't want to speak to the black woman.  He looked at
14       me as an angry black woman.
15  Q.   Did he say anything to you to make you believe that or
16       was it --
17  A.   He didn't say anything to me at all that day or any
18       other time.
19  Q.   So what makes you think that Austin looked at you as
20       to quote your words, angry black woman?
21  A.   The way he looked at me.
22  Q.   How did he look at you?
23  A.   With a frown on his face.
24  Q.   But you didn't speak to him at all?
25  A.   He didn't speak to me.  I waited and he didn't say hi,

Page 225

1        bye, nothing.
2   Q.   All right.  So we talked about being bullied by Renee
3        Mullen --
4   A.   Yes.
5   Q.   -- Austin not speaking to you and to quote you,
6        looking at you like you're an angry black woman.
7        Anything else?
8   A.   No.
9   Q.   Did you ask -- specify all of that to Peter when you
10       say, Peter, I think we should have a meeting or I want
11       to have a meeting with everyone and get to the truth?
12  A.   Yes.
13  Q.   So what exactly -- how did you spell it out to Peter?
14            MR. SANDERS:  Objection, asked and
15       answered.  You asked that six, seven times in this
16       deposition, what she said to Peter; she's answered
17       that question.
18  BY MS. KATO:
19  Q.   Ma'am, I'm just trying to understand.  You suggest a
20       meeting to Peter, right?
21  A.   Yes.
22  Q.   Why wouldn't Renee Mullen, who bullies you, be in
23       attendance of that meeting?
24  A.   Because he changed my manager.
25  Q.   So the fact that Renee was no longer your manager

Jacqueline Meadows
May 22, 2023

Page 226

1    didn't matter anymore then?  I mean, you felt bullied
2    by Renee Mullen, but Renee Mullen --
3  A.  No, I didn't want to see her, because she very
4    insensitive while my mom was placed on a ventilator.
5    Would you want to speak to someone that bullied you
6    when your mom was on a ventilator?
7  Q.  Well, I don't get to answer questions.
8  A.  That's not a good feeling.  It's not a good feeling.
9  Q.  But you didn't want to have that addressed in front of
10    Peter?
11  A.  With Peter, yes.
12  Q.  But you didn't want to give Renee a chance to defend
13    herself?
14  A.  No --
15        MR. SANDERS:  Why?
16  A.  -- no, no. Renee Mullen knew that my mom was on a
17    ventilator.  I didn't know if my mom was going to die
18    or live.  My mom had been sick since September.  While
19    we were out to dinner, mom had a stroke.
20  BY MS. KATO:
21  Q.  Ma'am, I understand that.
22  A.  I think you don't.  I think you don't.  And for
23    somebody to tell you I need your statement by the end
24    of the day while your mother is on a ventilator, no.
25  Q.  Why don't we take a break?

Page 227

1  A.  Keep asking.  I don't want a break.  No, I don't want
2    a break, I'm good.
3  Q.  Okay.  Ma'am, I understand the fact that Renee Mullen
4    bullied you or you felt bullied by her, but she was
5    part of the investigation and I was wondering why you
6    would not recommend that she be part of the
7    discussion.
8        MR. SANDERS:  Objection, asked and
9    answered.  She just answered that question, why she
10    felt she didn't want her part of the discussion.  Can
11    we move on, Counsel; she just answered that.
12        MS. KATO:  Okay.
13  BY MS. KATO:
14  Q.  Is there anything else you wanted with Peter other
15    than to have this meeting?
16  A.  No, I wanted the meeting.
17  Q.  Okay.  You did utilize the open door policy and reach
18    out to different leaders after you were issued the
19    FCAN, right?
20        MR. SANDERS:  Objection, form, foundation,
21    mischaracterization of the record.
22        MS. KATO:  I'm not sure any of that is
23    valid.
24        MR. SANDERS:  You saying she only reached
25    out after she received the disciplinary action, and

Page 228

1    the record reflects that she reached out before and
2    after receiving the disciplinary action.
3        MS. KATO:  Counsel, let me ask the
4    question, please.
5  BY MS. KATO:
6  Q.  Did you reach out to leaders pursuant to the open door
7    policy after you were issued FCAN?
8  A.  Yes.
9        MARKED FOR IDENTIFICATION:
10        DEPOSITION EXHIBIT 19
11        4:34 p.m.
12  BY MS. KATO:
13  Q.  Ms. Meadows, I handed you what has been marked as
14    Exhibit 19.  This is an e-mail from Tracy Gallegos
15    to you on July 14, 2021.  Do you see that?
16  A.  Yes.
17  Q.  Do you recall receiving this e-mail?
18  A.  Yes.
19  Q.  Let me ask you this:  When did you reach out to Tracy
20    Gallegos in HR?  She's from HR, right?
21  A.  Yes.
22  Q.  And were you familiar with Ms. Gallegos before you
23    reached out to her?
24  A.  I didn't reach out to her.
25  Q.  Okay.  She reached out to you?

Page 229

1  A.  So when I had a meeting with Allison, she was in on
2    the Zoom call, that's when I met her.
3  Q.  When was this meeting with Allison?
4  A.  It says here June 1st, '21.
5  Q.  Okay.  So this was after your prior e-mails back in
6    April 2020 that we looked at, right?
7  A.  Yes.
8  Q.  And tell me how your meeting with Allison Ausband came
9    about.
10  A.  Well, as you can see, I followed all the leaders to
11    get to Allison to try to tell my side of the story.
12    So I met with all these managers that you have listed
13    here and then Allison was the last one.
14  Q.  Okay.  Was it a Zoom meeting?
15  A.  Yes.
16  Q.  And Tracy was in attendance, is that right?
17  A.  No --
18  Q.  Okay.
19  A.  -- she wasn't.  I'm sorry, I'm looking at two Tracys.
20    Tracy was, yes.
21  Q.  Tracy Gallegos, yes.
22  A.  Yes.
23  Q.  So reading through her e-mail, it appears that, at
24    least for her, there were two concerns that you
25    raised.  Let me read you the second sentence of the

Jacqueline Meadows
May 22, 2023

Page 230

1    first paragraph.  It says, your first concern was
2    regarding conversation with a field service manager
3    where you claim the field service manager told you
4    that you were being set up.  Do you see that?
5  A.  Yes.
6  Q.  What was that conversation referring to?
7  A.  When I was coming to work and I was in the in-flight
8    office, Field Service Manager Steven Jones had
9    approached me and asked if I would step into a
10    briefing room with him, and I did, and he asked me how
11    I was doing and I'm like I'm okay, and he was like
12    this whole incident is wrong and I feel like you were
13    being set up.
14  Q.  When did this conversation take place?
15  A.  It was during this investigation.
16  Q.  Do you recall like early on --
17  A.  No, later on.
18  Q.  If he was asking you to step into a briefing room,
19    would it be fair to say it was maybe before COVID hit,
20    since that probably wouldn't happen?
21  A.  It was before.  It was before then, yeah.
22  Q.  Back in 2020, stepping into briefing room sounds like
23    a little dangerous.
24  A.  Yes.
25  Q.  So would it be fair to say sometime between October

