UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JACQUELINE MEADOWS,** | **2:22-CV-11276-TGB-KGA** |
| Plaintiff, | HON. TERRENCE G. BERG |
| vs. | |
| **DELTA AIRLINES, INC., PETER SABALLA, Base Director, and CHRISTIAN GUNN, Field Service Manager,** | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMRARY JUDGMENT (ECF NO. 25)** |
| Defendants. | |

Jacqueline Meadows was a 30-year veteran Flight Attendant with Delta and a reserve Detroit Police Officer since 2017 when she was disciplined for using threatening language in an argument with a coworker that allegedly violated Delta's Workplace Violence Policy. In this is employment discrimination case, Plaintiff Meadows, an African American, alleges that Defendants Delta Airlines, Inc., Peter Saballa-Davis, and Christian Gunn intentionally discriminated against her based on her race when she was disciplined after an altercation with a Caucasian coworker, while that coworker was not similarly disciplined. Meadows asserts claims against all Defendants for intentional race discrimination under Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act.

Now before the Court is Defendants' Motion for Summary Judgment, ECF No. 25, seeking dismissal of Meadows's claims. The

1

motion has been fully briefed. A hearing was held on March 11, 2025, at which counsel for Plaintiff and Defendants appeared. For the reasons stated below, Defendants' Motion for Summary Judgment will be **GRANTED.**

## I.    BACKGROUND

Plaintiff Jacqueline Meadows, an African American female, began working as a flight attendant for Northwest Airlines in 1989 and became an employee of Delta in or about 2008 when Northwest Airlines merged with Delta. Meadows Dep. 17–18, ECF No. 25-2, PageID.197–98. Meadows became a Purser-qualified flight attendant while working for Northwest Airlines and retained that status with Delta. *Id.* 28–31, PageID.200–01. Pursers are on-board leaders on Delta One's trans-oceanic markets, ECF No. 25-3, and are expected to lead other flight attendants in ensuring the passengers' safety, comfort, and security, to serve as a liaison between the pilots and the flight crew, and to coordinate the flight crew and de-escalate any crew conflict. Meadows Dep. 48–49, ECF No 25-2, PageID.205. Meadows has also been a Reserve Police Officer with the Detroit Police Department since July 17, 2017. *Id.* 20, PageID.198. Her status as a reserve police officer is well known among Delta's Detroit-based flight attendants and managers. *Id.* 23–25, 53, PageID.199, 206.

2

### A. The October 7, 2019 Incident Onboard DL 2880 in Orlando

On October 7, 2019, Meadows was a flight leader on DL 2880, which was a round-trip flight from Detroit ("DTW") to Orlando ("MCO") airports. Meadows Dep. 51, ECF No. 25-2, PageID.206. The flight crew consisted of Lynette Marshall, with whom Meadows had previously flown without any issues, Taylor Ramon, and Khristin Moore, neither of whom Meadows knew, and another crew member named Kayla. *Id.* 51–53, 55–56, PageID.206–07. Marshall has been a flight attendant since 1986. Marshall Dep. 6, ECF No. 25-6, PageID.305. The first leg of the trip from Detroit to Orlando was uneventful. Meadows Dep. 53, ECF No. 25-2, PageID.207.

Upon arrival in Orlando, the Federal Aviation Administration's ("FAA's") minimum crew regulations required that all five flight attendants remain onboard the aircraft until all passengers had deplaned. And, as the designated flight leader, Meadows was also required to remain onboard until the door safety flight attendant—in this case, Lynette Marshall—confirmed that the cabin safety check (verifying that all passengers had deplaned, there are no hidden passengers onboard, and the doors have been disarmed) had been completed. *Id.* 54–59, PageID.207–08; On-Board Manual, §§ 5.1.13 and 5.1.14, ECF No. 25-4, PageID.298–99.

Meadows apparently deplaned before the cabin safety check was completed in order to assist a passenger with a wheelchair who needed

3

help with her baggage. Meadows Dep. 59–64, 70–71, ECF No. 25-2, PageID.208–09, 211. After assisting the passenger, Meadows went to the top of the jetway to get the paperwork for the return flight to DTW and then made a phone call to her father before returning to the plane. *Id.* 64–65, PageID.209. Meadows was not onboard the aircraft when Marshall came up to the front of the plane to report that the cabin safety check had been completed. Marshall Dep. 13, ECF No. 25-6, PageID.306.

Once Meadows returned to the aircraft, Marshall, who was seated at the exit row, told her that she should not have exited the aircraft while passengers were still onboard. Meadows Dep. 66-70, ECF No. 25-2, PageID.210–11. According to Meadows, Marshall "approached [her] in a very threatening aggressive manner" and told her, "You shouldn't have gotten off the plane," "I needed you," and "why did you get off the plane?" *Id.*; Meadows Statement, ECF No. 25-5, PageID.301. Meadows responded that she was assisting a wheelchair passenger and added that Marshall needed to back off because she was unaware of Meadows's personal issues, explaining that her mother was ill and that she answered her father's phone call while she was on the jetway. Meadows Dep. 67–68, ECF No. 25-2, PageID.210; Meadows Statement, ECF No. 25-5, PageID.301; Marshall Dep. 14, ECF No. 25-6, PageID.307. Meadows reports that Marshall yelled at her, "You rather make money than be home with your mother." Meadows Statement, ECF No. 25-5, PageID.301. Marshall admits making this statement, and that she

4

regrets making it because it was "unkind, not professional." Marshall SRS Report, ECF No. 25-7, PageID.317.

According to Marshall, she was seated in the exit row by the doorway and Meadows was "standing over [her], yelling at [her]." Marshall Dep. 10, ECF No. 25-6, PageID.306; Meadows Dep. 66–67, ECF No. 25-2, PageID.210 (agreeing that she was standing and Marshall was seated when they first interacted).When Marshall stood up from her seated position in an attempt to get away from Meadows, who Marshall said was "yelling and spitting" on her, Meadows told Marshall "come any closer to me and I will take you down." Marshall Dep. 10–11, 14, ECF No. 25-6, PageID.306–07; Marshall SRS Report, ECF No. 25-7; Mohammed Decl. ¶ 6, ECF No. 25-8, PageID.320; Mohammed Statement, ECF No. 25-8, PageID.323.

Although Meadows initially confirmed making the "take-down" statement when she spoke to Field Service Manager ("FSM") Neil Mohammed on the date of incident, Mohammed Statement, ECF No. 25-8, PageID.323, she now denies she made that statement or that she said anything threatening or inappropriate to Marshall. Meadows 68–69, ECF No. 25-2, PageID.210. Meadows states she instead walked away from Marshall and headed toward the cockpit to talk to the flight Captain, Patrick Cooney, in an attempt to de-escalate the situation, and that Marshall followed her and continued to yell at her. *Id.* 74, PageID.212. Meadows asked Captain Cooney to tell Marshall to stop

yelling at her and Captain Cooney told Marshall to back off and to get to the back of the aircraft. *Id.* Meadows states that she requested that a manager meet the flight in Detroit so that she could press harassment charges against Marshall, and that she also texted or called her supervisors, Renee Mullen and Steven Jones, to inform them of the incident. *Id.* 81–83, PageID.213–14.