Page 231

1    and February of 2020, October '19 and February 2020?
2  A.  I can't recall.
3  Q.  So he says he asked you to step into a briefing room
4    and he tells you this incident is wrong, I think
5    you're being set up?
6  A.  Yes.
7  Q.  How did you respond to that?
8  A.  I was hurt.
9  Q.  What did he say?  Did he elaborate as to why he thinks
10    you're being set up?
11  A.  He didn't say.  He just said he never witnessed
12    anything like this, that it looked like a setup.  I
13    asked him why would you feel like that, I asked him if
14    he would have a meeting with me, of course he said no,
15    with Allison, he declined it.
16  Q.  Did he give you any details as to who was setting you
17    up?
18  A.  He said the Detroit leadership.
19  Q.  Did he give any specific example as to why?
20  A.  No.  He just said Detroit leadership.
21  Q.  So he didn't give you any names, right?
22  A.  No.
23  Q.  And how did you leave that conversation?
24  A.  Oh, I had to go because we were briefing.
25  Q.  Okay.  Did you have any follow-up conversation with

Page 232

1    Steven Jones about what he meant by that?
2  A.  No.
3  Q.  Okay.  So that was one thing you shared with Allison
4    Ausband and Tracy Gallegos on -- appears to be June
5    28, '21.  Does that sound right?
6  A.  Around that time, yes.
7  Q.  And the second concern was IFS Director Tracy Coram
8    left a final corrective action notice letter at the
9    duty desk for you to retrieve.  What was that about?
10  A.  No, she left a -- that's when she gave me the FCAN.
11    It was at the duty desk for everybody to see.  There's
12    flight attendants coming up there asking questions,
13    they can see it; I was briefing with my crew at the
14    time, she asked could I speak with her, and I said
15    sure, and then that's when she went and grabbed it,
16    and I watched her and there was a manager looking at
17    it.
18  Q.  Who was the manager who was looking at it?
19  A.  I can't remember, but it was two managers, two
20    African-American women; they were sitting there and
21    looking over and she grabbed it.
22  Q.  So you witnessed two African-American -- were they
23    managers?
24  A.  Yes, only managers sit back there, yeah.
25  Q.  So they were -- they had a clear view of your

Page 233

1    discipline?
2  A.  Yes.
3  Q.  Do you know who they were?
4  A.  No.
5  Q.  Have you seen them since?
6  A.  I haven't been down there.
7  Q.  All right.  So were these two specific issues that you
8    recall raising with Allison Ausband and Tracy Gallegos
9    on this June 28th meeting?
10  A.  I'm sorry?
11  Q.  Are these the two incidents we just talked about?
12  A.  Yes, I had a meeting with them.
13  Q.  And those are two things you talked about?
14  A.  Yes.
15  Q.  Got it.  So Tracy is getting back to you on July 14th
16    and saying she couldn't substantiate either of these
17    concerns.  But she goes on to say, as per your
18    request, below is a list of leaders you spoke with
19    regarding either the FCAN document you received and/or
20    the investigation leading up to the FCAN document.  Do
21    you see that?
22  A.  Yes.
23  Q.  So what request did you make of her where this is her
24    response?
25  A.  Rephrase your question.

Page 234

```
 1   Q.   It starts with as per your request, do you see that on
 2        top of the second paragraph --
 3   A.   Yes, yes.
 4   Q.   As per, so I'm wondering what the request was that she
 5        was responding to you?
 6   A.   Oh, she knew I was trying to, once again, have a
 7        meeting with everybody.
 8   Q.   By this time, was everyone who is listed on here would
 9        have attended the meeting?
10   A.   No, not the meeting that I was trying to have.  I
11        wanted a thorough investigation, so that's why when I
12        spoke to Claudine, spoke with Ranjan, spoke with
13        Allison, that's the chain of command, as you would
14        say.
15   Q.   All right.
16   A.   So when I was being told no, I continued to go through
17        the chain of command.
18   Q.   So why was Tracy giving the comprehensive reverse
19        order list of all the leaders you spoke with?
20   A.   I do not know.
21   Q.   Okay.
22   A.   I don't know, she just sent this to me in an e-mail.
23   Q.   I was wondering if you specifically asked for this
24        information or this was something you -- she may have
25        misunderstood as to what you were --
```

Page 235

```
 1   A.   She sent all this to me in an e-mail, yes.
 2   Q.   All right.  That was my question, as to what exactly
 3        your request was that generated this list.
 4             If you can pull up Exhibit 1 for me,
 5        please, and turn to page 2 for me, please.  Actually,
 6        turn back to the first page.  I apologize.
 7             First interrogatory, we asked you to
 8        identify persons who you believe have knowledge or
 9        information relevant to the allegations in your
10        Complaint, and for each person identified, describe in
11        detail or otherwise state the relevant knowledge or
12        information he or she possesses, his or her current
13        job title, contact information, and relationship to
14        you.
15             So I'm interested in the first one as to
16        what relevant knowledge or information each of these
17        persons possesses.  If you turn to the next page, you
18        gave us several names.  I think most we covered in
19        some form or fashion today.  But I don't have the
20        relevant information that you believe these people
21        have.  I don't want to make assumptions, so if you can
22        go through those and tell me what each of these
23        persons has that supports your allegations or somehow
24        relates to this lawsuit.  Can we go through that
25        exercise?
```

Page 236

```
 1   A.   Yes.
 2             MR. SANDERS:  I'm objecting to the form of
 3        the question, to the extent that she has testified as
 4        to relevant information that most of these people
 5        have, and I don't believe her answer to this question
 6        should be limited to the information she gives in the
 7        answer to this one question when she's testified for
 8        five hours concerning relevant information these folks
 9        have, but go ahead.
10             MS. KATO:  If you let me ask the question,
11        I think that will cover it.
12   BY MS. KATO:
13   Q.   So Renee Mullen is the first name you have here.
14   A.   Right.
15   Q.   We have addressed quite a bit about Ms. Mullen today.
16        I think in this conversation you say you spoke to her
17        on October 7, 2019.  Do you see that?
18   A.   I didn't speak with her; I sent her a text message.
19   Q.   But you did speak with her subsequently on the 8th, I
20        think the 13th of October, and November 3rd, right?
21   A.   Yes.
22   Q.   We talked about that.
23   A.   Yes.
24   Q.   Other than what we already talked about, is there
25        anything else that Renee Mullen would have that's
```

Page 237

```
 1        relevant to your lawsuit?
 2   A.   No.
 3   Q.   How about John Arila, so we talked about the fact that
 4        you don't recall speaking to him, all you recall is
 5        him saying you need to talk to Austin because he's in
 6        charge?
 7   A.   Yes.
 8   Q.   Anything else that Mr. John Arila would have that's
 9        relevant to this lawsuit?
10   A.   No.
11   Q.   Neil Mohammed, that's the third name, represented as
12        someone you spoke with on October 7, 2019.  Do you see
13        that?
14   A.   Yes.
15   Q.   Other than what we already talked about today, is
16        there anything else that Mr. Neil Mohammed would know
17        that's relevant to this lawsuit?
18   A.   No.
19   Q.   Steven Jones, you have him listed as someone you spoke
20        with on October 7th, 2019.
21   A.   Uh-huh.
22   Q.   Now, I think your testimony is that you spoke to
23        Steven Jones from Orlando and he indicated to you that
24        the incident was already on Detroit leadership's radar
25        and they will be managing meeting you?
```

Page 238

1   A.   Yes.
2   Q.   Anything else you would like to add with respect to
3        anything Steven Jones would have to contribute to this
4        lawsuit?
5   A.   No.
6   Q.   Okay.  Christian Gunn, he was your FSM, right?
7   A.   Uh-huh.
8   Q.   He's currently --
9             MR. SANDERS:  You have to say yes or no.
10  A.   Yes, I'm sorry.
11  BY MS. KATO:
12  Q.   Christian Gunn is no longer your FSM, right?
13  A.   Correct, he's not.
14  Q.   So you have listed as speaking with him in October --
15       December 2nd, 2019, which I think we went over as
16       possibly the conversation you had about him following
17       up on a statement, right?
18  A.   Yes.
19  Q.   You also have October 5, 2020 as the day of
20       conversation with him.  Can you explain what that is?
21  A.   I think that conversation was him welcoming me to his
22       team.
23  Q.   Okay.
24  A.   Yes.
25  Q.   I think that happened in November '19 though, right?