Marshall  states that she construed Meadows's statement to her to "come any closer to me and I will take you down" to be a threat, because Marshall knew Meadows was also a police officer. Marshall Dep. 10–11, 14, PageID.306–07; Marshall SRS Report, ECF No. 25-7. Marshall immediately reported the incident to the In-Flight Service Operations Desk ("OCC"), stating that Meadows told her, "if you get any closer to me, I will take you down." Monette OCC Page, ECF No. 25-9. Based on Marshall's report, Delta dispatched MCO-based FSM Neil Mohammed to ascertain whether the two flight attendants could work together on the flight back to Detroit. *Id.*

FSM Mohammed first spoke with Meadows, and then Marshall. Mohammed Statement, ECF No. 25-8, PageID.323. FSM Mohammed reported that Meadows admitted to him that she told Marshall to "get out of her face or she 'will take her down.'" *Id.* When FSM Mohammed asked her what she meant by those words. Meadows explained that she was a police officer prior to working at Delta and that she was reacting based on her police training and that she did not intend to hurt anyone.

6

*Id.* FSM Mohammed then spoke to Marshall, who confirmed that Meadows had made the statement to her. *Id.* FSM Mohammed relayed this information to DTW-based leaders via e-mail and had no further involvement with either flight attendant. Mohammed Decl. ¶¶ 8-9, ECF No. 25-8, PageID.320–21; Mohammed Statement, ECF No. 25-8, PageID.323. Meadows and Marshall agreed that they could work together on the return flight to Detroit. Mohammed Statement, ECF No. 25-8, PageID.323. The flight then returned to DTW.

Meadows has since denied that she told Mohammed that she said "I will take you down" to Marshall or that she mentioned her police training. Meadows Dep. 98–99, ECF No. 25-2, PageID.218. Prior to October 7, 2019, Meadows had never met FSM Mohammed nor had any dealings with him; and she had no reason to believe FSM Mohammed was aware of her status as a police officer. *Id.* 95, 99, PageID.217–18; Mohammed Decl. ¶¶ 5, 7, ECF No. 25-8, PageID.319–20.

Upon their arrival back in Detroit, Meadows and Marshall were met by DTW-based FSMs Austin Lynch and John Arilla who had learned of the crew conflict in MCO via the OCC Page. Lynch Dep. 8–9, ECF No. 25-10, PageID.329. FSMs Lynch and Arilla's task at this time was to check on the flight attendants, offer support, and request that the flight attendants send their statements to their respective managers. But Lynch and Arilla did not investigate the incident. *Id.* 9–10, 16, PageID.329–31. FSM Lynch spoke with Marshall while FSM Arilla spoke

with Meadows, and FSM Lynch then prepared a short, combined incident report. *Id.* 10–11, PageID.330; Lynch Incident Report, ECF No. 25-11. Neither FSM Lynch nor FSM Arilla had any further contact with Marshall or Meadows after October 7, 2019. Lynch, 9, ECF No. 25-10, PageID.329.

### B. Delta's Investigation of the Incident

At the time of this incident, Meadows's immediate supervisor was DTW-based FSM Renee Mullen. Meadows Dep. 86, ECF No. 25-2, PageID.215. Under Delta's practice, FSM Mullen, as Meadows's direct supervisor, was responsible for investigating the October 7, 2019 incident. On October 8, 2019, Meadows submitted a short statement to DTW HR Manager Courtney Ebert only (even though FSM Mullen had requested a written statement from Meadows). *Id.* 87–88, 142, PageID.215, 229; Meadows Email Statement, ECF No. 25-5. Meadows acknowledged that her October 8, 2019 e-mail statement to HR Manager Ebert was a complete statement of the events on October 7, 2019 in Orlando. Meadows Dep. 148–49, ECF No. 25-2, PageID.230.

That same day, Marshall submitted a report summarizing the incident through Delta's Safety Reporting System ("SRS"), based on her understanding of Delta's expectations for reporting security-related concerns. Marshall Dep. 6–9, ECF No. 25-6, PageID.305; Marshall SRS Report, ECF No. 25-7. According to that report Marshall was "yelling and standing very close and leaning over [Meadows] in what felt like a

8

threatening manner," and when Marshall "stood up and tried to say something … [Meadows] interrupted [her] and said 'Come any closer to me and I will take you down.'" Marshall SRS Report, ECF No. 25-7, PageID.317.

On November 3, 2019, FSM Mullen spoke with Meadows regarding the details of the October 7, 2019 incident and again requested that she submit a written statement to her. Meadows Dep. 154–58, ECF No. 25-2, PageID.232–33; Mullen Note to File, ECF No. 25-13. In response, Meadows sent FSM Mullen the October 8, 2019 email she had prepared for and sent to HR Manager Ebert. *Id.* 157–58, PageID.232–33; Meadows Email Statement ECF No. 25-5.

After her November 3, 2019 conversation with FSM Mullen, Meadows asked DTW General Manager Peter Saballa-Davis that she be assigned a different manager. Meadows Dep. 158–61, ECF No. 25-2, PageID.233; Saballa-Davis Dep. 6–7, ECF No. 25-14, PageID.354. Delta reassigned Meadows to FSM Christian Gunn. Meadows Dep. 160–61, ECF No. 25-2, PageID.233. FSM Gunn completed Delta's investigation of the October 7, 2019 incident by interviewing Flight Attendants Taylor Ramon and Khristian Moore and obtaining their written statements. Gunn Dep. 8–9, 12, ECF No. 25-12, PageID.340–41; Ramon and Moore Statements, ECF No. 25-15. According to their statements, both Ramon and Moore recalled the incident as one in which Marshall appeared to confront Meadows in a somewhat aggressive manner. But neither Ramon

9

nor Moore confirmed or denied that Meadows said, "I will take you down" to Marshall. Ramon and Moore Statements, ECF No. 25-15. Ramon states she went to the front of the plane "to lay[] out waters" shortly after the confrontation between Meadows and Marshall began and "heard a lot of back and forth; [Marshall] trying to tell [Meadows] how she broke the rules and [Meadows] telling her we weren't going to do this right now." *Id.* PageID.360. Ramon saw the two "marching up to the flight deck" as they "continued to try to talk over each other," and stated that the Captain told Marshall to go to the back of the plane. *Id.* Moore did not offer any details of the conversation between Meadows and Marshall, but said that when Meadows was walking away from the confrontation, Marshall "charge[d]" after her "in a taunting manner." *Id.* PageID.361.

## C.   **Delta's Workplace Violence Committee Review**

Because of the nature of the incident wherein Marshall reported that she was verbally threatened by Meadows and both flight attendants accused the other of engaging in a threatening behavior, the DTW leaders, with assistance from HR Manager Ebert, decided to submit the case for review by Delta's Workplace Violence ("WPV") Committee. Vanneman Dep. 9, ECF No. 25-16, PageID.365; Ebert Decl. ¶¶10-12, ECF No. 25-17, PageID.375–76. FSM Gunn was tasked with preparing a "Workplace Violence Investigation Summary" for the WPV Committee, which consisted of a summary of the incident, summaries of Meadows's, Ramon's, Moore's and FMS Mohammed's  statements, as well as Gunn's

10

findings and recommendation. The investigation summary did not disclose anyone's race. Gunn found that Marshall initiated the confrontation with Meadows, and when Meadows requested that Marshall "back off," Marshall instead followed Meadows as she was walking away. *Id.* Gunn did not believe there was a violation of the WPV Policy, and he recommended that Marshall be issued a Formal Verbal Coaching ("FVC") under Delta's disciplinary guidelines[1] for initiating the confrontation with Meadows, and that Meadows be issued a FVC for making the "I will take you down" statement, which he noted she admitting to making "when speaking with MCO Leadership." *Id.* Gunn testified that he viewed Meadows's "I will take you down" statement as an argument or defensive stance and that he believed that Marshall instigated the crew conflict. Gunn Dep. 14–17, 30, 33, ECF No. 25-12, PageID.342, 346. However, the final determination as to whether Meadows's and/or Marshall's conduct violated Delta's WPV Policy was to be made by the WPV Committee. Vanneman Decl. ¶ 4, ECF No. 25-19,