Page 239

1   A.   I don't remember.
2   Q.   Mr. Christian Gunn is a named defendant in this
3        lawsuit, and I realize that's more a legal strategy
4        question, but what do you think Christian Gunn did
5        wrong with respect to your FCAN and investigation of
6        October 7, 2019 incident?
7             MR. SANDERS:  Objection, form, foundation,
8        calls for a legal conclusion.
9             You can answer.
10  A.   Well, once again, he never asked me what happened.  I
11       wish he would have asked me, or we had a sit-down
12       conversation about what happened.
13  BY MS. KATO:
14  Q.   I think we talked about the fact that you might have
15       had a conversation with him on December 2nd where
16       other things were going on, and I understand.
17  A.   Yeah.
18  Q.   But for lack of better terms, what Christian did wrong
19       is that he didn't have a sit-down conversation with
20       you and as far as you can recall, he didn't ask you
21       what happened?
22  A.   Yes.
23  Q.   Anything else?
24  A.   No.
25  Q.   Kara Vannaman, she's a base manager, right?

Page 240

1   A.   Yes.
2   Q.   I think your testimony is that you have only met Ms.
3        Vannaman once on February 6th in connection with the
4        other incident, right?
5   A.   Yes.
6   Q.   At which point she advised you the October 7, 2019 was
7        still under investigation?
8   A.   Yes.
9   Q.   Anything else you would like to add with respect to
10       Ms. Vannaman's knowledge?
11  A.   No.
12  Q.   Cheronda Davis, you also listed her as having
13       conversation with you on February 6 of 2020.
14  A.   Yes.
15  Q.   She was the FSM who met you to talk about the
16       unrelated incident from January 2020, right?
17  A.   Yes.
18  Q.   Anything else you would like to add with respect to
19       anything Cheronda Davis might know?
20  A.   No.
21  Q.   All right.  Peter Saballa-Davis, right?
22  A.   Yes.
23  Q.   You have several days listed and we talked about your
24       interaction with Mr. Saballa-Davis, and one of your,
25       for lack of better terms, gripes is that he never took

Page 241

1        you up on your suggestion to have a meeting, right?
2   A.   Yes.
3   Q.   You also have October 31, 2020 listed as a date of
4        your communication with him.  Do you know what that is
5        about?
6   A.   No, I don't recall.
7   Q.   Anything else -- and again, just like Mr. Gunn, Mr.
8        Saballa-Davis is a named defendant in this lawsuit.
9        For lack of better terms, what did he do wrong?
10            MR. SANDERS:  Same objection as I made
11       concerning Mr. Gunn, the question concerning Mr. Gunn.
12            You can answer.
13  A.   I didn't get an open door policy meeting with Peter.
14  BY MS. KATO:
15  Q.   But didn't he talk to you about, you know, your
16       concerns in which you were requesting to have a
17       meeting, big meeting with everyone?
18  A.   We talked about it, but it never happened.
19  Q.   So you don't consider the first conversation to be an
20       open door meeting?
21  A.   No.
22  Q.   So if I understand you correctly, open door meeting,
23       open door policy meeting, being everyone at the table
24       that's key players and talking through what
25       happened --

Jacqueline Meadows
May 22, 2023

Page 242

1  A.  Yes.
2  Q.  -- and getting to the truth, is that right?
3  A.  Yes.
4  Q.  So he didn't sort of follow up on that meeting;
5      anything else?
6  A.  No.
7  Q.  Melissa Drue, she's a base manager, right?
8  A.  Yes.
9  Q.  And you have listed April 30th, 2020 was your
10     communication.  I'm wondering if that's a mistake for
11     April 3rd.
12 A.  I knew it was during COVID and she called to set up
13     the meeting with Peter, if I recall correctly.
14 Q.  So if I can call your attention to Exhibit 12, if you
15     can dig that out, it was a one page e-mail with her
16     picture on it, if that helps.
17 A.  I got it.
18 Q.  Take a look at Exhibit 12.  Is that April 3rd and not
19     April 30th?
20 A.  Yes, it is April 3rd.
21 Q.  So did you not have a separate conversation with
22     Melissa Drue on April 30th?
23 A.  No, no, that's my mistake.
24 Q.  Okay.  So other than you having a conversation with
25     Melissa Drue in which you advised her that you had a

Page 243

1      meeting pending with Mr. Saballa-Davis, anything else
2      you might want to add with respect to anything Ms.
3      Drue might know about your lawsuit?
4  A.  No.
5  Q.  Claudine Rydstrand, you have her dates listed as 28th
6      of April, and there are dates of August 26 and
7      September 26 listed.
8  A.  Yes.
9  Q.  What were the conversations that you had with her on
10     these dates?
11 A.  4/28 was the day I believe I got the FCAN; 8/26/20 was
12     when she came to Detroit to meet with me; and 9/26/20
13     is when she let me know when the FCAN would stand.
14 Q.  So Ms. Rydstrand let you know that FCAN would stand on
15     September 26, is that right?
16 A.  Yes.
17 Q.  Was it a phone conversation or in-person meeting?
18 A.  Phone conversation.
19 Q.  And tell me about that conversation.
20 A.  She called me on a Saturday morning, I remember it was
21     early, and she was like, I'm sorry, but we can't
22     change anything and the FCAN would stand.
23 Q.  Did you ask any questions?
24 A.  I asked her what else could I do and she said you can
25     meet with Ranjan.

Page 244

1  Q.  So she sent you one step above her?
2  A.  Yes.
3  Q.  All right.  So I guess that's the next name, Ranjan
4      Goswami, he's the vice president of flight operations,
5      and you have communication with him on October 5th and
6      October 26 of 2020.  Do you see that?
7  A.  Yes.
8  Q.  Tell me about your conversation with Mr. Goswami.
9  A.  Oh, we had a Zoom call with Mary and had a meeting,
10     then he called -- there was supposed to be another
11     Zoom meeting on 10/26, which was canceled to just a
12     telephone call to let me know the FCAN would stand.
13 Q.  So when you say Mary, are you referring to Mary
14     Wisniewski?
15 A.  Yes.
16 Q.  In this initial conversation with Mr. Goswami and Ms.
17     Wisniewski, what did you tell them?  I mean, was this
18     kind of the same thing, I still want the meeting, we
19     should have --
20 A.  Yes.
21 Q.  -- we should have an all-out meeting where everything
22     gets talked about?
23 A.  Yes.
24 Q.  Anything else?
25 A.  No.