---

[1] Delta's disciplinary guidelines, referred to as "Performance Development," provide several levels of discipline, ranging from Verbal Coaching (formal and informal), Written Coaching, Corrective Action Notice ("CAN"), and the Final Corrective Action Notice ("FCAN"). ECF No. 25-20. Delta's approach to discipline is not progressive in nature; rather, Delta issues the appropriate level of discipline based on several considerations, including the nature and seriousness of the policy violation and the employee's length of service, among other things. *Id.* Thus, an FCAN may be issued to an employee who commits a serious policy violation that warrants a higher level of discipline. *Id.*

PageID.386; *see also* Gunn Dep. 30, ECF No. 25-12, PageID.346 ("I would say I would present the findings of the taunting and allow the workplace violence committee to determine if those actions were a violation of workplace violence.… I am not a decision maker as it comes to that.").

Delta maintains a strong policy against workplace violence. *The Way We Fly*, Delta's employee manual, provides that "Delta maintains a zero-tolerance policy towards workplace violence. [Delta] do[es] not tolerate violence or threats of violence against one another, [its] customers, aircraft or other people or property." *The Way We Fly* 6, ECF No. 25-21, PageID.403. Delta's Security Manual for Workplace Security similarly provides that "Delta Air Lines…has a policy of zero tolerance for acts or threats of workplace violence by anyone," and unequivocally states "[i]f it is determined that an act or a threat of workplace violence has been committed by an employee, serious administrative action will be taken, up to and including termination of employment." Security Manual 2, ECF No. 25-22, PageID.431. Delta's Workplace Violence Policy expressly prohibits "threatening or intimidating comments or gestures (even said in jest)" and "actual or threat of physical contact (such as hitting, pushing, shoving, kicking, touching, or assault)." *Id.* 3, PageID.432. Meadows testified that she was familiar with both documents and fully understood that a threat of violence in the workplace could result in serious discipline, including termination. Meadows Dep. 38–43, ECF No. 25-2, PageID.204–04.

Delta's Workplace Security Team—more commonly referred to as the Workplace Violence ("WPV") Committee—is comprised of cross-divisional subject matter experts from Delta's Corporate Security, Legal, and Equal Opportunity Departments, who review all cases involving an allegation of workplace violence to (a) determine whether a WPV policy violation occurred; and (b) recommend the appropriate level of discipline for cases involving a WPV Policy violation. Security Manual 6, ECF No. 25-22, PageID.435; Terry Dep. 10, 15, ECF No. 25-23, PageID.444–45. During the WPV Committee meeting, the subject matter experts are joined by base leaders that support the individual employee(s) whose conduct is being reviewed, and the HR representative who supports the base leaders, and the case is discussed as a group. Terry Dep. 14–15, ECF No. 25-23, PageID.445. In cases of policy violations, the WPV Committee makes a recommendation to the business unit and HR unit for the employee's discipline, up to and including termination. Security Manual 6, ECF No. 25-22, PageID.435; Terry Dep. 10, ECF No. 25-23, PageID.444.

Delta Director of Internal Security Programs, Christian Terry, routinely sits on the WPV Committee as the Corporate Security representative. Terry Dep. 7, 19, ECF No. 25-23, PageID.443, 446. Terry explained that while the base leaders have the ultimate discretion to adopt the WPV Committee's recommendation for discipline (inclusive of termination), the WPV Committee's recommendations are rarely

challenged. *Id.* 67–68, PageID.458. Terry also explained that while the WPV Committee's official duty is limited to determining whether there has been a violation of the WPV Policy and making discipline recommendations in cases where the WPV Policy violation is found, the WPV Committee may also call out other inappropriate or unprofessional behavior that violates Delta's other standing policies and recommend that the base leaders consider issuing discipline. *Id.* 68–69, PageID.458. The WPV Committee is also generally careful not to include any reference to an employee's race in its review process. *Id.* 65–66, PageID.457–58.

In accordance with its standard practice, on January 13, 2020, the WPV Committee reviewed the October 7, 2019 incident involving Meadows and Marshall, with DTW Base Manager Kara Vanneman and FSM Gunn presenting the case, supported by HR Manager Ebert. Vanneman Dep. 10, ECF No. 25-16, PageID.366; Vanneman Decl. ¶ 3, ECF No. 25-19, PageID.385; Ebert Decl. ¶¶ 11-12, ECF No. 25-17, PageID.375–76. Based on its review of all the evidence, the WPV Committee determined that Meadows's statement to "take down" another flight attendant—especially in light of her training as a police officer—was a verbal threat that violated the WPV Policy. Vanneman, 18–19, 20–21, ECF No. 25-16, PageID.368; Ebert Decl. ¶¶ 14-16, ECF No. 25-17, PageID.376–77. The Committee also found that Meadows failed to de-escalate the situation, which was her responsibility as a flight leader and something that Delta expected of her. Ebert Decl. ¶¶ 14-16, ECF No.

14

25-17, PageID.376–77. The WPV Committee recommended that Meadows receive a Final Corrective Action Notice ("FCAN") based on her tenure. *Id.* ¶16, PageID.377; Vanneman 1/24/2020 Email, ECF No. 25-24. An FCAN may be issued "to an employee who has received previous warnings [who] or commits an infraction Delta considers serious enough to warrant a higher level of discipline," up to a review for termination, and it remains in the employee's file "for 36 months or until the most recent written Performance Development expires." ECF No. 25-20, PageID.390. There was no mention of anyone's race, including the respective races of Meadows and Marshall, during the January 13, 2020 WPV Committee meeting. Ebert Decl. ¶ 13, ECF No. 25-17, PageID.376; Vanneman Decl. ¶ 6, ECF No. 25-19, PageID.386; Terry Dep. 65–66, ECF No. 25-23, PageID.457–58.

While the WPV Committee did not find Marshall's conduct on October 7, 2019 to be in violation of the WPV Policy, the WPV Committee nonetheless found that her conduct was inappropriate and unprofessional and violative of Delta's Rules of the Road and the Way We Fly, and thus warranted discipline. Vanneman Decl. ¶¶ 5, 7, ECF No. 25-19, PageID.386–87. DTW In-Flight Service ("IFS") leaders issued a Written Coaching to Marshall on March 12, 2020. *Id.*; Marshall Written Coaching, ECF No. 25-27. Pursuant to the Written Coaching, for the next 18 months, Marshall was ineligible for transfer, promotion, or special assignment outside of In-Flight Service and any bid for transfer,

15

promotion, or special assignment within In-Flight Service was subject to file review. ECF No. 25-27. The Court notes that the WPV Committee recommended more serious disciplines for both Meadows (FCAN) and Marshall (Formal Written Coaching) than Gunn had recommended, which was Formal Verbal Coaching for both.

On January 24, 2020, Vanneman sent an email to IFS Corporate Director Claudine Rydstrand explaining the WPV Committee's recommendation and advising that DTW leadership and HR supported the WPV Committee's recommendation to issue Meadows an FCAN. ECF No. 25-24. As an IFS Director who oversees multiple bases including Detroit, Minneapolis, and Cincinnati, Rydstrand frequently received detailed emails similar to what Vanneman provided on January 24, 2020. Rydstrand Dep. 11–12, 47–49, ECF No. 25-26, PageID.469, 478.