Page 245

1  Q.  So the next name is, again, Mary Wisniewski.  Does she
2      overlap with Mr. Goswami?
3  A.  Yes.
4  Q.  So next name you have is Tracy Coram, and you have
5      April 1st of 2021 on there.
6  A.  Uh-huh.
7  Q.  Is that the date when she gave you the FCAN?
8  A.  Yes.
9  Q.  Other than her, for lack of better terms, indiscretion
10     in letting your FCAN be visible to other managers,
11     anything else you would like to add with respect to
12     this lawsuit?
13 A.  No.
14 Q.  And Allison Ausband, again, we've been talking about
15     her.  So you had e-mail communication with her back in
16     April, right; April 2020, I'm sorry?  We went over
17     that, the exhibits.
18 A.  Yes.
19 Q.  And that's when she referred you to Claudine
20     Rydstrand, right?
21 A.  Yes.
22 Q.  And you circled back to her in June of 2021; did that
23     happen?
24 A.  Yes.
25 Q.  So tell me about what your conversation with Ms.

Jacqueline Meadows
May 22, 2023

Page 246

1    Ausband was about.
2    A.   Another Zoom call meeting with her and Tracy Gallegos
3         and read my statement again, what happened and how I
4         was being treated.
5    Q.   And did you ask for that big meeting again?
6    A.   Yes.
7    Q.   And did they get back to you, or did Allison get back
8         to you about that?
9    A.   Allison did not, Tracy did.
10   Q.   Is that the e-mail that we just looked at as Exhibit
11        19?
12   A.   It was before that time; it was a phone call.
13   Q.   So tell me about that phone call.
14   A.   That she spoke to Allison and that the FCAN would
15        stand.
16   Q.   Okay, got it.  At that point, did you ask what else
17        you could do or were you at the end of the road?
18   A.   It was done, Tracy said there was nothing else I could
19        do; I couldn't reach out to any more leaders.
20   Q.   All right.  Now, at each step, these leaders did give
21        you time and let you make your case, right?  I
22        understand they couldn't help you, but --
23             MR. SANDERS:  Object to the form and
24        foundation of the question.
25             You can answer.

Page 247

1    A.   Yes.
2    BY MS. KATO:
3    Q.   Did you ever feel any of these leaders were kind of
4         short-shrifting you or not giving you the attention
5         you deserved?
6    A.   Yes.
7    Q.   Who were those?
8    A.   I would say all of them with the exception of
9         Claudine.
10   Q.   And is it because -- what did they do?  I mean, I
11        understand you talked to many people, but what gave
12        you the impression that they weren't giving you the
13        support you were seeking?
14   A.   The time, the time, like ten minutes.
15   Q.   So how much time would you have wanted?
16   A.   More than ten minutes.
17   Q.   Can you give me an idea?  Like if they gave you 30
18        minutes, would you have been satisfied?
19   A.   30, 45 minutes, uh-huh.
20   Q.   Now, all of the people that we just looked at, which
21        is Exhibit 1, is there anyone in particular that you
22        are accusing of discriminating against you on the
23        basis of your race?
24   A.   Renee Mullen, Peter, Austin, did I say Renee Mullen?
25   Q.   You did.  Austin, which is not on the list, but got

Page 248

1         it; anybody else?
2    A.   No.
3    Q.   So tell me all the facts that make you believe Renee
4         Mullen was discriminating against you because you're
5         African-American.
6    A.   She's a bully.
7    Q.   So to be fair, you didn't have any issue with her
8         until this investigation took place, right?
9    A.   Prior to, with the uniform.
10   Q.   I'm sorry, yeah.  You got the uniform issue where she
11        didn't follow up with you.  Do you know when that was?
12   A.   I can't remember when we transitioned to the uniform;
13        I don't remember what year.
14   Q.   Is that when you went from navy to purple uniforms?
15   A.   Yes.
16   Q.   So whenever that year was.
17   A.   Yep.
18   Q.   So that was an incident in which she did not follow up
19        with your request that would you like to have a men's
20        uniform as opposed to a woman's uniform?
21   A.   Yes.
22   Q.   What makes you think that is because you were
23        African-American?
24   A.   African-American and I'm a lesbian.
25   Q.   Okay.  But what makes you think that's why Renee was

Page 249

1         not following up?
2    A.   She didn't follow up.
3    Q.   So other than the fact, did she say anything to sort
4         of suggest she was sort of poo-pooing your request
5         because you're African-American?
6    A.   No.
7    Q.   Okay.  With respect to this incident of bullying, did
8         she say anything or did she act in a way that would
9         suggest she was treating you poorly because you're
10        African-American?  I mean, setting aside the fact the
11        time was horrible and it was very insensitive, but
12        what makes you think that was because of your race and
13        not because Renee was just inept manager?
14   A.   Just her overall treatment.
15   Q.   Are we talking about her lack of sensitivity?
16   A.   Yes.
17   Q.   She didn't -- did she ever make a comment that makes
18        you think that she would discriminate against you
19        because of race?
20   A.   No.
21   Q.   Other than this bullying and uniform incident, did she
22        ever act in a way that would suggest to you that she
23        would discriminate against you because of your race?
24             MR. SANDERS:  Objection to the form of the
25        question.

Jacqueline Meadows
May 22, 2023

Page 250

1              You can answer.
2  A.   No.
3  BY MS. KATO:
4  Q.   Okay.  Anything else you would like to add with
5       respect to why you think Renee Mullen was
6       discriminating against you because of your race?
7  A.   Yes.
8  Q.   Same question with respect to Peter Saballa-Davis.
9       First of all, what makes you think Peter would
10      discriminate against you because you're
11      African-American?
12 A.   Well, once again, he knew the circumstances that, you
13      know, Lynnette confronted me and that Lynnette is a
14      white woman, I'm black, and he didn't show any type of
15      concern; he didn't address if I needed anything after
16      the incident.  When I spoke to him regarding the
17      incident with the uniform, he apologized for that and
18      he let me know, too, that he was a gay man and that he
19      was there and was going to make sure that I get the
20      uniform that I needed, which I did eventually after I
21      had to call Atlanta to get involved.
22 Q.   But was he assisting you in getting what you needed?
23 A.   No.
24              MR. SANDERS:  Objection as to form.  As to
25      what?

Page 251

1              MS. KATO:  We're talking about the uniform.
2              MR. SANDERS:  That wasn't the original
3       again.  The question was about this incident.
4              MS. KATO:  And the witness went to the
5       uniform.
6              MR. SANDERS:  Yeah, I am talking to the
7       witness.
8              MS. KATO:  I'm sorry.
9              MR. SANDERS:  Answer the question.
10 BY MS. KATO:
11 Q.   So setting aside the uniform issue, let's get back to
12      it.  Do you know if Peter ever arranged such a meeting
13      in other cases?  I understand you wanted to have a
14      meeting where all parties came and talked about it,
15      but do you know of any instance in which Peter
16      arranged such a meeting?
17 A.   No.
18 Q.   So as far as you know, if Lynnette requested such a
19      meeting, that was being denied because you were not
20      invited to such a thing, right?
21 A.   I did not know of it, no.
22 Q.   So other than the fact that Peter didn't sort of run
23      with your idea of having the meeting and didn't follow
24      up with you, anything else that --
25              MR. SANDERS:  Objection, that's a

Page 252

1       mischaracterization of the summary of her testimony.
2       So I prefer you say other than what you've already
3       testified to.
4              MS. KATO:  Actually, please don't
5       choreograph my testimony -- my deposition.
6              MR. SANDERS:  That's it, your testimony.
7       That's the problem.
8  BY MS. KATO:
9  Q.   But your counsel's point is taken.  So other than what
10      we've talked about, anything else you would like to
11      tell me as to why Peter Saballa-Davis would
12      discriminate against you because you're
13      African-American?
14 A.   No.
15 Q.   Austin Lynch, we talked about the fact that he -- you
16      think he looked at you as you were an angry black
17      woman and he didn't talk to you at all.  Anything else
18      to suggest he would discriminate against you?
19 A.   He didn't speak to me when he came to the plane, he
20      was in charge of the case; he spoke to everybody else
21      except for me.
22 Q.   With respect to Austin Lynch in charge of the case,
23      all I know is what John told you, correct?
24 A.   Yes.
25 Q.   You don't know if that's really true or not?