Because Rydstrand was unable to attend the initial WPV Committee meeting on January 13, 2020, she requested a follow-up call with the WPV Committee to ensure that the WPV Committee had taken into consideration that Meadows was under stress at the time of the crew conflict due to her family's situation and that she now denies making the "I will take you down" statement. *Id.* 37–38, PageID.475–76; Ebert Decl. ¶ 18, ECF No. 25-17, PageID.377.

The follow-up WPV Committee meeting occurred on February 27, 2020. Ebert Decl. ¶ 18, ECF No. 25-17, PageID.377. Between the time of the first WPV Committee meeting and this one, DTW IFS base leaders

received a written statement from Captain Patrick B Cooney, dated January 15, 2020. *Id.* ¶ 19.[2] Cooney stated that Marshall "barg[ed] into the flight deck" as he was speaking to Meadows, and "proceeded to yell at [Meadows] in a totally unprofessional manner and was quite disruptive." Cooney Statement, ECF No. 32-1, PageID.794. He stated that Meadows did not raise her voice and "responded to this event in a totally professional manner." *Id.* Cooney said, however, that he "never knew the circumstances that precipitated this event." *Id.* Because Cooney was not present when Meadows made the "I will take you down" statement to Marshall, his statement did not change DTW IFS Base Leaders' view of the case. Ebert Decl. ¶ 19, ECF No. 25-17, PageID.377–78. The WPV Committee upheld its determination and the recommendation for the FCAN for Meadows at the conclusion of the follow-up call. *Id.* ¶¶ 20–21, PageID.378; Rydstrand Dep. 38, ECF No. 25-26, PageID.76. Ultimately, DTW IFS leadership, including Base Manager Vanneman and Director Rydstrand, adopted the WPV Committee's determination and accepted its recommendation.

---

[2] Gunn testified that he had not obtained Cooney's statement earlier because he and other Leaders had "[r]eached out to the Piolets [sic] office to obtain a statement several times, and we did not receive a statement." Gunn Dep. 23–24, ECF No. 25-12, PageID.344.

### D.   Meadows Receives an FCAN for the October 7, 2019 Incident

On April 29, 2020, Saballa-Davis delivered Meadows's FCAN to her over the phone by reading the discipline verbatim. Meadows Dep. 191–92, ECF No. 25-2, PageID.241; Saballa-Davis Dep. 10–11, ECF No. 25-14, PageID.355;[3] Meadows FCAN, ECF No. 25-28. As of that date, Meadows understood that she was placed on an FCAN because her statement, "I will take you down," violated Delta's WPV Policy. Meadows Dep. 192, ECF No. 25-2, PageID.241. Meadows's FCAN removed her from the Purser program for 36 months. ECF No. 25-28.

After receiving her FCAN, Meadows contacted Rydstrand seeking to overturn her discipline pursuant to Delta's Open Door Policy. Meadows Dep. 192–94; 197–99, ECF No. 25-2, PageID.241–42; Rydstrand Dep. 19, ECF No. 25-26, PageID.471. Meadows had also reached out to other leaders during this time period. See ECF No. 25-29 (listing leaders Meadows "spoke with regarding either the FCAN document [she]

---

[3] Saballa-Davis explained that he delivered the FCAN over the phone to Meadows because "[i]t was during COVID" and Meadows "was on leave, so the letter would have been delivered after." Saballa-Davis Dep. 11, ECF No. 25-14, PageID.355. Saballa-Davis had also spoken with Meadows by phone one time prior to the April 29th phone call, with Meadows asking about the status of the investigation. *Id.* 10–11, PageID.355. Meadows states that she asked for a meeting between herself, Marshall, Captain Cooney, and other witnesses "to tell the story," so that she could confront the witnesses against her in front of DTW IFS leaders. Meadows Dep. 182–90, ECF No. 25-2, PageID.239–40. It does not appear that this meeting was held.

received and/or the investigation leading up to the FCAN document").
Meadows admitted in her deposition that she felt fully supported by
Rydstrand throughout this process. Meadows Dep. 247, ECF No. 25-2,
PageID.255.[4]

Following their initial email exchanges and telephone calls,
Rydstrand and Senior HR Manager Terrence Jackson agreed to an in-
person meeting with Meadows in Detroit on August 26, 2020. Rydstrand
Dep. 18, ECF No. 25-26, PageID.471; 8/24/2020 Email, ECF No. 25-30.
At this meeting, Meadows again denied telling Marshall "I will take you
down" and disputed FSM Mohammed's account. Rydstrand Dep. 19, 21,
ECF No. 25-26, PageID.471. Based on Meadows's representation,
Rydstrand and Jackson contacted FSM Mohammed regarding his
statement, and he confirmed that on October 7, 2019, Meadows admitted
to him that she told Marshall "I will take you down" and acknowledged

---

[4] Meadows states in her Response that she wrote a statement dated May
5, 2020 at the request of Mullen, that was shared with Rydstrand and
"other Delta managers" outlining the incident. *See* ECF No. 33-4,
PageID.1191–92. In that statement, Meadows states: "In my humble
opinion, I have experienced racism, bullying and sexism on [sic] the
workplace. This has caused be [sic] great disappointment and grief to the
point that I have sought professional counseling to aide me with
depression and anxiety." *Id.* However, this statement is an email written
by Meadows and sent to Meadows. It is not clear who it was shared with.
Rydstrand testified that if she got the email statement she would have
forwarded it to HR because investigating claims of discrimination are
"outside the scope of my role." Rydstrand Dep. 40–42, ECF No. 25-26,
PageID.476–77. Meadows asserts that her complaint of racism was never
addressed.

that her training as a police officer kicked in. *Id.* 21–24, 34–36 PageID.471–72, 475; Mohammed Decl. ¶10, ECF No. 25-8, PageID.321.

Rydstrand upheld the WPV Committee's recommendation for FCAN after speaking with FSM Mohammed, and she advised Meadows of her decision on or about October 26, 2020. 10/27/2020 Email, ECF No. 25-31. Meadows, however, remained in the Purser program through November 2020. *Id.* Meadows stopped working on international flights in January 2021 for personal reasons, though she is still employed as a flight attendant with Delta. Meadows Dep. 50–51, ECF No. 25-2, PageID.206.

### E. Meadows Brings This Lawsuit

Meadows then brought this lawsuit against Delta, Saballa-Davis, and Gunn alleging intentional race discrimination in violation of Title VII (Count I) and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") (Count II). ECF No. 4.

Defendants Delta, Saballa-Price, and Gunn have filed a motion for summary judgment, seeking dismissal of Meadows's claims. ECF No. 26. Meadows filed a Response in opposition to Defendants' motion, ECF No. 29, and the Defendants filed a reply brief in support of their motion. ECF No. 35.

## II.   LEGAL STANDARD

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). No genuine material factual dispute exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the Court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. *Id.* The nonmoving party's evidence need not be in an admissible form. *Celotex v. Catrett*, 477 U.S. 317, 332 (1986). But he must "show that [he] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (emphases in original).