Page 253

1  A.   Correct.  I just went by what John said, yes.
2  Q.   All right.  So I think Renee, Peter, Austin are the
3       three people you named, correct?
4  A.   Yes.
5  Q.   Did I miss anyone?
6  A.   No.
7  Q.   So let's wrap up a couple of things.  If you can go
8       back to Exhibit 5, which is your Complaint.  If I can
9       call your attention to paragraph 35.  Paragraph 35
10      alleges Ms. Meadows had never spoken to Saballa prior
11      to the issuance of the disciplinary action.  This is
12      not true, right?
13 A.   No.  I spoke to him prior to, yes.
14 Q.   And speaking of which, how long have you known Peter
15      Saballa-Davis?
16 A.   I had met him when he came to the base.
17 Q.   So this definitely was not the first time you had
18      spoken to Mr. Davis, right?
19 A.   For this incident?
20 Q.   No, I mean the allegation is that Ms. Meadows had
21      never spoken to Saballa prior to the --
22 A.   No, I've seen him in the base and spoken social.
23 Q.   So this allegation in paragraph 35 is incorrect,
24      right?
25 A.   Correct.

```
1              MR. SANDERS:  Object to the form.
2    BY MS. KATO:
3    Q.   Do you remember the first time you met Peter?
4    A.   No.
5    Q.   Do you recall meeting him and him asking you if you
6         would like to be called Jacqueline or Jackie?
7    A.   I don't recall that, no.
8    Q.   Do you recall telling him in kind of a chuckle saying
9         people call me The General?
10   A.   No.
11   Q.   You don't recall that?
12   A.   No.
13   Q.   Do you recall telling Peter that you were a reserve
14        police officer?
15   A.   Yes.
16   Q.   So the two of you had a casual conversation about your
17        reserve police officer role?
18   A.   Yes.
19   Q.   Paragraph 36, based upon your information and belief,
20        Marshall was not disciplined.  Do you see that?
21   A.   Yes.
22   Q.   Have you come to understand, ma'am, that Lynnette
23        Marshall was, indeed, disciplined for her role on the
24        October 7, 2019 incident?
25   A.   I wasn't aware of it.
```

```
1    Q.   So at the time this allegation was made, you just
2         didn't know?
3    A.   Right.
4    Q.   Did you ever ask someone whether Lynnette was being
5         disciplined?
6    A.   Yes.
7    Q.   Who did you ask that?
8    A.   I think I asked Claudine.
9    Q.   And I take it she didn't tell you?
10   A.   No, she didn't.
11   Q.   Paragraphs 37 and 38, you allege that your FCAN was
12        clearly unwarranted.  I think we talked about the fact
13        that you believe your conduct on October 7, 2019 did
14        not warrant any discipline whatsoever?
15   A.   Correct.
16   Q.   Anything else that supports the allegation it was
17        clearly unwarranted?
18   A.   No, I don't think it was fair, no, because I didn't do
19        it.
20   Q.   In paragraphs 41 and 43 on the same page, the
21        allegation is that Ms. Meadows was subjected to
22        disparate treatment as a result of her race.  And 43
23        says you would not have been subject -- had you been
24        -- let me start over.  If Ms. Meadows had been
25        Caucasian, she would not have been subjected to the
```

```
1         disciplinary action.
2    A.   Yes.
3    Q.   With respect to disparate treatment, we went through
4         your interrogatory answers and your testimony is that
5         it's Austin's conduct, right, because he didn't talk
6         to you, he looked at you as angry black woman;
7         anything else?
8              MR. SANDERS:  Objection to the form and
9         foundation of that question and the limited scope in
10        which you narrowed down the allegation of race
11        discrimination.
12             MS. KATO:  I was about to tell the witness
13        anything else you wanted to add.
14             MR. SANDERS:  You asked her about several
15        individuals and she said why she thought they had
16        discriminated against her on the basis of her race.
17             MS. KATO:  And if you had let me finish,
18        Counsel, my question would have been is there anything
19        you would like to add in support of that allegation.
20             THE WITNESS:  No.
21   BY MS. KATO:
22   Q.   Okay.  What makes you think that if you were
23        Caucasian, you would not have been subject to the
24        FCAN?
25   A.   I think Austin would have questioned me and asked me
```

```
1         the same way that he questioned Lynnette.
2    Q.   Okay.  You were not present when Austin was speaking
3         to Lynnette, right?
4    A.   I was on the aircraft and after 15 minutes the captain
5         and I walked off the aircraft and waited at the door.
6    Q.   My question was:  Were you present --
7    A.   Oh, no.
8    Q.   -- when Lynnette was speaking with Austin?
9    A.   No.
10   Q.   So you don't know what Lynnette told Austin, right?
11   A.   No.
12   Q.   And you just said something that makes me wonder, when
13        you said 15 minutes, how did -- let me back up.
14             Plane landed in Detroit, right?
15   A.   Yes.
16   Q.   Passengers deplane, correct?
17   A.   Yes.
18   Q.   And everyone is gone?
19   A.   Yes.
20   Q.   Where did Austin and John meet you and the crew?
21   A.   I was in first class, John met me in first class with
22        the captain; Lynnette and Austin was by door 2 on a
23        757.
24   Q.   Does it have a different jet way entry between --
25   A.   At door 2.
```

Jacqueline Meadows
May 22, 2023

Page 258

1  Q.  And you were at door 1?
2  A.  Yes, I was in first class.  When you come in, you go
3      to the left.
4  Q.  How did John and Austin enter the aircraft, if you
5      know?
6  A.  Through door 2.
7  Q.  So at door 2.  And where were all four members located
8      when they arrived on the aircraft?  I'm assuming you
9      were not standing next to Lynnette.
10 A.  No.  Lynnette was in the back at door 4, I believe
11     Taylor and Kayla was at door 2, and -- I'm sorry,
12     Kayla was at door 3, I think.
13 Q.  All right.
14 A.  No, doors 2 and 3, that's right, and then at door 3, I
15     think the guy was there by himself, Chris.
16 Q.  And you and Captain Cooney were up in the first class?
17 A.  Yes.
18 Q.  So that's your configuration when John and Austin walk
19     in --
20 A.  Yes.
21 Q.  -- to the best of your recollection?
22 A.  Yes.
23 Q.  I understand it's three years ago.
24 A.  Yes.
25 Q.  Okay.  So Austin goes to, what, to the right to talk

Page 259

1      to Lynnette and others, and John turns left to come
2      talk to you and Captain Cooney?
3  A.  Yes.
4  Q.  All right.  So how long did you and John talk to
5      Captain Cooney?  I understand you were not actively
6      contributing to that conversation, but how long did
7      that conversation take place?
8  A.  Five minutes, not even ten minutes.
9  Q.  All right.  Did John leave after he took Captain
10     Cooney -- he spoke to Captain Cooney?
11 A.  Yes.
12 Q.  Where did Captain Cooney go after that?
13 A.  He stayed with me.
14 Q.  So in the meantime, Austin is having conversation with
15     Lynnette --
16 A.  Yes.
17 Q.  -- and three other flight attendants?
18 A.  Yes.
19 Q.  On an individual basis?
20 A.  Yes.
21 Q.  And how long did that take place?
22 A.  I know I was still in the airport like 40 minutes
23     after we landed.
24 Q.  So where were you seated during the conversation in
25     which Austin is interviewing individual flight