## III.   DISCUSSION
### A. Meadows's Claims Against Individual Defendants Saballa-Davis and Gunn

Defendants first argue that Meadows cannot establish individual liability against Defendants Saballa-Davis and Gunn under either Title VII or the Michigan ELCRA. Meadows did not to respond to these arguments and thus could be found to have waived any argument in opposition. *See Alexander v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018) (a party waives an argument when she "fails to address [the argument] in response to a motion for summary judgment"); *Brown v.*

*VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (Sixth Circuit "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *see also United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009) ("To preserve [an] argument... the litigant not only must identify the issue but also must provide some minimal level of argumentation in support of it.").

However, even if Meadows did not waive opposition to this argument, the Court would nevertheless find that Meadows's claims against Defendants Saballa-Davis and Gunn should be dismissed.

### 1. There is no individual liability under Title VII

It is well settled that Title VII imposes liability on employers only. Supervisors, managers, or other employees may not be held liable as individuals for violating its provisions. *See Post v. Trinity Health-Michigan*, 44 F.4th 572, 578 (6th Cir. 2022) (citing *Hiler v. Brown*, 177 F.3d 542, 545–47 (6th Cir. 1999)); *Wathen v. General Elec. Co.*, 115 F.3d 400, 404–06 (6th Cir. 1997) ("In sum, we find that the statute as a whole, the legislative history and the case law support the conclusion that Congress did not intend individuals to face liability under the definition of 'employer' it selected for Title VII."). Plaintiff's counsel agreed at the hearing on this motion that he was not asserting claims against Saballa-Davis or Gunn under Title VII. Thus, Plaintiff's Title VII race discrimination claim against Saballa-Davis and Gunn is **DISMISSED**.

## 2. Individual liability under the ELCRA

At oral argument on this motion, Plaintiff's counsel confirmed that he was asserting race discrimination claims against Saballa-Davis and Gunn under the Michigan ELCRA. While the Michigan ELCRA recognizes individual liability for persons who act as "agents" of the employer, MCL § 37.2201(a); *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 863 (Mich. 2005), Defendants argue that Meadows fails to allege that either Saballa-Davis or Gunn engaged in any acts that could sustain Meadows's ELCRA race discrimination claim against them.

The Michigan Supreme Court held in *Elezovic v. Ford Motor Company*, 697 N.W.2d 851, 863 (Mich. 2005), that "because employers can be held liable under the [ELCRA], and because agents are considered employers, agents can be held liable, as individuals, under the [ELCRA]." In *Elezovic v. Bennett (After Remand)*, 731 N.W.2d 452 (Mich. App. 2007), the Michigan Court of Appeals held that an individual becomes an "agent" for purposes of the ELCRA through "delegation of general supervisory power and authority," and that "[a]n agent can be held directly and individually liable *if he engaged in discriminatory behavior in violation of the [ELCRA] while acting in his capacity as the victim's employer.*" *Id.* at 458, 461 (emphasis added).

Defendants do not deny that Saballa-Davis and Gunn had supervisory power and authority over Meadows, but instead argue that neither Saballa-Davis nor Gunn were decision-makers with respect to

Meadows's FCAN and that they did not exhibit any discriminatory behavior. Saballa-Davis's conduct consisted only in informing Meadows of her FCAN over the phone, while Gunn's name appeared at the bottom of Meadows's written FCAN (which appears to be signed by Saballa-Davis on behalf of Gunn). Meadows FCAN, ECF No. 25-28; Meadows Dep. 191–92, ECF No. 25-2, PageID.241; Saballa-Davis Dep. 10–11, ECF No. 25-14, PageID.355. While Saballa-Davis did not participate in the investigation of the October 7, 2019 incident and only learned of the disciplinary recommendation after it was made by the WPV Committee, he nevertheless testified that he fully supported his Leadership Teams' recommendation. Saballa-Davis Dep. 17–19, ECF No. 25-14, PageID.356–47. However, when asked at her deposition how Saballa-Davis discriminated against her because of her race, Meadows only stated that "he knew the circumstances that, you know, Lynette [Marshall] confronted me and that Lynette is a white woman, I'm black, and he didn't show any type of concern; he didn't address if I needed anything after the incident," and that he did not organize a meeting that Meadows requested. Meadows Dep. 250–51, ECF No.25-2, PageID.256. She admits, however, that she is not aware that Saballa-Davis arranged such a meeting in any context that would suggest disparate treatment. *Id.* Meadows in fact has failed to argue in her Response how Saballa-Davis engaged in any racially discriminatory behavior toward her or displayed any racially discriminatory animus with respect to her

discipline for the October 7, 2019 incident. Meadows has failed to demonstrate that a reasonable jury could find that Saballa-Davis intentionally discriminated against her, and he therefore is not liable to Meadows under the ELCRA. *Elezovic*, 731 N.W.2d at 461.

Gunn, an African American, participated in the WPV Committee's investigation as Meadows's FSM and he issued Meadows's FCAN based on the WPV Committee's finding that she violated with WPV Policy. ECF No. 25-28. However, Gunn testified that he was not a decision maker as to whether Meadows's actions constituted a violation of the WPV Policy. Gunn Dep. 30, ECF 25-12, PageID.346. And, as Meadows recognizes in her Response, in his own investigative report, Gunn concluded that Meadows had *not* committed a Workplace Violence offense and he recommended the same discipline for both Meadows and Marshall— Formal Verbal Coaching—in his WPV Investigation Summary. ECF No. 28-18. This negates any inference of racial animus by Gunn. His recommendation was overturned by the WPV Committee. In addition, when Meadows was asked to name the individuals she accuses of discriminating against her based on her race, she did not name Gunn. *See* Meadows Dep. 247–53, ECF No. 25-2, PageID.255–56. At the hearing on this motion, Plaintiff's counsel stated that Meadows's intentional discrimination claim against Gunn is based only on the fact that his name appears on the FCAN issued to Meadows. The Court finds that Meadows has failed to present any evidence of racial animus by Gunn or that Gunn

engaged in discriminatory behavior towards Meadows based on her race, and consequently there is no evidence in support of the claim that he is liable to her under the ELCRA. *Elezovic*, 731 N.W.2d at 461.

Accordingly, the Court **DISMISSES** Meadows's Title VII and ELCRA claims against Defendants Saballa-Price and Gunn. But, even if the Court did find a basis for individual liability of Saballa-Price or Gunn under the ELCRA, Meadows's claims against those defendants nevertheless would be dismissed for the reasons that follow.

### B. Meadows's Title VII and ELCRA Race Discrimination Claims

Meadows's race discrimination claims under Title VII and the ELCRA are analyzed under the same standard. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999); *Blick v. Ann Arbor Pub. Sch. Dist.*, 516 F. Supp. 3d 711, 721 (E.D. Mich. 2021) (Davis, J.), *aff'd*, 105 F.4th 868 (6th Cir. 2024).

Meadows does not provide any evidence that anyone in a decision-making position at Delta made any express race-based comments, and so her race discrimination claims must rely on circumstantial evidence. In such case, the burden-shifting approach, first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973), applies. *See Johnson v. Kroger Co.*, 319 F.3d 858, 865–66 (6th Cir. 2003). Under that framework, Meadows must present a prima facie case of unlawful discrimination. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000) (citing

26

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981)). Once she has done so, the burden shifts to Defendants to "articulate some legitimate, nondiscriminatory reason" for taking the challenged action. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). If Defendants satisfy that burden, Meadows must then prove, by a preponderance of the evidence, that the proffered reason for Defendants' actions is not the true reason, but rather a pretext for discrimination. *Id.*

Defendants argue that Meadows has failed to establish a prima facie case of race discrimination under Title VII and under the ELCRA. Defendants further contend that, even assuming Meadows had established a prima facie case, Delta has articulated a legitimate, non-discriminatory reason for Meadows's discipline and that Meadows has failed to produce any evidence suggesting this was a pretext for unlawful discrimination. Defendants argue they are therefore entitled to summary judgment on Meadows's Title VII and ELCRA intentional race discrimination claims.