Page 260

1      attendants?
2  A.  Up in front, first class.
3  Q.  You're in the first class?
4  A.  Yes.
5  Q.  And they're still in the main cabin?
6  A.  Yes.
7  Q.  And how did the -- how did it end where Austin walked
8      by you?
9  A.  I was already deplaned.  I was right by the door.
10     When you come off the jet way, I was standing there.
11 Q.  So you had moved from the first class to the door --
12 A.  We got off the aircraft, yes.
13 Q.  Where was Austin at that point when -- at what point
14     did you walk from the first class to the door?
15 A.  About 30 minutes after.
16 Q.  Okay.  Was Austin still talking to the flight
17     attendants?
18 A.  Yes.
19 Q.  And as Austin left, that's when he sort of left and
20     that's when he gave you a look?
21 A.  Yes.
22 Q.  Do you know if he knew you were waiting to speak to
23     him?
24 A.  He should have known, he had a crew list.
25 Q.  But --

Page 261

1  A.  I was the one involved in the incident.
2  Q.  All right.  But you don't know what conversation or
3      arrangement John and Austin had with respect to who
4      interviews who, right?
5          MR. SANDERS:  Objection, asked and
6      answered.  You asked that question three or four hours
7      ago, but go ahead.
8          MS. KATO:  More like seven hours ago.
9          MR. SANDERS:  You only get seven, so if
10     that's what your testimony is, we can shut it down,
11     but I'll give you some more time.
12 BY MS. KATO:
13 Q.  So you don't know, right?
14 A.  Yes.
15 Q.  All right.  I think my original question was:  Is
16     there anything else that supports your allegation that
17     if you had been Caucasian, you would not have been
18     subjected to FCAN; and I think your question (sic), my
19     which started this entire line of questioning, or my
20     wanting to know what happened was because Austin spent
21     more time with Lynnette and you believed had you had
22     an opportunity to speak with Austin, you would not
23     have been issued an FCAN --
24 A.  Correct.
25 Q.  -- do I have that right?

Page 262

1  A.  Yes.
2  Q.  What makes you think that?
3  A.  Tell my side of the story.  I don't know what he told
4      her -- I mean, I don't what she told him.
5  Q.  If you could turn to paragraphs 49 and 58 of Exhibit
6      1, which I think is the same allegation.
7              MR. SANDERS:  Exhibit 1?
8              MS. KATO:  Exhibit 5, I'm sorry, the
9      Complaint.
10 BY MS. KATO:
11 Q.  So if I can call your attention to Exhibit --
12     paragraph 49, Exhibit 5, the Complaint, the allegation
13     is, the plaintiff's race was a factor that made a
14     difference in defendant's decision to subject her to
15     the wrongful and discriminatory treatment described
16     above.  Do you see that?
17 A.  Yes.
18 Q.  I think paragraph 58 is the same allegation except
19     under the Michigan state laws as opposed to Title 7.
20         Other than what we've been talking about,
21     anything else you can tell me that supports the
22     allegation that your race was a factor that made a
23     difference?
24 A.  Once again, I never got a chance to have my meeting or
25     the person that was in charge of the case never called

Page 263

1      me and spoke to me and asked me.
2  Q.  Is it your belief, and correct me if I'm wrong, that
3      if you had the chance to speak to Austin and if you
4      could have that meeting, you would have not been
5      issued an FCAN?
6              MR. SANDERS:  Objection, form and
7      foundation, calls for speculation as to what Austin
8      would have done or anyone who might have participated
9      in the decision process.
10             But you can answer.
11 A.  I don't know.
12 BY MS. KATO:
13 Q.  Well, I mean, you tell me those are the two things
14     that, you know, had you spoken to Austin, right, and
15     had there been a meeting, this wouldn't have happened.
16             MR. SANDERS:  Objection, same objection.
17 BY MS. KATO:
18 Q.  Do I have that right?
19 A.  I don't know.
20 Q.  You don't know?
21 A.  I don't know.
22 Q.  So when you say your race was a factor that made a
23     difference, that was my question to you, right, that's
24     the allegation, your race was a factor that made a
25     difference, and I asked you why, and you said you

Page 264

1      didn't get to speak with Austin and you never had a
2      meeting.
3  A.  Correct.
4  Q.  So my question is:  Because the allegation is raised,
5      would that have made a difference?
6  A.  Yes.
7  Q.  So what difference would it have made?
8              MR. SANDERS:  Same objection, form and
9      foundation.
10 A.  Yes, he should have asked me.  I waited for him.
11 BY MS. KATO:
12 Q.  Let me understand this:  So is it your belief, Ms.
13     Meadows, and I'm only asking for your belief here, if
14     Austin spoke with you on October 7, 2019, it would
15     have made a difference?
16 A.  Yes.
17 Q.  Is it because he appears to have spent quite a bit of
18     time with Lynnette?
19 A.  Yes.
20 Q.  Anything else?
21 A.  No.
22 Q.  And is it also you belief that if you had that meeting
23     where everybody gets to talk about their side of the
24     story --
25 A.  Yes.

Page 265

1  Q.  -- the outcome would have been different?
2  A.  Yes.
3  Q.  And is that because then you get to tell your side of
4      the story in your own words?
5  A.  Yes.
6  Q.  Anything else?
7  A.  No.
8  Q.  I'm getting to the final part.  If you can turn to
9      Exhibit 1, interrogatory 10.
10 A.  Yes.
11 Q.  Exhibit 1, interrogatory number 10, we asked you to
12     list essentially what damages you're seeking in this
13     lawsuit, including back pay, front pay, what we call
14     economic damages, financial damages, as well as
15     emotional damages, so forth.
16         And your answer is that it's continuing in
17     nature; amount is unknown at this time.
18         I kind of need a little bit clearer answer,
19     so I'm going to ask you a few more things.  What
20     economic loss are you seeking as damages in this
21     lawsuit?  And I'm talking about just financial, set
22     aside anxiety, depression all of that.  I understand
23     that since you can't bid as a purser, that some of the
24     things you lost was an income, right?
25 A.  Right.