### 1. Prima facie case

To establish a prima facie showing of discrimination based on indirect evidence under Title VII, Meadows must introduce sufficient evidence that (1) she was a member of the protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) similarly-situated non-protected employees were treated more favorably. *McDonnell Douglas,* 411 U.S. at 802; *Jackson v. VHS Detroit*

27

*Receiving Hosp., Inc.*, 814 F.3d 769, 776–77 (6th Cir. 2016). To be considered "similarly situated" under the fourth prong, the alleged comparator:

> must have [1] dealt with the same supervisor, [2] have been subject to the same standards and [3] have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). The Sixth Circuit has explained that the *Mitchell* factors do not require a plaintiff to "demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated;' rather, ... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the *relevant* aspects.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Further, the Court examines the plaintiff's and comparators' conduct and surrounding circumstances from the perspective of the employer at the time it took the adverse action. *See Oliver v. St. Luke's Dialysis LLC*, 491 F. App'x 586, 588 (6th Cir. 2012) (holding that a proposed comparator did "not qualify as similarly situated because no evidence suggest[ed] his supervisor ever knew about the" conduct that was allegedly comparable to that of the plaintiff); *Laney v. Ohio Dep't of Youth Servs.*, 448 F. App'x 553, 556 (6th Cir. 2011) ("[Plaintiff] can hardly fault her employer for not meting out discipline for infractions it did not know about.").

28

Defendants argue that Meadows's discrimination claims fail at the fourth prong of her prima facie case. Specifically, Defendants argue that Meadows and Marshall were not similarly situated because they did not engage in the same conduct—Marshall's conduct on October 7th was found to be inappropriate and unprofessional, warranting discipline. But Meadows's behavior was found to be violative of Delta's WPV Policy based on her reported statement to Marshall that "I will take you down" and her known status as a reserve police officer. Marshall's conduct was different; it did not involve a workplace violence claim. Further, Meadows was a Purser-qualified flight attendant in a leadership position and entrusted to de-escalate situations, and Marshall wasn't.

Meadows on the other hand argues that she and Marshall engaged in similar conduct on October 7th, or that Marshall was the aggressor in the situation rather than Meadows. Yet Meadows received a harsher discipline.

Meadows's burden at the prima facie stage is "not onerous" and "poses a burden easily met." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (citing *Burdine*, 450 U.S. at 253). The similarly-situated element of the prima facie cases focuses on whether plaintiff and comparators "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (quoting *Mitchell*, 964 F.2d at 583).

"[T]his evaluation must be conducted independently of [the defendant's] proffered nondiscriminatory reason and must not conflate the prima facie and pretext stages of the *McDonnell Douglas* test." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011) (citation omitted). The Court performs a "more searching evaluation of the relative qualifications of the two candidates" when examining pretext. *Id.* at 813, 816 (explaining that the "prima facie case is meant simply to force a defendant to proceed with its case" and warning courts not to "push all the evidence into the prima facie stage."); *see also Louzon v. Ford Motor Co.*, 718 F.3d 556, 563 (6th Cir. 2013) (determining that the district court erred by requiring, at the prima facie stage, that comparators must have dealt with the same supervisor); *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396–97 (6th Cir. 2008) (the burden of producing evidence "is not appropriate at the *prima facie* state, but rather is better suited for the pretext stage that occurs later").

The Court finds, considering the evidence in the light most favorable to Meadows, that she has met her "not onerous" and "easily met" preliminary burden of establishing a prima facie case that she and Marshall, though not precisely the same, were sufficiently similarly situated. Both Meadows and Marshall are flight attendants and were both involved in the October 7, 2019 altercation and exhibited inappropriate and unprofessional conduct that warranted discipline. The circumstances of Delta's consideration of Meadows's Purser-qualified

status and her alleged statement to Marshall that "I will take you down" go more to Delta's proffered legitimate, non-discriminatory reason for its disciplinary decision and whether Meadows can demonstrate pretext. *See Provenzano*, 663 F.3d at 813. Meadows therefore has satisfied her prima facie burden.

## 2. Legitimate non-discriminatory reason

If a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802. Defendants state that the cross-divisional WPV Committee independently determined, based on the evidence before it, that Meadows's statement to Marshall, "I will take you down," was a verbal threat that violated Delta's WPV Policy, warranting an FCAN.

Violation of work rules constitutes a legitimate, non-retaliatory basis for Delta's actions. *See Romans v. Michigan Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012). Employee misconduct is a legitimate basis for an adverse employment action, and the Sixth Circuit has held that threatening statements constitute legitimate reasons for discipline or termination. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (collecting cases); *Bormuth v. Dahlem Conservancy*, 837 F. Supp. 2d 667, 675 (E.D. Mich. 2011) (Steeh, J.). Defendants therefore have met their burden to articulate a legitimate, non-discriminatory reason for Meadows's discipline.

### 3. Pretext

When a defendant offers a legitimate, non-discriminatory reason for its employment decision, the burden shifts to the plaintiff to show that the proffered reason is merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. The burden of persuasion rests with the plaintiff at all times. *Hunter v. Sec'y of the U.S. Army*, 565 F.3d 986, 996 (6th Cir. 2009). Accordingly, it is Meadows's burden to demonstrate at least a genuine dispute of material fact over whether Defendants' proffered reason for her discipline was a pretext for a prohibited discriminatory act. *See Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014).

"[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 612 (6th Cir. 2019) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). Whichever method is employed, "a reason cannot … be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (citation omitted).

Defendants argue that Meadows cannot show that that Delta's legitimate, non-discriminatory reason for Meadows's FCAN was a

pretext for discrimination because she cannot show that the disciplinary decision was not based in fact, that the stated reason—violation of the WPV Policy—did not motivate the discipline, or that the stated reason was insufficient to justify her discipline. Marshall's OCC and SRS Reports on the date of the incident reported that Meadows told her "I will take you down." FSM Mohammed interviewed both Meadows and Marshall shortly after the altercation and he also reported that Meadows admitted to making the alleged statement "I will take you down," and that she also referred to her police training. FSM Gunn then investigated the incident, including interviewing flight attendants Ramon and Moore, and his WPV Investigation Summary made DTW IFS leaders and the WPV Committee aware of that information. After the WPV Committee made its recommendation to issue an FCAN to Meadows, Rydstrand confirmed FMS Mohammed's account of his discussion with Meadows on the date of the incident before also upholding Meadows's FCAN. Delta argues that it relied on its honestly held and reasoned belief, based on the particularized facts before it, that Meadows engaged in conduct violative of Delta's WPV Policy when deciding her discipline.

In assessing the viability of a pretext claim, the "honest belief" of the employer in its investigation can defeat a charge that the legitimate reason given is pretextual.  The Sixth Circuit has explained:

> The honest-belief rule provides that an employer is entitled to "summary judgment on pretext even if its conclusion is later

> shown to be mistaken, foolish, trivial, or baseless." *Chen v.
> Dow Chem. Co.,* 580 F.3d 394, 401 (6th Cir.2009) (internal
> quotation marks omitted). An employer's pre-termination
> investigation need not be perfect in order to pass muster
> under the rule. *Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d
> 274, 285 (6th Cir.2012) (holding that an employer need not
> demonstrate that its investigation was "optimal or that it left
> no stone unturned"). The key inquiry is instead "whether the
> employer made a reasonably informed and considered
> decision before taking an adverse employment action." *Id.*
> (internal quotation marks omitted). And to rebut an
> employer's invocation of the rule, the plaintiff must offer some
> evidence of "an error on the part of the employer that is too
> obvious to be unintentional." *Id.* at 286 (internal quotation
> marks omitted).