Jacqueline Meadows
May 22, 2023

Page 266

1   Q.   But I think your testimony was that you probably --
2        you stopped bidding on international trips because you
3        wanted to be close to your dad, right?
4   A.   Yes, but I couldn't apply for any other special
5        assignment or any other positions outside of
6        in-flight.
7   Q.   Okay.  What position would you look for outside of
8        in-flight?  So like a desk job?  I'm sorry --
9   A.   No, not a desk job, no.
10  Q.   What special assignment would you want to do that you
11       cannot do because of the FCAN?
12  A.   Training.
13  Q.   What kind of training?
14  A.   Flight attendant training.
15  Q.   What does that mean?
16  A.   Down in Atlanta, the training, flight attendant
17       training, you know, recurrent training, or any type of
18       special assignment.  Special assignments come up all
19       the time.  Being on the -- I can't think of the name
20       of the team that they go to special events all over
21       the world; peer support, couldn't be a part of any of
22       those.
23  Q.   Do those come with some premiums, if you know?
24  A.   I'm not familiar with it.
25  Q.   So special assignments, you can't go to the flight

Page 267

1        attendant training in Atlanta?
2   A.   No, I couldn't apply for that position.
3   Q.   Oh, to be a trainer?
4   A.   Yeah.
5   Q.   Oh, okay.  Got it.
6   A.   Sorry.
7   Q.   Is that something you have thought in the past?
8   A.   Oh, yes.
9   Q.   What happened?
10  A.   I just -- my mom got sick, I didn't want to leave,
11       leave Michigan.
12  Q.   And are you in a position to leave Michigan if you're
13       granted that position now?
14  A.   I don't want the position now.
15  Q.   You don't want the position?
16  A.   I wouldn't want the position now, no.
17  Q.   So we just talked about the trainer position, right?
18  A.   Uh-huh.
19  Q.   That's a position you don't want now?
20  A.   No.
21  Q.   All right.  So special assignment, like some teams and
22       peer support, those are things you cannot apply for
23       because of your FCAN?
24  A.   Right.
25  Q.   And you don't know if those come with any financial

Page 268

1        sort of premiums?
2   A.   I'm not aware.
3   Q.   All right.  Anything else that you have lost,
4        financially speaking, because of your FCAN?
5   A.   Yes, the purser position.
6   Q.   Okay.  Purser position is international flights,
7        right?
8   A.   Yes.
9   Q.   But you're not bidding on international trips because
10       of your dad now, right?
11  A.   Correct.
12  Q.   Any other economic loss?  I understand that's a legal
13       term, but the financial loss that you're claiming in
14       connection with this lawsuit?
15  A.   I had to take time off work.
16  Q.   For?
17  A.   When this incident happened.
18  Q.   When was that?
19  A.   Right after I was issued the FCAN.
20  Q.   Was it a medical leave of absence?
21  A.   Yes.
22  Q.   How long were you on leave?
23  A.   At least ten months.
24  Q.   Is that why your FCAN was not handed to you until
25       2021?

Page 269

1   A.   Could have been, yes.
2   Q.   Were you on FMLA, disability, for ten months?
3   A.   Yes.
4   Q.   Which one?
5   A.   FMLA.
6   Q.   Aside from that, anything else?
7   A.   No.
8   Q.   You're still getting the same benefits from Delta Air
9        Lines, right?
10  A.   Yes.
11  Q.   And because of your seniority, you can pretty much bid
12       on any trip you want?
13  A.   Yes.
14  Q.   And in response to our interrogatory number 8, you
15       state that you suffer from anxiety and depression
16       since the incident took place.
17  A.   Yes.
18  Q.   First, are you on any medication?
19  A.   Yes.
20  Q.   What are those, what medication?
21  A.   Lexapro and Ambien.
22  Q.   Ambien is to help you sleep?
23  A.   Yes.
24  Q.   Were those prescribed to you after the incident or
25       were they previously prescribed to you?

Jacqueline Meadows
May 22, 2023

Page 270

1  A.  Ambien previous; Lexapro during.
2  Q.  And when were these -- Ambien has been ongoing?
3  A.  Yes.
4  Q.  I can understand as a flight attendant sleep can be a
5      bit of an issue, right?
6  A.  Yes.
7  Q.  So the anxiety medication, when was that prescribed to
8      you?
9  A.  During this incident.
10 Q.  During or after?
11 A.  During.
12 Q.  Was it Dr. Gary Yashinsky who prescribed you the
13     medication?
14 A.  Yes.
15 Q.  He's an internal medicine doctor, right?
16 A.  Yes.
17 Q.  And are you seeing him for anxiety and depression as
18     well as anything else?
19 A.  Yes.
20 Q.  Is he your what we call the primary care physician?
21 A.  Yes.
22 Q.  Did he diagnose you with anxiety and with depression?
23 A.  Yes.
24 Q.  When did that happen?
25 A.  During this incident.

Page 271

1  Q.  And you're also seeing psychotherapist Harold Love?
2  A.  Yes.
3  Q.  He's a counselor, right?
4  A.  Yes.
5  Q.  How often do see Harold Love?
6  A.  At that time, I was going at least three times a
7      month, three, four times a month.
8  Q.  When did you start seeing him?
9  A.  When did I start?
10 Q.  Yes.
11 A.  Prior to this incident.
12 Q.  Prior to?
13 A.  Yes.
14 Q.  Was it because your mom was sort of heading in the
15     wrong direction?
16 A.  Yes.
17 Q.  Do you recall when you started seeing him?
18 A.  Maybe four or five months before this.
19 Q.  So that puts us about early summer of 2019?
20 A.  Yes.
21 Q.  How long were -- how often were you seeing him before
22     this incident?
23 A.  Maybe once a month.
24 Q.  And that got up to three to four times a month?
25 A.  Yes.

Page 272

1  Q.  How long did you see him three to four times a month?
2      Let me back up.  Are you seeing him now?
3  A.  Yes.
4  Q.  How often do you see him these days?
5  A.  Maybe like twice a month.
6  Q.  When did it go down from three to four times a month
7      to twice a month?
8  A.  After my mom's passing.
9  Q.  That was January 2021?
10 A.  Yes.
11 Q.  Any reason why that sort of reduced the number of
12     times you went to see him?
13 A.  Just dealing with life different.
14 Q.  Okay.  Harold Love cannot prescribe medication, right,
15     because he's a counselor?
16 A.  Correct.
17 Q.  So tell me about your anxiety.  What are the symptoms?
18 A.  Anxiety, not knowing, fearful.
19 Q.  Are you still working as the reserve police officer?
20 A.  Yes.
21 Q.  At least 12 hours a month?
22 A.  Yes.
23 Q.  Any impediment on your reserve officer performance or
24     work duties because of what happened?
25 A.  No.

Page 273

1  Q.  Anything else with respect to your anxiety that you
2      want to tell me?
3  A.  No.
4  Q.  What about depression, what are the symptoms?
5  A.  Not feeling good, by myself, disappointed not being a
6      leader anymore.
7  Q.  Are you hoping to -- now, your 36 month probation has
8      expired or is about to expire, right?
9  A.  I did inquire about that, so...
10 Q.  Is it your --
11 A.  But I -- go ahead.
12 Q.  Is it your desire to get back in the purser program?
13 A.  Yes.
14 Q.  When did you inquire about that?
15     Let me back up.  The question was:  Your PD
16     expires or is about to expire, right, and I think you
17     said you inquired about that.
18 A.  Yes.
19 Q.  So tell me about that.  Who did you inquire with and
20     what was the nature of that inquiry?
21 A.  My current FSM.
22 Q.  Who is your current FSM?
23 A.  Cara Harvey.
24 Q.  What was the inquiry you made with Cara?
25 A.  She wanted to meet with me, because she said we missed

Jacqueline Meadows
May 22, 2023

Page 274

1  a meeting in November and I asked her if the FCAN was
2  expired and she said she would look into it and let me
3  know.
4  Q.  Did she get back to you?
5  A.  No, not yet.
6  Q.  Was that a recent meeting?
7  A.  The conversation was about two weeks ago.
8  Q.  Okay.  If it's expired, is it your intention to
9  reapply for the purser program?
10 A.  Yes.
11 Q.  Any other damages that you're seeking in this lawsuit,
12 other than what we talked about in the past however
13 long we've been talking?
14 A.  No.
15 Q.  At the risk of opening up a can of worms here, I
16 usually ask the final catch-all question:  We've been
17 talking a lot today and asking a lot of questions.  Is
18 there anything else that we did not already talk about
19 today that supports your claim of race discrimination
20 in this case?
21 A.  No.
22 Q.  So we exhausted your recollection?
23 A.  Yes.
24 Q.  Have we talked you out?
25 A.  Yes.