*Loyd*, 766 F.3d at 590–91; *see Wright v. Murray Guard Inc.*, 455 F.3d 702,

708 (6th Cir. 2006) ("[T]he key inquiry is whether the employer made a

reasonably informed and considered decision before taking an adverse

employment action.") (quoting *Burdine*, 450 U.S. at 256).

Meadows argues in her Response brief that Delta's stated basis for

her discipline is a pretext for discrimination because (1) no one on the

plane corroborated that Meadows said; "I'll take you down;" (2) Delta

ignored Gunn's recommendation that Meadows's "I will take you down"

statement did not constitute an act of workplace violence (3) the WPV

Committee did not take into account Captain Cooney's statement; (4)

Defendants' 30(b)(6) witness did not attend the WPV Committee meeting

regarding Meadows; (5) the WPV did not consider Ramon's and Moore's

statements; and (6) Delta did not investigate Meadows's complaint of

race discrimination. Meadows's counsel advanced most of these same arguments at the hearing.

None of Meadows's claims regarding pretext undermine Delta's position that it had a well-founded belief, based on the particularized facts before the WPV Committee, that Meadows engaged in behavior that violated the WPV Policy. Meadows denies she made the "I will take you down" statement and argues that the WPV Committee should have instead credited the statements of flight attendants Ramon and Moore and Captain Cooney over those of Marshall and Mohammed.[5] However, the WPV Committee was presented with summaries of Ramon's and

---

[5] Meadows's argument that Defendants' references to the WPV Committee should be stricken is readily rejected. Meadows claims that there are no "documented" findings of the Committee and that Defendants' Rule 30(b)(6) witness testified that he did not personally participate in the WPV Committee's review of the October 7, 2019 incident. However, Christian Terry was proffered to testify "about information known or reasonably available to the organization," and not as a fact witness. *See* Fed. R. Civ. P. 30(b)(6); *Weber Mfg. Technologies, Inc. v. Plasan Carbon Composites, Inc.*, No. 14-12488, 2016 WL 8114507, at *5 (E.D. Mich. July 26, 2016) (Davis, M.J.) (recognizing that "the designated [30(b)(6)] person does not need personal knowledge of the facts to which he testifies"). Meadows ignores that Defendants proffered the testimony of Kara Vanneman, Christian Gunn, and Claudine Rydstrand, and the declaration of Courtney Ebert, all of whom participated in one or both WPV Committee reviews of the incident and testified about the Committee's review and finding of a WPV Policy violation by Meadows. In addition, Meadows's FCAN explains that her discipline was due to violation of the WPV Policy, ECF No 25-28, and Vanneman's January 24, 2020 email to Rydstrand provides the findings of the WPV Committee. ECF No. 25-24.

Moore's statements at the January 13th meeting, and Captain Cooney's statement was available to the Committee when it re-evaluated this incident. While it is true that neither Ramon, Moore, nor Captain Cooney corroborate Marshall's claim that Meadows made the "I will take you down statement," neither do they dispute it. Ramon, Moore, and Captain Cooney admit in their statements that they did not hear all of the actual exchange between Meadows and Marshall. Cooney Statement, ECF No. 4, PageID.33 (admitting that he "never knew the circumstances that precipitated this event"); Meadows Dep. 79–81, ECF No. 25-2, PageID.213 (admitting that Captain Cooney was not present during Meadows's initial encounter with Marshall); Ramon and Moore Statements, ECF No. 25-15, PageID.360–61. Therefore, those three individuals' statements cannot establish that Delta's decision had no basis in fact. And, most significantly, although they suggest that Marshall may have been the instigator of the confrontation and that she behaved in an inappropriate and unprofessional manner, they do not contradict or address the key factual question of whether Meadows made the "take-down" statement. *See Romans*, 668 F.3d at 839 (the defendant's "well-founded belief in the particularized facts that were set forth in the Summary of Investigation at the time Plaintiff was fired" is not undermined by the plaintiff's dispute of two of the disciplines considered in the investigation).

The only directly contradictory evidence before the WPV Committee was Meadows's own statement denying that she made the "take-down" statement. And this Delta had to weigh against the report of FMS Mohammed that Meadows made the alleged statement, which was based on his interview of Meadows on the day of the incident—where he records that she admitted making the statement and giving the reason why: that her police training had kicked in and she used those words to get Marshall to back off. Meadows has not proffered any evidence that FMS Mohammed, who had never met Meadows before the October 7, 2019 incident, harbored any racial animus or otherwise had any reason to fabricate his report that Meadows admitted to him that she made the "I will take you down" statement. The reliability of Mohammed's statement is enhanced by the fact that it includes Meadows's explanation that she made the take-down statement because of her law enforcement training. Mohammed would have no way of knowing such a fact unless disclosed by Meadows. It was a true fact that only could have come from Meadows. And such a disclosure makes no sense outside the context in which Mohammed says it was made: as an explanation for why she used the words "I will take you down." Thus the context and timing of Mohammed's report of Meadows' statement has a high indicia of reliability.

That the WPV Committee's disciplinary recommendation differed from Gunn's does not establish pretext. Gunn found, like the WPV

Committee did, that Meadows made the "I will take you down statement," and that she "admitted to using this phrase when speaking with MCO Leadership." ECF No. 25-18, PageID.383. While Gunn recommended finding that this statement was not a violation of the Workplace Violence Policy, *id.*, he testified that he is "not a decision maker as it comes to that" and that the WPV Committee makes that determination. Gunn Dep. 30, ECF No. 25-12, PageID.346. And while Gunn recommended issuing a Formal Verbal Coaching to each party, the WPV Committee recommended issuing harsher penalties to both Meadows (an FCAN) and Marshall (a Formal Written Coaching). Meadows admits that any employee who violates the Workplace Violence Policy is subject to discipline, up to and including termination. Meadows Dep. 42–43, ECF No. 25-2, PageID.204. Thus, she concedes that Defendants' stated reason was sufficient to warrant the discipline she received. The Court further notes that the WPV Committee did not find Marshall blameless in this incident. It found she escalated the conflict, admitted to using personal information in an unkind and unprofessional manner, and that her comments were inappropriate, unprofessional, and did not meet Delta's expectations of conduct in the workplace. Marshall Written Coaching, ECF No. 25-27, PageID.481.