Page 275

1            MS. KATO:  All right.  Unless Mr. Sanders
2  has some follow-up questions, I'm done with my
3  preliminary examination.
4            MR. SANDERS:  Let me take a look at my
5  notes and we'll see if I have anything.
6            (Off the record at 5:34 p.m.)
7            (Back on the record at 5:47 p.m.)
8                  EXAMINATION
9  BY MR. SANDERS:
10 Q.  As it relates to the incident on or about October 7,
11 2019, do you feel that through the process you feel were
12 treated the same or differently than Ms. Marshall?
13 A.  Differently.
14 Q.  Why?
15 A.  Because Peter and Christian signed off on my
16 discipline.
17 Q.  Okay.  And what is it about Peter and Christian
18 signing off on your discipline?
19 A.  Well, Lynnette instigated this incident, started this
20 incident, and I just -- Lynnette started this
21 incident; it wasn't investigated properly.
22 Q.  Why do you say it wasn't investigated properly?
23 A.  Because of my race.
24 Q.  Why do you believe that because of your race it wasn't
25 investigated properly; what leads you to conclude

Page 276

1  that?
2  A.  Once it was signed off.
3  Q.  What do you mean about that?
4  A.  Once I was given discipline by Peter and Christian.
5  Q.  Okay.  What discipline did you receive as a result of
6  this occurrence?
7  A.  36 months' probation.
8  Q.  Okay.  And what did you receive that discipline for,
9  allegedly?
10 A.  Workplace violence.
11 Q.  Okay.  Were you violent in the workplace?
12 A.  No.
13 Q.  Okay.  And what happened that led to you receiving
14 this discipline?
15 A.  I feel like I was discriminated against because of my
16 race.
17 Q.  Let me ask the question differently:  What were the
18 facts on October 7th that ultimately resulted in you
19 receiving a discipline?
20 A.  That Lynnette Marshall instigated the incident.
21 Q.  How?
22 A.  By yelling at me, threatening, coming to me in a
23 threatening manner to the point I went to the cockpit
24 for my safety, and the captain saw all of that, saw
25 her following me with anger.

Page 277

1  Q.  Okay.  At any time did you threaten her?
2  A.  No.
3  Q.  At any time did you say you would take her down?
4  A.  No.
5  Q.  At any time have you had an opportunity to see any
6  evidence, other than today, that said anything to the
7  contrary?
8  A.  No.
9  Q.  Now, you mentioned Mr. Saballa-Davis and Christian
10 Gunn signed off on your discipline; what does that
11 mean?
12 A.  That the determination was made by those two to put me
13 on a 36 month probation.
14 Q.  Why do you have that impression?
15 A.  I was given that and they signed off.
16 Q.  You were given what?
17 A.  A letter, the form of -- the correction notice letter.
18 Q.  Okay.  And you said they signed off on it?
19 A.  Yes.
20            MR. SANDERS:  I don't have anything
21 further.
22            MS. KATO:  I have just a few follow-up
23 questions.
24                  RE-EXAMINATION
25 BY MS. KATO:

Jacqueline Meadows
May 22, 2023

Page 278

1  Q.  Ms. Meadows, other than the fact Austin Lynch spoke
2      with Lynnette Marshall on October 7, 2019, do you have
3      any understanding as to how her conduct was
4      investigated by Delta Air Lines?
5  A.  No.
6  Q.  So you don't know how her case was treated?
7  A.  No.
8  Q.  All right.  So the only thing you do know is that fact
9      that Austin Lynch did speak to her on the day of these
10     events, right?
11 A.  Yes.
12 Q.  Ms. Meadows, are you familiar with Delta's
13     confidentiality policy with respect to investigation
14     of employee misconduct?
15 A.  No.
16 Q.  So you don't know the policy is to keep everything
17     confidential?
18 A.  Well, yeah, I was told that when I inquired, yes.
19 Q.  When did you make that inquiry?
20 A.  With Tracy Gallegos.
21 Q.  And how did it come about that she was providing you
22     that information?  I mean, what question did you ask
23     to prompt that response?
24 A.  I asked her if Lynnette was disciplined.
25 Q.  All right.  And I think you just gave testimony to

Page 279

1      your counsel's question that Christian and Peter
2      signed off on your discipline.  I think we went
3      through this during my questioning is that your belief
4      that Christian Gunn and Peter Saballa-Davis was the
5      decision-maker with respect to your discipline is
6      because their name appears on your document, right?
7  A.  Yes.
8  Q.  Do you have any other facts to support your belief
9      that Peter and Christian are responsible for issuing
10     you a final corrective action notice?
11 A.  With their names on it, yes.
12 Q.  Do you have any other information --
13 A.  No.
14 Q.  -- other than their names?
15 A.  No.
16 Q.  So that's what you're going on, right?
17 A.  Yes.
18 Q.  And I think you testified to your counsel's question
19     that Captain Cooney saw what was going on.  I'm
20     paraphrasing.
21 A.  Yes.
22 Q.  With respect to what Captain Cooney saw, that was
23     interaction on the flight deck, right?
24 A.  Yes.
25 Q.  Not your first encounter with Lynnette Marshall by

Page 280

1      door 2, correct?
2  A.  Yes.
3  Q.  He was not, as far as you know, he was not anywhere
4      near?
5  A.  No, no.
6          MS. KATO:  That's all the questions I have.
7          MR. SANDERS:  I don't believe I have
8      anything further.  Other than, Counsel, do you have
9      any objection to us putting on the record our
10     conversation as it relates to discovery?
11         MS. KATO:  No, not at all.
12         MR. SANDERS:  Maybe I'll go and you can
13     correct me if I say anything that's wrong.
14         MS. KATO:  Sure.
15         MR. SANDERS:  I believe discovery is set to
16     expire on or about June 16th.
17         MS. KATO:  17th, I think.
18         MR. SANDERS:  June 17th.  And counsel and I
19     had a conversation off the record in which we
20     indicated we would stipulate to extend discovery
21     somewhere between 30 to --
22         MS. KATO:  60 maybe.
23         MR. SANDERS:  Maybe 60 days.  We'll discuss
24     it and work it out.  There is an understanding I that
25     requested some initial depositions and through the

Page 281

1      deposition of plaintiff, there may be a couple or
2      several other deps that might need to be taken, and
3      for that reason we're agreeing to extend discovery.
4      Is that accurate?
5          MS. KATO:  Absolutely.
6          MR. SANDERS:  Thank you.
7          (The deposition was concluded at 5:56 p.m.
8      Signature of the witness was not requested by
9      counsel for the respective parties hereto.)

Jacqueline Meadows
May 22, 2023

Page 282

```
1                    CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN )
3                    ) SS
4   COUNTY OF OAKLAND )
5
6            I, JENIFER WEISMAN, certify that this
7        deposition was taken before me on the date
8        hereinbefore set forth; that the foregoing questions
9        and answers were recorded by me stenographically and
10       reduced to computer transcription; that this is a
11       true, full and correct transcript of my stenographic
12       notes so taken; and that I am not related to, nor of
13       counsel to, either party nor interested in the event
14       of this cause.
15
16
17
18
19
20
21
22            JENIFER WEISMAN, CSR-6006
23            Notary Public,
24            Oakland County, Michigan.
25   My Commission expires:  August 17, 2027
```