Meadows also contends in her Response that she made an allegation of race discrimination to Delta that Delta failed to investigate and that this evidences a "pattern" of race discrimination. Meadows

testified this allegation was made for the first time to Delta on April 30, 2020, after Delta had issued her the FCAN at issue in this lawsuit. Meadows Dep. 199–205, 210–12, ECF No. 25-2, PageID.243–44, (stating she reached out to Rydstrand after she received her discipline), 246 (stating this was the first time she brought up a concern with racism). An allegation made after the disciplinary decision had been made cannot support Meadows's intentional discrimination claim in this case and is not evidence of a "pattern of race discrimination."[6]

Further, Defendants presented evidence dispelling an inference of intentional discrimination. During the same time period the WPV Committee was considering Meadows's discipline, the WPV Committee and Delta leaders issued an FCAN to another Purser-qualified flight attendant, Dana Smith, a Causasian, who was involved in a crew conflict onboard. The WPV Committee determined that Smith's conduct—a

---

[6] Meadows cites *McLemore v. Detroit Receiving Hospital & Union Medical Center*, 493 N.W.2d 441 (Mich. App. 1992) and *Meyer v. City of Center Line*, 619 N.W.2d 182 (Mich. App. 2000), in support of her argument. However, *McLemore* and *Meyer* did not involve intentional discrimination claims and therefore are inapposite. *McLemore* involved a claim of retaliatory discharge, not intentional discrimination, and whether raising "the spectre of a discrimination complaint" was a protected activity supporting a prima facie case of retaliation. *McLemore*, 493 N.W.2d at 443. And *Meyer* involved a retaliation claim and whether "a supervisor's decision not to take action to stop harassment by co-workers in retaliation for an employee's opposition to a violation of the Civil Rights Act can constitute an adverse employment action." *Meyer*, 619 N.W.2d at 189.

verbal altercation that escalated to Smith "pointing rolled silverware during [her] discussion"—violated Delta's WPV Policy and similarly suspended her from the Purser program for 36 months. Smith FCAN, ECF No. 25-25, PageID.464; Ebert Decl. ¶¶ 24–24, ECF No. 25-17, PageID.378–79. A reasonable jury could not find, on these facts that the WPV Committee harbored a hidden racial animus for its disciplinary decision. In addition, Meadows has not disputed that during the WPV Committee's review of the October 7, 2019 incident, there was no mention of the race of any of the participants.

Meadows also relies on *Henderson v. Delta Airlines, Inc.*, No. 19-10441, 2021 WL 463682 (E.D. Mich. Feb. 9, 2021) (Robert, J.) in support of her discrimination claim. In *Henderson*, the plaintiff, an African American female and former flight attendant, alleged that she had been discriminated and retaliated against based on her race and sex and denied a reasonable accommodation of her disability. *Id.* at *1. Henderson and a fellow flight attendant, Danial Boas, a white male, got into an altercation before and during a flight. The incident was referred to the WPV, which determined that neither Henderson's nor Boas's conduct violated the WPV Policy, and recommended issuing Corrective Action Notices ("CANs") to both Henderson and Boas. *Id.* at *2. Henderson was subsequently terminated, however, because Delta found she engaged in additional alleged violations, including alleged use of her phone in violation of Delta's safety policy and alleged misrepresentation

in connection with her workers' compensation claim. *Id.* at *3. The court found that, because Delta terminated Henderson for her involvement in inappropriate conduct in addition to the incident with Boas, Henderson and Boas were not similarly situated and thus Henderson's race and sex discrimination claims failed. *Id.* at *3–4. At the same time, however, the court found that Henderson raised a genuine issue of material fact as to her retaliation claim after she complained of gender and race discrimination, in part because she provided her statement, corroborated by the statements of two other flight attendants, that Boas was the aggressor and "attempted to lunge over carts and 'get at' Henderson." *Id.* at *6.

Unlike *Henderson*, the WPV Committee in this case determined that Meadows, but *not* Marshall, had violated the WPV Policy because the statement "I will take you down" was a potential threat of violence. Meadows's conduct thus differed from Boas's and Henderson's, who were not found to have violated the  WPV policy. In addition, as discussed above, Meadows has not provided any corroborating evidence that she did not make the "I will take you down" statement, while Henderson did.

The Sixth Circuit has explained that when facing summary judgment, "the 'plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants ... did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action.'" *Tingle v.*

41

*Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001)). "The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process." *Id.* An unadorned argument that "the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question and fails to create a genuine issue of material fact." *Id.* (quoting *Seeger*, 681 F.3d at 285).

The Sixth Circuit has explained that the plaintiff and comparator are not required to "commit exactly the same mistake in order to permit a reasonable inference of intentional discrimination from their differential discipline." *Jackson*, 814 F.3d at 782. However, "a plaintiff cannot establish a reasonable inference of discriminatory motive based on her 'employer's more severe treatment of more egregious circumstances.'" *Id.* at 777 (quoting *Clayton*, 281 F.3d at 612). And employers enjoy considerable latitude when deciding exactly what makes some circumstances "more egregious" than others. *See Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 503 (6th Cir. 2009) (rejecting proposed comparator where the employer deemed plaintiff's falsification of a document to be "serious" but not her proposed comparator's violations of safety rules); *Klepsky v. United Parcel Serv.*, 489 F.3d 264, 272–73 (6th Cir. 2007) (finding that the omission of relevant medical history and the forgery of another employee's signature were "not sufficiently similar to raise an implication of pretext" "although both involved dishonesty");

42

*Clayton*, 281 F.3d at 612 (rejecting proposed comparators who had "engaged in the same acts of negligence" but whose negligence did not cause injury to a coworker like the plaintiff's did).

A review of the record evidence in this case, looked at in the light most favorable to Meadows, demonstrates that Delta made an informed and reasoned business decision, following a fulsome investigation, to credit Marshall's and Mohammed's reports of the incident over Meadows's recantation of her statement. An employer's investigation need not be perfect to support an "honest belief" that the discipline was appropriate. And Meadows cannot establish pretext by merely second-guessing that business decision, as Plaintiff's counsel requested the Court do at the hearing on this motion. *See Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 848 (6th Cir. 2015) (explaining that, in determining whether pretext exists, it is not the court's role to "act as a super personnel department that second guesses employers' business judgment"); *Romans*, 668 F.3d at 839 ("Although Plaintiff contests the validity of at least two of [his] disciplines [that form the basis of the termination decision], this dispute is immaterial because it does not undermine [the employer's] well-founded belief in the particularized facts that were set forth in the Summary of Investigation at the time Plaintiff was fired."); *Heyden v. Morton Salt, Inc.*, No. 5:13CV1706, 2015 WL 1383654, at *9 (N.D. Ohio Mar. 25, 2015) ("[A] plaintiff cannot establish pretext by simply denying that he committed the conduct alleged or by

second-guessing the employer's business decision."). Indeed, as stated above, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.' " *Tingle*, 692 F.3d at 531 (citing *Chen*, 580 F.3d at 401).

While there is evidence that Marshall was the instigator of the October 7, 2019 incident, and that she admittedly made a rude comment to Meadows and thus engaged in inappropriate and unprofessional behavior, and there is also evidence that Meadows behaved in a professional manner when she attempted to walk away from the confrontation, the WPV Committee was clearly justified in concluding that the unfortunate language Meadows used invoked a threat of violence against Marshall. The Court finds that Meadows has failed to proffer evidence that Delta's stated reason for his discipline—that she made a threatening statement of "I will take you down" to Marshall, which violated Delta's WPV Policy—was pretextual, and that the real reason for her discipline was racial discrimination. Accordingly, viewing all the evidence in the light most favorable to Meadows, she has not raised a genuine issue of fact to overcome Defendants' legitimate, non-discriminatory reason for disciplining her, and Defendants are entitled to summary judgment on Meadows's Title VII and ELCRA discrimination claims.

## IV.   CONCLUSION

For the reasons state above, Defendants' Motion for Summary Judgment, ECF No. 25, is **GRANTED** and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

This is a final decision that closes the case.

**IT IS SO ORDERED.**

Dated: March 17, 2025          /s/Terrence G. Berg
                              HON. TERRENCE G. BERG
                              UNITED STATES DISTRICT JUDGE